RECEIVED

FEB - 2 2026

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

4-26-cv-52

Theodore Clark,

Plaintiff,

v.

Dallas County Sheriff's Office;
Dallas County, Iowa;
Sheriff Adam Infante, in his official and individual capacities, in his official and individual capacities;
Sgt. Nick Pearson, in his official and individual capacities;
Sgt. Neil Vanderlust, in his official and individual capacities;
Det. Adam Jacobs, in his official and individual capacities;
Deputy Wyatt Westburg, in his official and individual capacities;
Deputy Jalen Townsell, in his official and individual capacities;
Deputy Deavon Richards, in his official and individual capacities;
Unnamed Sgt. Badge #6 in 2025, in his official and individual capacities;
Rebecca Moser, in her individual capacity;
Iowa Division of Criminal Investigation;
Agent Matthew Papin, in his official and individual capacities;
Kara Bittner (f/k/a Kara Clark), in her individual capacity;
Keith Bittner, in his individual capacity;
Erin Helleso, in her individual capacity;
Candor Recovery & Counseling, Inc, in their business capacity;
Jaclyn Zimmerman, in her individual capacity;
George Millard, in his individual capacity;
Beverly Derry, in her individual capacity;
Deborah Vodenik, in her individual capacity;
Randy Vodenik, in his individual capacity;
Shelby Caruso, in her individual capacity;
Penny Scott, in her individual capacity;

Defendants.

COMPLAINT AND DEMAND FOR JURY TRIAL

Case No.: [To be assigned by Court]
Plaintiff, Theodore Clark ("Plaintiff"), Appearing Pro Se:

I. INTRODUCTION

1. This is an action brought under 42 U.S.C. § 1983 and 42 U.S.C. § 1985 for the deprivation of Plaintiff's civil rights guaranteed by the First, Fourth, Fifth, and Fourteenth Amendments specifically including the rights to due process, equal protection, freedom from unreasonable

searches and seizures, and freedom from malicious prosecution to the United States Constitution. Plaintiff also asserts claims under Iowa state law, including malicious prosecution, abuse of process, civil conspiracy, defamation, intentional infliction of emotional distress, and invasion of privacy.

2. This action arises from an orchestrated, multi-year criminal conspiracy involving private individuals and multiple Iowa law enforcement agencies, including the Dallas County Sheriff's Office ("DCSO") and the Iowa Division of Criminal Investigation ("DCI"). This conspiracy was designed to deprive Plaintiff of his constitutional rights, his liberty, and ultimately his children, through a campaign of fabricated evidence, false arrests, malicious prosecution, and the deliberate suppression of exculpatory information and credible threats against Plaintiff's life.

3. Defendants, acting individually and in concert, engaged in a pattern of willful misconduct, deliberate indifference, and gross negligence, resulting in Plaintiff's false arrest, illegal search and seizure, and profound emotional distress, while simultaneously protecting and enabling individuals known to law enforcement to be serial perpetrators of harassment, fraud, child abuse, and threats of violence.

4. Plaintiff seeks declaratory and injunctive relief, as well as compensatory and punitive damages in excess of the jurisdictional minimum, the precise amount to be Determined at trial, plus attorney's fees and costs pursuant to 42 U.S.C. § 1988

## II. JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

6. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as these claims arise from a common nucleus of operative fact and involve the same parties and transactions as the federal claims.

7. Venue is proper in the United States District Court for the Southern District of Iowa pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events or omissions giving rise to the claims occurred in Dallas County, Iowa, which is located within this District.

## III. PARTIES

8. Plaintiff Theodore Clark is an adult resident of DeSoto, Dallas County, Iowa. He is the biological father of C.C. (born 2018) and R.C. (born 2020) with Defendant Kara Bittner.

9. Defendant Dallas County Sheriff's Office a law enforcement agency of Dallas County, Iowa, responsible for providing police services within the county.

10. Defendant Dallas County, Iowa is a political subdivision of the State of Iowa, responsible for the actions and policies of the DCSO.

11. Defendant Sheriff Adam Infante is, and at all times relevant hereto was, the duly elected Sheriff of Dallas County, Iowa, and the chief policymaker of the DCSO. He is sued in his official and individual capacities.

12. Defendant Chief Deputy Bret Maxwell is, and at all times relevant hereto was, second in command with the DCSO acting under color of state law. He is sued in his official and individual capacities.

13. Defendant Sgt. Nick Pearson is, and at all times relevant hereto was, a Sergeant with the DCSO, acting under color of state law. He is sued in his official and individual capacities.

14. Defendant Sgt. Neil Vanderlust is, and at all times relevant hereto was, a Sergeant with the DCSO, acting under color of state law. He is sued in his official and individual capacities.

15. Defendant Det. Adam Jacobs is, and at all times relevant hereto was, a Detective with the DCSO, acting under color of state law. He is sued in his official and individual capacities.

16. Defendant Deputy Wyatt Westberg is, and at all times relevant hereto was, a Deputy with the DCSO, acting under color of state law. He is sued in his official and individual capacities.

17. Defendant Deputy Jalen Townsell is, and at all times relevant hereto was, a Deputy with the DCSO, acting under color of state law. He is sued in his official and individual capacities.

18. Defendant Deputy Deavon Richards is, and at all times relevant hereto was, a Deputy with the DCSO, acting under color of state law. He is sued in his official and individual capacities.

19. Defendant Unnamed Sgt. Badge #6 in 2025 is, and at all times relevant hereto was, a Sergeant with the DCSO, acting under color of state law. He is sued in his official and individual capacities.

20. Defendant Rebecca Moser, is, and at all times relevant hereto was, the records custodian for DCSO who allegedly obstructed public records requests in violation of Iowa Code Chapter 22. She is sued in her individual capacity.

21. Defendant Iowa Division of Criminal Investigation (DCI) is a statewide law enforcement agency of the State of Iowa, responsible for investigating serious crimes and assisting local law enforcement.

22. Defendant Agent Matthew Papin is, and at all times relevant hereto was, an agent with the DCI, acting under color of state law. He is sued in his official and individual capacities.

23. Defendant Kara Bittner (f/k/a Kara Clark) is an adult resident of Dallas County, Iowa. She is the former spouse of Plaintiff and the mother of their two minor children. She is sued in her individual capacity.

24. Defendant Keith Bittner is an adult resident of Dallas County, Iowa. He is the current partner of Defendant Kara Bittner and is sued in his individual capacity.

25. Defendant Erin Helleso is, and at all times relevant hereto was, a court-appointed custody evaluator/professional in Plaintiff's custody proceedings, acting in her individual capacity for actions taken outside the scope of any judicial immunity.

26. Defendant Candor Recovery & Counseling, Inc, is, and at all times relevant hereto was, a business entity operating in Iowa providing counseling and evaluative services. Defendant Erin Helleso was, at all times relevant hereto, an employee, agent, or apparent agent of Candor Recovery & Counseling, Inc, acting within the scope of her employment or agency. Candor Recovery & Counseling, Inc is sued in its business capacity under theories of vicarious liability, including respondeat superior, and direct liability for inadequate supervision, training, and quality control of its employees, including Defendant Helleso, and for its role in the conspiracy to violate Plaintiff's civil rights.

27. Defendant Jaclyn Zimmerman is, and at all times relevant hereto was, an attorney licensed in Iowa, representing Defendant Kara Bittner in various legal proceedings. She is sued in her individual capacity.

28. Defendant George Millard is an adult resident of Iowa, the grandfather of Defendant Kara Bittner, and is sued in his individual capacity.

29. Defendant Beverly Derry is an adult resident of Iowa, the great-aunt of Defendant Kara Bittner, and is sued in her individual capacity.

30. Defendant Deborah Vodenik is an adult resident of Iowa, the aunt of Defendant Kara Bittner, and is sued in her individual capacity.

31. Defendant Randy Vodenik is an adult resident of Iowa, the uncle of Defendant Kara Bittner, and is sued in his individual capacity.

32. Defendant Shelby Caruso is an adult resident of Iowa, the sister of Defendant Kara Bittner, and is sued in her individual capacity.

33. Defendant Penny Scott is an adult resident of Iowa, the mother of Defendant Kara Bittner, and is sued in her individual capacity.

IV. FACTUAL ALLEGATIONS

## A. Overview Background

34. Defendant Kara Bittner's Motive for Malicious Prosecution and False Allegations: Defendant Kara Bittner's aggressive and malicious campaign against Plaintiff, including the filing of multiple fraudulent protection orders, false police reports, and manipulation of state agencies, was driven by a self-serving motive to conceal her own substandard parental conduct and evade accountability. Her actions against Plaintiff were not based on legitimate concerns, but rather constituted a calculated and desperate attempt to deflect scrutiny from her own conduct, to undermine Plaintiff's established legal custody, and to create a false narrative that would prevent the exposure of her fundamental unsuitability as a parent. This ulterior motive fueled her malicious prosecution of Plaintiff and her repeated false allegations, demonstrating a clear intent to weaponize the legal system for personal gain.

35. This action concerns an orchestrated, multi-year criminal conspiracy between private individuals, multiple Iowa law enforcement agencies, and other state actors, designed to maliciously prosecute, falsely arrest, and intimidate Plaintiff, Theodore Clark, to deprive him of his constitutional rights, his liberty, and ultimately his children.

36. Violation of Constitutional Oath and Public Trust. Plaintiff alleges that Defendants Dallas County Sheriff's Office, Sheriff Adam Infante, Chief Deputy Bret Maxwell, Sgt. Nick Pearson, Sgt. Neil Vanderlust, Det. Adam Jacobs, Deputy Wyatt Westberg, Deputy Jalen Townsell, Deputy Deavon Richards, Unnamed Sgt. Badge #6 in 2025, Iowa Division of Criminal Investigation, Agent Matthew Papin, and Erin Helleso, as public officials or individuals acting under color of state law, each took a solemn oath to uphold and defend the Constitution of the United States and the Constitution of the State of Iowa. Their willful, malicious, and deliberate actions, as Detailed herein, constitute a profound breach of this sacred oath and a betrayal of the public trust, demonstrating a conscious and reprehensible disregard for Plaintiff's fundamental constitutional rights and the rule of law.

## B. Defendant Kara Bittner's Pattern of Fabricated Allegations and Abuse of Process 2021-2024

37. Defendant Kara Bittner has a documented pattern of fabricating allegations and abusing legal process to gain an advantage in custody disputes, demonstrating a malicious intent and a disregard for the truth.

38. November 9, 2021: First Fraudulent Ex Parte Protection Order (Kansas) – The Genesis of Malicious Prosecution.
> a. On or about November 9, 2021, Defendant Kara Bittner obtained a fraudulent Ex Parte Protection Order (EPO) against Plaintiff in Kansas, initiating a multi-year campaign of malicious prosecution and child endangerment.
> b. This EPO was obtained immediately after Plaintiff discovered Defendant Kara Bittner's extensive infidelity, revealing her motive was not genuine fear, but a calculated tactical

maneuver to gain an unlawful advantage in divorce proceedings and to protect her burgeoning romantic relationships.

c. Direct Evidence of Malicious Intent: Facebook Messages. Contemporaneous Facebook messages from Defendant Kara Bittner, preserved by Plaintiff, unequivocally demonstrate her malicious intent and abuse of process. For example, on November 9, 2021, she stated to her friend Misty: "I kinda think it's good it happened this way so I can get more help," and subsequently, "I'm going to ask for a 30-day extension so the divorce can get started." She further revealed her callous disregard for the children's well-being and her prioritization of her romantic interests by stating, "Josh is way better for them than he is laugh out loud," referring to her romantic partner. These statements directly contradict any claim of genuine fear and prove her ulterior, malicious motive.

d. Perjured Testimony to Obtain EPO. Defendant Kara Bittner falsely alleged to the Kansas court that Plaintiff had threatened to kill her and the children, a knowing fabrication. In reality, any alleged threat was directed at her romantic partner, Josh, and not at her or the children. Her sworn testimony to obtain the EPO constituted perjury.

e. Despite her false claims of fear, Defendant Kara Bittner simultaneously made Thanksgiving plans and coordinated romantic rendezvous with Josh, prioritizing his presence over her children's stability and further demonstrating the fraudulent nature of her allegations.

f. On December 8, 2021, the Kansas court, recognizing the fraudulent nature of the allegations, struck down the EPO, allowing Plaintiff to resume contact with Defendant Kara Bittner and the children, and return to his home.

g. Defendant Kara Bittner's actions in obtaining and weaponizing this EPO demonstrate a clear pattern of abusing legal process for personal gain, rather than genuine safety concerns, and constitute the foundation of her malicious prosecution of Plaintiff.

39. Profound Trauma and Parental Neglect Following the Fraudulent EPO

The fraudulent EPO in November 2021 initiated an intensely traumatic period for Plaintiff and his children. Based on these false allegations and the resulting court order, Plaintiff was forcibly removed from his home and separated from his children, C.C. and R.C., then 3 years old and 1 year old, respectively. During this period of Plaintiff's forced absence, Defendant Kara Bittner allowed her romantic partner, Josh Foreman, an individual known to Plaintiff with an extensive history of criminal activity and a pervasive pattern of moral turpitude, known to Kara Bittner as a screw up within his own family, with him not supposed to reside around his Nephews at his sisters residence due to his alcohol theft and consumption, to reside in Plaintiff's home with his children and belongings, while Plaintiff, then actively serving in the U.S. Army, was compelled to live in military barracks. Right before this, Josh, along with a married couple and their infant child (whose paternity was unknown), had been recently living transiently, involved in drug use, and were known to steal from their hosts. This egregious decision by Defendant Kara Bittner created an environment of profound instability, criminality, and severe child endangerment, directly exposing C.C. and R.C. to individuals engaged in illicit activities, prioritizing her illicit romantic entanglements over the safety and well-being of her vulnerable children. The preserved messages further expose Defendant Kara Bittner's profound disregard for her

children's safety, as she knowingly chose to introduce a demonstrably dangerous individual, prioritizing her illicit romantic entanglements over their well-being.

40. Escalating Threat: Josh's Access to Military Base and Kara's Reckless Indifference

Defendant Kara Bittner further exacerbated the immediate danger to the children by personally driving Josh onto and off the military base where Plaintiff was stationed, granting him access through the trusted traveller program, without declaring him to live at my on base residence without permission, which wouldn't have been permitted, without his business on the secure federal installation. This reckless facilitation, particularly given Josh's volatile nature and Kara's pattern of infidelity, which historically provoked extreme reactions from her partners. This conduct constitutes a grave breach of parental duty and further evidence of child endangerment under applicable Kansas child welfare and criminal statutes.

41. Intentional Infliction of Emotional Distress on Plaintiff

The emotional and psychological toll on Plaintiff was severe and immediate. He experienced extreme sleep disturbances, with sleep medication often proving ineffective, and suffered from profound emotional distress, including periods of debilitating rage stemming from the injustice of the situation and grave concerns for the safety and well-being of his children, knowing he was unable to intervene. This conduct constitutes intentional infliction of emotional distress.

42. When Plaintiff was finally permitted supervised visitation with his children, it was for limited periods and under the humiliating and restrictive condition of requiring an appointed individual from the Army to monitor interactions. This forced Plaintiff to conduct visitations in public places, further exacerbating the difficulty of parenting a 1-year-old and a 3-year-old under such demeaning circumstances and directly contributing to the children's distress.

43. Defendant Kara has engaged in a consistent and egregious pattern of maliciously using legal processes, particularly those related to custody and protection orders, to harass Plaintiff, gain unfair advantage, and inflict emotional distress. This pattern demonstrates a calculated intent to weaponize the legal system against Plaintiff, and is directly relevant to her malicious intent, abuse of process, and lack of credibility. Following the issuance of an initial protection order, during which Defendant Kara made multiple attempts to have Plaintiff arrested for purported violations. As evidenced by Defendant Kara's own communications in Facebook messages from that period, she actively sought opportunities to ensnare Plaintiff, including soliciting a friend to induce Plaintiff into messaging her friend to ask Kara something to create a pretext for arrest. Another instance involved Defendant Kara providing Plaintiff with spoiled milk for their child (C.C.). Upon discovering the milk was spoiled, Plaintiff disposed of it, and, concerned about the re-use of the contaminated container, left a small note on the bottle stating "wash please." Defendant Kara immediately attempted to use this innocuous and welfare-driven note as a basis to have Plaintiff arrested for violating the protection order, demonstrating her willingness to exploit even child welfare concerns for malicious ends.

44. Child Endangerment: Excessive Drinking, Drug Use, and Parental Abandonment

Upon the Kansas court striking down the fraudulent EPO on December 8, 2021, Plaintiff returned to his home for approximately four weeks before his relocation to Iowa. During this period, Defendant Kara Bittner's conduct further Deteriorated. She frequently engaged in excessive drinking and drug use, often staying out until minutes before Plaintiff had to leave for work. On multiple occasions, Plaintiff had to return home from his military duties as fast as he could to care for the children after finding Defendant Kara Bittner unable to properly care for them due to her excessive drinking and illicit activities. Such conduct constitutes child endangerment under Kansas child welfare and criminal statutes.

45. Defendant Kara Bittner repeatedly abandoned her minor children, both during the day and at night, for large swaths of time to engage in random sexual encounters with multiple individuals and other illicit activities. These actions demonstrate a profound disregard for the children's safety and well-being, prioritizing her personal gratification over her parental responsibilities, and constitute severe parental neglect and child endangerment under Kansas child welfare and criminal statutes.

46. Extensive Documentary Evidence of Infidelity, Neglect, and Malice

Furthermore, Plaintiff discovered extensive evidence of Defendant Kara Bittner's ongoing infidelity, severe parental neglect, and profound animosity towards Plaintiff. After accessing the computer, Plaintiff transferred thousands of messages from Defendant Kara Bittner's Facebook Messenger account from November and December. These messages, now preserved, contain raw, unedited communications between Defendant Kara Bittner and her friend Misty, her romantic partner Josh, her sister Shelby Caruso, and fifteen distinct sexual partners. These communications explicitly expose Defendant Kara Bittner's pattern of abandoning her minor children, C.C. and R.C., while she entertained sexual partners and engaged in excessive partying, all to the severe Detriment of the children's care and emotional development. This extensive body of evidence proves the fraudulent nature of the 2021 EPO and the subsequent 2024 EPO, which also relied on fabricated past events, and demonstrates her pattern of perjury and abuse of process.

47. The content of these messages, and Defendant Kara Bittner's conduct during this period, establish her extreme malice and hatred towards Plaintiff for discovering her infidelity. They demonstrate her willingness to lie, fabricate allegations, and abuse the legal process without compunction, confirming her motive and culpability for subsequent events and the ongoing conspiracy.

48. Documented Psychological Abuse and Child Endangerment (C.C)

The trauma inflicted upon C.C. by Defendant Kara Bittner's actions and Plaintiff's forced absence was profound. C.C. began pulling out his hair, a clear manifestation of severe distress and longing for Plaintiff. This behavior necessitated a haircut, which Defendant Kara Bittner

facilitated. Despite this clear evidence of C.C.'s suffering due to Plaintiff's removal, Defendant Kara Bittner later attempted to falsely blame Plaintiff, asserting that C.C.'s hair pulling had occurred 'beforehand' as a justification for her actions. This assertion is demonstrably false, and Plaintiff possesses video recordings in which C.C. explicitly confirms the true cause of his distress, thereby exposing Defendant Kara Bittner's consciousness of guilt and willingness to further abuse C.C. psychologically. This conduct constitutes psychological abuse and child endangerment under Kansas child welfare and criminal statutes.

49. Child Exploitation and Extreme Indifference to C.C.'s Trauma (Shelby Caruso & Kara Bittner). The callousness of Defendant Kara Bittner and Defendant Shelby Caruso towards C.C.'s emotional trauma is further evidenced by their grotesque communications. In a series of Facebook messages, Defendant Kara Bittner recounted C.C. talking about a scary ghost, and stating 'my dada is gonna die.' Rather than offering comfort or concern for C.C.'s distress, Defendant Shelby Caruso and Defendant Kara Bittner engaged in a disturbing conversation, speculating about putting C.C. in a trance, trying to get into C.C.'s head to communicate with him that way. This exchange highlights their complete disregard for C.C.'s emotional well-being and their willingness to exploit a child's suffering for their own perverse narratives, constituting child exploitation and child endangerment under Kansas child welfare and criminal statutes.

50. Sustained Pattern of Neglect During Critical Developmental Period

During this period, C.C., who previously preferred Plaintiff to attend to his needs, was left lost and vulnerable, forced to rely on Defendant Kara Bittner. However, Defendant Kara Bittner was consistently preoccupied with her phone, engaging in sexually explicit conversations, entertaining Josh, consuming alcohol profusely, and actively plotting Plaintiff's ruin, all to the severe Detriment of C.C.'s care and emotional development. This sustained pattern of neglect and emotional deprivation constitutes child endangerment under Kansas child welfare and criminal statutes.

51. Defendant Kara Bittner's Pervasive Pattern of Deception, Manipulation, and Abuse of Legal Process (2021-Present)

Defendant Kara Bittner has a deeply ingrained and pervasive pattern of deception, manipulation, and abuse of legal process, consistently fabricating allegations, concealing material facts, and weaponizing court proceedings to gain an unfair advantage in custody disputes and to financially exploit her partners. This pattern evidenced a profound disregard for the truth, the welfare of her children, and the integrity of the judicial system.

52. Pattern of Financial Exploitation and Deliberate Evasion of Court Orders (2022-Present)

Following the 2022 divorce judgment in Kansas, Plaintiff was ordered to pay Defendant Kara Bittner approximately $440 per month. However, the Kansas judgment also mandated that Defendant Kara Bittner was solely responsible for providing all child-related necessities, including but not limited to bed sheets, diapers, Halloween costumes, baby wipes, shoes,

hoodies, and clothes, for the children even when they were in Plaintiff's care. This unique structure was designed to offset the monthly payment. Despite this clear court order, Defendant Kara Bittner never provided any of these items, mocking Plaintiff's requests and asserting she was not obligated to do so. She successfully evaded these court-ordered responsibilities until the divorce judgment was restructured in Iowa in 2023. At that time, the amount Plaintiff owed her was adjusted downward, but Plaintiff was still compelled to pay her around $330 per month based on the prior judgment, a judgment that heavily favored Kara due to Plaintiff's pre-emptive, pre divorce papers financial transfers to protect his children's assets from both Kara and Josh. This financial inequity, where Plaintiff consistently paid while Kara deliberately evaded her obligations, was a source of great revelry for Defendant Kara Bittner. For February 2025, a new court order mandated that Defendant Kara Bittner pay Plaintiff a sum slightly exceeding what Plaintiff owed her. In response, Defendant Kara Bittner immediately engaged in a deliberate pattern of financial evasion, quitting her job to avoid enforcement, then working reduced hours at a new job to minimize garnished payments, and ultimately ceasing work altogether a some months later, receiving nothing from her since. Despite this, Plaintiff remained obligated to continue his payments to her. This pattern of deliberate evasion, combined with her taunting, constitutes a clear and sustained abuse of legal process and financial exploitation.

53. Defendant Kara Bittner's Strategic Deception Regarding Living Situations and Relationships

Defendant Kara Bittner has consistently engaged in a pattern of concealing her actual living situations and romantic relationships from Plaintiff, the court, and even her own family, for strategic and manipulative purposes.

    a. Late 2021, Knowing Josh's extreme ill repute, Defendant Kara orchestrated a scheme for him to move out of the marital home, while secretly maintaining their relationship, solely to prevent it from being used against her in the divorce. This calculated deception reveals her willingness to exploit personal relationships and manipulate facts to achieve her desired outcomes, directly undermining the veracity of her subsequent allegations against Plaintiff.

    b. Early 2022 Concealment: From early 2022 to mid-2022, Defendant Kara Bittner deliberately concealed her true residence. She falsely claimed to be living with her mother or other relatives, while in fact residing in an apartment building approximately 40 minutes closer to Plaintiff. This deception caused Plaintiff's mother to travel unnecessarily long distances for child exchanges, while Defendant Kara Bittner orchestrated the exchanges just blocks from her hidden residence. This deception was not discovered by Plaintiff until 2023.

    c. Concealment of Robert (Late 2022 - Mid 2023): Defendant Kara Bittner lived with another man named Robert for several months between late 2022 and mid-2023, without Plaintiff's knowledge or consent, and is now typical of her clandestine nature.

    d. Concealment of Keith Bittner (August - December 2024): Despite Defendant Keith Bittner residing with Defendant Kara Bittner since August 2024, she consistently denied their relationship and living arrangement in court proceedings in December 2024. This mirrored her prior deception with Shane Dewees, whom she also introduced to Erin Helleso as merely a "friend" despite their cohabitation and their relationship. This pattern

of concealment is designed to manipulate court proceedings and avoid scrutiny of the individuals she exposes her children to.

This established pattern of deliberate deception and manipulation of legal processes directly undermines Defendant Kara's credibility regarding all allegations she has made against Plaintiff, and demonstrates her capacity and willingness to fabricate narratives when it serves her interests.

54. Defendant Kara Bittner's Strategic Deception Regarding Living Situations and Relationships

Defendant Kara Bittner has consistently engaged in a pattern of concealing her actual living situations and romantic relationships from Plaintiff, the court, and even her own family, for strategic and manipulative purposes.

a. Late 2021, Knowing Josh's extreme ill repute, Defendant Kara orchestrated a scheme for him to move out of the marital home, while secretly maintaining their relationship, solely to prevent it from being used against her in the divorce. This calculated deception reveals her willingness to exploit personal relationships and manipulate facts to achieve her desired outcomes, directly undermining the veracity of her subsequent allegations against Plaintiff.

b. Early 2022 Concealment: From early 2022 to mid-2022, Defendant Kara Bittner deliberately concealed her true residence. She falsely claimed to be living with her mother or other relatives, while in fact residing in an apartment building approximately 40 minutes closer to Plaintiff. This deception caused Plaintiff's mother to travel unnecessarily long distances for child exchanges, while Defendant Kara Bittner orchestrated the exchanges just blocks from her hidden residence.

c. Concealment of Robert (Late 2022 - Mid 2023): Defendant Kara Bittner lived with another man named Robert for several months between late 2022 and mid-2023, without Plaintiff's knowledge or consent, and is now typical of her clandestine nature.

d. Concealment of Keith Bittner (August - December 2024): Despite Defendant Keith Bittner residing with Defendant Kara Bittner since August 2024, she consistently denied their relationship and living arrangement in court proceedings in December 2024. This mirrored her prior deception with Shane Dewees, whom she also introduced to Erin Helleso as merely a "friend" despite their cohabitation and their relationship. This pattern of concealment is designed to manipulate court proceedings and avoid scrutiny of the individuals she exposes her children to.

This established pattern of deliberate deception and manipulation of legal processes directly undermines Defendant Kara's credibility regarding all allegations she has made against Plaintiff, and demonstrates her capacity and willingness to fabricate narratives when it serves her interests.

55. Defendant Kara Bittner's Manipulation of Financial Records and Social Media

Defendant Kara Bittner consistently engages in strategic manipulation of her financial records and social media presence to mislead the court and conceal her financial activities. She routinely removes her Cash App and Venmo accounts from her social media profiles

immediately prior to court appearances, only to reinstate them shortly thereafter, demonstrating a deliberate intent to obscure her financial transactions and resources.

56. Her cultivation of a false persona on social media platforms such as TikTok for personal and financial gain, where she presented a persona of religious devotion while simultaneously displaying sexually suggestive content and soliciting financial contributions from a predominantly male audience via platforms like Venmo and Cash App, demonstrating a pattern of false representations for financial benefit. Her calculated transformation of personal identity from previously identifying as a practitioner of witchcraft to adopting a fervent Christian persona. Kara systematically adopted a contradictory public Christian persona. This manipulative use of religious identity is further evidenced by contemporaneous messages between Kara and her sister, defendant Shelby Caruso, wherein they discussed attempting to induce a trance state in their then three-year-old child for the purpose of extracting information. This conduct, profoundly inconsistent with any genuine Christian faith and demonstrating extreme manipulative intent toward a vulnerable minor, reveals Defendant Kara's willingness to exploit any persona, relationship, or individual - including her own child - to achieve her objectives. The stark contradiction between her documented witchcraft practices, including the attempted manipulation of a minor child, and her subsequently adopted Christian public image demonstrates a calculated pattern of identity manipulation designed to gain litigation advantage and deceive courts and opposing parties regarding her true character and motives. This deliberate misrepresentation of her character and motives, coupled with the undisclosed receipt of funds, her willingness to exploit personal relationships and legal proceedings, and her demonstrated pattern of manipulating vulnerable individuals including minor children, directly undermines the veracity of her allegations against Plaintiff, evidences her malicious intent and absence of good faith in her actions, and demonstrates both her motive and willingness to initiate and maintain false claims against Plaintiff for personal advantage. Defendant Keith, acting in concert with Defendant Kara and with full knowledge of her true practices and beliefs, similarly employs a deceptive Christian persona, further illustrating a joint pattern of calculated manipulation and coordinated hypocrisy designed to bolster their false accusations, deceive the Court, and conceal their true motives and character.

## C. The Second Fraudulent EPO 2024

57. January 31, 2024: Second Fraudulent EPO (Iowa)
> a. On January 31, 2024, Defendant Kara Bittner filed a second fraudulent Ex Parte Protection Order against Plaintiff in the Iowa District Court for Polk County, directly stemming from her orchestrated provocation and deliberate misrepresentation of events during a child exchange on January January 19, 2024. This EPO, like the 2021 Kansas EPO, was obtained through material misrepresentations and omissions, lacked any legitimate basis, and was filed for the improper purpose of gaining tactical advantage in custody proceedings and depriving Plaintiff of his constitutional rights to parent his children.
> b. In this petition, Defendant Kara Bittner falsely alleged numerous instances of domestic violence, including:

      i. That Plaintiff became violent during sex, including choking and slapping her, and that escalating violence led to the divorce.

      ii. A disagreement in mid-2021 where Plaintiff allegedly "backhanded her face hard" in a vehicle. This was a known falsehood; Plaintiff was attacked by Defendant Kara Bittner in the vehicle driving on the interstate, with the children present, and Plaintiff had to restrain her, while driving, to prevent further endangerment.

      iii. That on November 9, 2021, Plaintiff grabbed a handgun and threatened to kill her. This was a known falsehood, contradicted by her own contemporaneous communications and court records.

      iv. That Plaintiff committed or attempted to commit a sexual act against her will, using broad, generalized language, implying rape.

      v. That Plaintiff said or acted in a way that made her feel afraid of physical or sexual abuse.

  c. These allegations were knowingly false, as evidenced by:

      i. Defendant Kara Bittner's own handwritten 19-point list of reasons for divorce from December 2021, which contains no mention of any physical or sexual violence.

      ii. Her contemporaneous Facebook messages from November and December 2021 to many individuals, which make no mention of physical or sexual violence, instead allege other things, showing it was made up.

  d. On February 2, 2024, Plaintiff was prohibited from picking up his children due to this fraudulent EPO, in which he didn't become aware of until service on February 3rd, 2024, resulting in substantial legal fees and a total of five weeks of forced separation from his children, causing profound and lasting emotional harm to Plaintiff and the minor children.

58. January January 19, 2024: Defendant Kara Bittner's Orchestrated Provocation and Fabrication of EPO Pretext

On January 19, 2024, Plaintiff and Defendant Kara Bittner conducted a child exchange for R.C., then 3 years old and ill, in the parking lot of the Walmart store located in Grimes, Iowa. During the exchange, Defendant Kara Bittner instructed Plaintiff to administer antibiotic medication to R.C. When Plaintiff, exercising reasonable parental concern, inquired whether a bacterial culture test had been performed to confirm the necessity of antibiotics—given the well-established medical risks of unnecessary antibiotic use for the much more common viral infections, including making the illness worse, destroying the good gut bacteria for months, antibiotic resistance, and adverse side effects—Defendant Kara Bittner became enraged. While Plaintiff was holding the sick R.C. in his arms and securing him in a car seat in Plaintiff's vehicle, Defendant Kara Bittner repeatedly shouted, "Are you a doctor!? Are you a doctor!?" in an aggressive and provocative manner. Defendant Kara Bittner, who had been driven to the exchange by Shane Dewees, continued her verbal assault as she walked back toward the vehicle in which Mr. Dewees' was driving. Shane Dewees, who directly witnessed the entire interaction, subsequently confirmed to Plaintiff that Defendant Kara Bittner was "purposely provoking" Plaintiff by repeatedly demanding to know if he was a doctor and refusing to engage

with his legitimate parental concerns about R.C.'s medical treatment. Defendant Kara Bittner's conduct during this exchange demonstrated no fear of Plaintiff whatsoever; to the contrary, she deliberately approached Plaintiff's vehicle, initiated and sustained verbal confrontation, and engaged in calculated provocation designed to elicit a reaction. Following this incident in the EPO, Defendant Kara Bittner falsely characterized Plaintiff's conduct as "invading her personal space" and used this fabricated narrative as the factual basis for filing the second fraudulent Ex Parte Protection Order against Plaintiff on January 31, 2024. Plaintiff's attempts to obtain surveillance footage from the Walmart parking lot to corroborate his account and expose Defendant Kara Bittner's fabrications were obstructed: despite Plaintiff's specific instructions regarding the location and time of the exchange, the footage initially provided by Walmart depicted an irrelevant area of the parking lot, and subsequent communication revealed that the cameras covering the actual exchange location were purportedly non-functional.The January 19 2024 incident directly precipitated Defendant Kara Bittner's filing of the second fraudulent EPO on January 31, 2024, demonstrating her established pattern of abusing legal process, manufacturing false allegations, and weaponizing the children's welfare and the court system for tactical advantage in custody proceedings. Plaintiff had previously avoided direct child exchanges with Defendant Kara Bittner for approximately eighteen months (from late January 2022 through October 2023) specifically due to his well-founded distrust of her propensity to fabricate incidents and make false allegations, a pattern established by her prior fraudulent EPO in Kansas in 2021

59. Defendant Kara Bittner's Reckless Conduct and Lack of Genuine Fear Following the Second Fraudulent EPO

Defendant Kara Bittner's actions following the issuance of the second fraudulent Ex Parte Protection Order on January 31, 2024, unequivocally demonstrate her complete lack of genuine fear of Plaintiff and her malicious intent to weaponize the legal system. The exchange of the kids on January 26, 2024 was done by Kara without incident. She showed no fear at it and did it herself, rather than using someone else.

60. On February 23, 2024—just one day after Plaintiff consented to a temporary no-contact order—Defendant Kara Bittner photographed vehicles in Plaintiff's driveway and transmitted the image to Shane Dewees. This act of deliberate surveillance, undertaken while simultaneously claiming to fear for her safety, constitutes direct evidence of fraudulent intent and abuse of process. The following night, February 24, 2024, Defendant Kara Bittner engaged in the "Brown Boy Incident," demonstrating profound disregard for her children's safety and well-being. While intoxicated and with Shane Dewees present in the residence, Defendant Kara Bittner brought home a male "friend" from a bar. The situation escalated into a domestic disturbance requiring the intervention of Defendant Randy Vodenik and Defendant Deborah Vodenik, who physically removed the intoxicated individual from the premises while the minor children were present. During this incident, Defendant Kara Bittner instructed her minor children to refer to the intoxicated stranger as "Brown Boy" instead of his name, exposing them to racist and dehumanizing conduct. This incident, occurring within 48 hours of obtaining a consent from the fraudulent EPO claiming fear of Plaintiff, constitutes egregious child endangerment under Iowa

Code § 726.6, demonstrates fundamental parental unfitness, and provides compelling evidence of malicious intent and abuse of process. Defendant Randy Vodenik subsequently denied knowledge of this incident under oath constituting perjury and active concealment of child endangerment.

61. Defendant Kara Bittner Post-Fraudulent EPL Behavior Indicating Malice and Instability

a. Extreme Paranoia and Armed Conduct: Following the issuance of the second fraudulent Ex Parte Protection Order (EPO) against Plaintiff in 2024, Defendant Kara Bittner exhibited extreme paranoia and dangerous behavior concerning Plaintiff. She was observed by Shane Dewees, who resided with her at the time, repeatedly walking around her rural property armed with a firearm, attempting to "clear" abandoned farm buildings. Defendant Kara Bittner expressed a delusional belief that Plaintiff was attempting to establish a meth lab on her property, even mistaking an old jar for evidence of such activity and destroying it.

b. Defendant Kara Bittner slept with a firearm under her pillow, driven by explicit fear that Plaintiff would seek revenge for being unjustly separated from his children through her fraudulent actions. This conduct and stated fear constitute an admission that she knew the protection order was fraudulently obtained and her actions wrongful. Her willingness to resort to armed vigilance and contemplate lethal force against Plaintiff for presumed 'revenge' underscores her malicious intent and dangerous instability.

62. The fraudulent EPOs and Defendant Kara Bittner's malicious conduct inflicted profound and distinct emotional trauma on both minor children, C.C. and R.C. While C.C. exhibited distress through hair pulling during the 2021 separation, R.C., the younger child, developed an exceptionally strong and at times anxious attachment to Plaintiff from 2022 onward, demonstrating profound clinginess and fear of separation.

63. R.C. 's intense attachment to Plaintiff was evidenced by his frequent jealousy if he saw Plaintiff embracing or cuddling C.C., often leading R.C. to demand exclusive physical affection. Furthermore, for an extended period well into 2023, R.C. would refuse assistance from other known individuals for simple tasks like feeding or drinking if Plaintiff was present, becoming preDetermined ouvisibly angry and demanding that only Plaintiff help him. This behavior underscored his deep reliance on and fear of separation from Plaintiff.

64. The impact of the second fraudulent EPO in early 2024 was particularly devastating for R.C. At too young an age to comprehend the malicious intent behind his mother's actions, R.C. endured five weeks of forced separation from Plaintiff. During this period, Defendant Kara Bittner deliberately withheld any explanation from R.C. regarding Plaintiff's absence or the reason for his being kept away, exacerbating his confusion and hurt.

65. Upon R.C.'s return to Plaintiff's care in late February 2024, he exhibited profound signs of trauma and fear of abandonment. For many weeks, R.C. remained unusually close to Plaintiff around the house, constantly seeking reassurance of Plaintiff's presence. Plaintiff possesses

video and audio evidence documenting R.C.'s palpable anger and sadness when it was time for him to return to Defendant Kara Bittner's custody or go to daycare, as he associated these transitions with being taken away from Plaintiff. This intense distress persisted for many months until R.C. gradually regained a sense of trust that he would not be forcibly separated from Plaintiff again, mirroring the profound emotional distress Plaintiff experienced during his own forced separation in 2021.

66. Defendant Kara Bittner's malicious intent to undermine the children's relationship with Plaintiff is further evidenced by her observable jealousy. Shane Dewees, in an audio-recorded conversation with Plaintiff, confirmed that Defendant Kara Bittner would become visibly upset when C.C. and R.C. expressed excitement about returning to Plaintiff's home for their visitation. This intense jealousy frequently caused Defendant Kara Bittner to retreat to another room to vent her jealous frustrations to Shane Dewees about the children's evident love for Plaintiff.

67. Shane took on more active parenting role than Defendant Kara when living together such as picking up kids, cooking, engaging with kids, taking them places without Kara, while she was more preoccupied on her phone, even locking herself in her room with children present, being on her phone during outings with them, and smoking weed. This is in spite of Shane working far more than Kara did. Shane told how Kara expects others to do the parental duties when other people are around.

68. As a direct consequence of this jealousy and malice, Defendant Kara Bittner deliberately ceased providing any positive or even neutral information to the children about their impending visits with Plaintiff. Instead, when it was time for exchanges, the children were simply told to "get ready and get in the car," without the customary announcement that they were going to their father's house. This calculated omission was designed to diminish the children's anticipation and joy in seeing Plaintiff, further demonstrating Defendant Kara Bittner's ongoing efforts to sabotage their relationship.

69. Defendant Kara Bittner consistently engaged in a pattern of financial exploitation and emotional manipulation of her romantic partners. During her nine-month cohabitation with Shane Dewees, she relied on him to pay over $50,000 for her and her children's expenses. Upon their breakup, a text message exchange reveals Kara Bittner's explicit attempts to financially coerce Shane, stating, 'Why can't you just stay here and pay bills?' This demonstrates her consistent motive to exploit partners for financial gain, directly linking to her subsequent malicious prosecution of Plaintiff to maintain financial support.

70. On March 8, 2024, after a year-long consent order to stay away from Defendant Kara, Plaintiff made extensive efforts, including contacting law enforcement and exhausting all other options, to arrange for a third party to transfer the children following a family spring break trip. Law enforcement officials explicitly instructed Plaintiff to transfer the children at a gas station in Adel, Iowa, assuring Plaintiff that officers from the City of Adel Police Department would be present to ensure a peaceful exchange. Upon arrival, Plaintiff parked two spaces away from Defendant Kara's vehicle, instructed the children to walk directly to their mother's vehicle on the

sidewalk, and said goodbye. As Plaintiff drove away, Plaintiff observed Defendant Kara and Defendant Shane actively engaging with the present police officers, pointing at papers and then pointing at Plaintiff, clearly attempting to instigate Plaintiff's arrest. Law enforcement subsequently confirmed to Plaintiff that no violation had occurred, as Plaintiff had followed their direct instructions. Despite this, Defendant Kara maliciously used this incident to initiate contempt proceedings against Plaintiff in court in Spring 2024, seeking to punish Plaintiff for following law enforcement's explicit guidance.

71. On April 19, 2024, a second egregious incident occurred in the following weeks, involving the drop-off of C.C. at school. On a typical mid spring morning, C.C. refused to wear any of the three hoodies Plaintiff offered that were kept in the car, stating he wasn't cold and preferred a specific hoodie in his classroom and was only walking approximately 100 feet straight inside the school building. As Plaintiff drove away, Defendant Kara immediately messaged Plaintiff via the parenting app, insinuating Plaintiff was a neglectful parent for C.C. not wearing a hoodie. Concerned, Plaintiff returned to the school to verify C.C. had his preferred hoodie, speaking only with the secretary and C.C., while seeing only them and the school resource officer and a teachers assistant, who brought C.C. from his classroom. Despite the minor nature of the incident, and Plaintiff's reasonable efforts to ensure C.C.'s well-being, Defendant Kara, who worked at the school at the time, nowhere near the front office, maliciously initiated contempt proceedings against Plaintiff for this incident. This is further shown with the Plaintiff being in the precedence of Kara during school drop offs and pickups. The Court, despite Plaintiff's adherence to school protocols and the triviality of the matter, found Plaintiff in contempt, ordered Plaintiff to pay Defendant Kara's legal fees, demonstrating the judicial system's susceptibility to Defendant Kara's malicious and manipulative tactics.

72. June 2024: Child Endangerment via Marijuana Exposure and Judicial Dismissal of Concerns.

> a. On or about June 29, 2024, while in Defendant Kara Bittner's care, C.C. and R.C. were subjected to direct exposure to second-hand marijuana smoke. The children reported that Defendants Kara Bittner and Shelby Caruso smoked marijuana inside a vehicle with windows rolled up while driving to a swimming location, effectively 'hotboxing' the children. Plaintiff possesses video recordings of his children describing this incident.
> b. This exposure was particularly egregious given that R.C. was, at this time, receiving treatment for asthma, a fact known to Defendant Kara Bittner.
> c. Plaintiff raised this grave concern in a subsequent court hearing in September 2024, seeking to have Defendant Kara Bittner drug tested. Plaintiff also informed the court that his children reported the smell of "funny" smoke, implying marijuana.
> d. In court, Defendant Kara Bittner claimed to possess a medical marijuana card. Plaintiff, who has never smoked marijuana and whose children's ability to identify the smell from public exposure was evident, disputed the court's erroneous implication that the children's knowledge derived from him.

e. Despite the clear evidence of child endangerment and Plaintiff's offer to undergo a drug test himself, the presiding judge declined to order Defendant Kara Bittner to be drug tested.

f. Upon information and belief, Defendant Kara Bittner's medical marijuana card was not obtained for legitimate medical reasons but as a pre-emptive measure to justify marijuana use in future litigation, and she continued obtaining marijuana from family members including Defendant Penny Scott. This conduct constitutes child endangerment under Iowa Code § 726.6

## D. Background: Defendant Keith Bittner's Pattern of Abuse and Impersonation

73. Defendant Keith Bittner's Documented History of Severe Child Abuse and Termination of Parental Rights

a. On September 8, 2023, Norwalk Police officers initiated a report concerning possible child abuse at 2128 Swan Drive, leading to Iowa HHS workers removing children from the home. HHS informed officers that a four-month-old child, Bodie Bittner, had sustained fractured ribs and a head injury, necessitating an airlift to the University of Iowa Hospital.

b. On September 11, 2023, medical professionals at the University Hospital confirmed that the type and severity of these injuries were consistent with abuse. The primary caretakers were identified as Mandi Hammer and Defendant Keith Bittner.

c. Medical testing on September 8, 2023, revealed fluid blood around Bodie Bittner's brain and additional rib fractures. On September 13, 2023, it was discovered that Bodie's twin brother, Elliot, also suffered from rib fractures.

d. This incident led to the initiation of two Termination of Parental Rights (TPR) cases against Defendant Keith Bittner, resulting in the removal of six of his children from two different families from his care.

e. Law enforcement sought and obtained a search warrant for the cellular telephones of both Mandi Hammer and Defendant Keith Bittner, explicitly stating their belief that the "seizure search and forensic examination of Mandi and Keith cellular telephones will provide Vital Information about the date, time, individual, or event that injured the babies."

f. Defendant Keith Bittner previously had his parental rights terminated to his oldest child (now approximately 16 years old), bringing the total number of children for whom his parental rights have been removed to seven. Keith had a no contact order placed on him with the mother of the child.

g. Defendant Keith Bittner has been professionally diagnosed with Borderline Personality Disorder and Bipolar Disorder as of 2023.

h. Defendant Keith Bittner has a documented history of physical violence towards his ex-wife Valerie Bittner, deliberate harm to multiple animals (dogs), and physical abuse of young children, especially those unable to communicate what occurred.

i. On information and belief, Defendant Keith Bittner has extensive records showing behaviour and criminal records dating back to his teenage years, reflecting a long history of violent and manipulative behavior.

74. Defendant Keith Bittner's Sophisticated Digital Surveillance and Evidence Manipulation Capabilities

a. Immediately following the seizure of their phones for forensic examination during the child abuse investigation, Defendant Keith Bittner remarked to Mandi Hammer, "at least both of them were in each other's phones," implying that law enforcement would face significant difficulty in deciphering the phone data due to the prior installation of "AllTracker," a parental/worker access application, and other apps installed on their phones, allowing them to access accounts. Mandi Hammer understood this statement, combined with the context of the child abuse, as a direct admission of guilt by Defendant Keith Bittner. This account is corroborated by Plaintiff's audio recording of Mandi Hammer's statement.

b. Defendant Keith Bittner has an extensive, documented history of using "AllTracker" and other spyware to covertly monitor and record his partners' phones without their full knowledge or consent, including receiving their recorded phone calls and accessing cameras. Plaintiff possesses photographic evidence of Defendant Keith Bittner's documented use of AllTracker years before Plaintiff was falsely accused of installing it on Bittner's devices.

c. Defendant Keith Bittner engaged in a pattern of installing cameras throughout residences to watch and listen to his partners, using the footage for future manipulation, while deliberately deleting footage from times when the cameras would capture his own misconduct.

d. Defendant Keith Bittner admitted to a licensed therapist during couples counseling sessions with Mandi Hammer that he lied and manipulated Mandi by creating a fake account and falsified text messages, claiming that Mandi's mother was sending Keith rude messages. Keith stated this was done "out of desperation to try to get Mandi to himself and help him feel like they were more aligned and she was not being impacted by her mother." This admission, documented in therapeutic records, demonstrates Keith Bittner's long-standing, calculated pattern of using digital manipulation and impersonation as tools of psychological abuse and coercive control.

75. Defendant Keith Bittner's Systematic Pattern of Impersonation and Spoofed Communications

a. Defendant Keith Bittner has engaged in an extensive pattern of impersonating individuals through a rotating supply of spoofed phone numbers and text messages to harass, manipulate, and create false narratives.

b. Defendant Keith Bittner sent fake text messages, often from spoofed or unfamiliar numbers, to his ex-partners Valerie Bittner, Mandi Hammer, their family members (including Jennifer Porter's husband), coworkers, and others, impersonating different

individuals or creating false narratives. These fake text messages were often designed to elicit a response that Defendant Keith Bittner would then manipulate to frame the recipient for threats or false allegations.

c. Mandi Hammer recounted to Plaintiff an elaborate scheme where Defendant Keith Bittner impersonated both Mandi Hammer and her mother in simultaneous text message conversations, sending messages from a spoofed number to Mandi's mother while simultaneously impersonating Mandi's mother in text messages to Mandi Hammer. This complex manipulation, often carried out using laptops he habitually carried, demonstrates his extreme malicious intent and sophisticated methods for creating false narratives and obstructing investigations. This account is corroborated by Plaintiff's audio recording.

d. Defendant Keith Bittner impersonated law enforcement officers to at least two individuals, Mandi Hammer and Shane Dewees, in attempts to obtain information or intimidate.

e. Defendant Keith Bittner used these manipulated communications as a basis for false reports to law enforcement.

f. Defendant Keith Bittner gained unauthorized access to Jennifer Porter's (his ex-mother-in-law's) internet password and was observed signing into her internet service from his residence in another town, demonstrating a pattern of digital intrusion.

g. Defendant Keith Bittner used an app to spoof text messages, making it appear as though Valerie Bittner was sending him disturbing messages, requiring Valerie Bittner to obtain her phone history to prove the messages were fabricated.

h. Mandi Hammer observed that Defendant Keith Bittner has a pattern of "warning" about future harmful conduct through deceptive communications before engaging in such acts. The severe child abuse occurred less than two months after Defendant Keith Bittner sent a fabricated message to Mandi's mother, supporting this observed pattern.

i. Defendant Keith Bittner possesses technological proficiency, despite what he told the courts in his divorce proceedings and falsely asserted he was abused by his ex Valerie Bittner due to his lack of computer knowledge, and fits perfectly with his longstanding M.O. of accusing others of what he does.

76. Pattern of Digital Manipulation Extended to Plaintiff

On December 5, 2024, prior to the custody trial, Plaintiff received text messages from an unknown number, falsely pretending to be a concerned friend of Defendant Kara Bittner who was "going through her phone." Plaintiff immediately recognized this as a tactic consistent with Defendant Keith Bittner's known modus operandi and refrained from responding. Defendant Keith Bittner has similarly deceived many other individuals, who, unaware of his tactics, have communicated with him for significant periods while he was impersonating others. DCSO was made aware of and shown these specific messages, yet failed to take appropriate action.

77. Defendant Keith Bittner's Threats to Use Law Enforcement Connections and Pattern of Witness Intimidation

a. Defendant Keith Bittner repeatedly threatened to use "people he knows in law enforcement" to "ruin lives and plant things" on his victims. Keith has also threatened he knows how to clone sim cards.

b. Defendant Keith Bittner has claimed to former partners, including Mandi Hammer (mother of his children), that his family has killed to protect their interests and that he could arrange for harm to come to individuals even while incarcerated. These threats are corroborated by audio recordings in Plaintiff's possession.

c. These threats have created a pervasive climate of fear among those with knowledge of his criminal conduct, directly explaining the reluctance of witnesses to come forward and testify against him. This pattern of witness intimidation is a continuing overt act in furtherance of the conspiracy alleged herein.

78. Defendant Keith Bittner's Law Enforcement and First Responder Background

Defendant Keith Bittner has an employment history as a firefighter and Emergency Medical Services (EMS) worker across multiple Iowa jurisdictions. This background provided him with professional contacts within law enforcement and first responder communities, as well as insider knowledge of investigative procedures, evidence handling protocols, and techniques for evading Detection. This professional history directly supports and explains his documented threats to use "people he knows in law enforcement" to frame, harass, and "ruin the lives" of his victims, and demonstrates his capability to execute the sophisticated conspiracy alleged herein.

79. Defendant Keith Bittner's Abuse of Legal Processes and Malicious Litigation Tactics

a. During his divorce from Valerie Bittner, Defendant Keith Bittner engaged in a protracted and malicious campaign of litigation abuse, filing multiple frivolous motions to intentionally drag out the proceedings for two years, despite there being little of substance to contest. This was done with the express purpose of harming Valerie Bittner and her family, demonstrating a long-standing pattern of utilizing the legal system as a weapon.

b. This pattern of filing numerous motions to harass was also evident in his TPR cases, where he falsely accused Plaintiff of "hacking" him as a pretext for his own litigious tactics.

c. During his protracted divorce, Defendant Keith Bittner repeatedly contacted doctors' offices where his children received care, falsely claiming an open DHS case for child abuse against Jennifer Porter (his ex-mother-in-law). This malicious tactic forced the doctors' offices to contact Valerie Bittner and DHS, creating undue stress and suspicion against Jennifer Porter and Valerie Bittner.

80. Additional Pattern Evidence of Harassment and Psychological Abuse

a. Defendant Keith Bittner engaged in severe psychological abuse and coercive control, consistently using his own children as unwilling pawns in his manipulative schemes to harass the mothers of his children and gain strategic advantage.

b. Defendant Keith Bittner exhibited a distinct pattern of preemptively accusing others of the very misconduct he himself is engaged in or about to commit.

c. On one occasion, Defendant Keith Bittner called his ex-father-in-law (Valerie Bittner's father) one day after he suffered a heart attack, expressing hopes that he would die, among other malicious statements.

d. Defendant Keith Bittner subjected Valerie Bittner to daily harassment during their divorce, screenshotting her responses to use against her in court.

e. When Valerie Bittner first met Defendant Keith Bittner in college, a college administrator contacted Jennifer Porter and advised Valerie Bittner to withdraw from the institution due to Keith Bittner's presence, stating that Keith Bittner had previously been banned from the college for harassing and abusing another female student. The administrator indicated Valerie Bittner would be welcomed back once she was no longer with Keith Bittner.

81. Warnings to Plaintiff About Defendant Keith Bittner's Methods.

a. Plaintiff has audio recordings from Defendant Keith Bittner's former partners, including Valerie Bittner (his ex-wife) and Mandi Hammer (mother of his children), Detailing these patterns of abuse, threatening, surveillance, stalking, geospoofing, use of scheduled texts, manipulating, impersonation, feining suicude, and falsely attributing suicide threats about himself from others with faked messages.

b. These tactics were known to numerous individuals, including his ex-mother-in-law, Jennifer Porter, who explicitly warned Plaintiff about Keith's methods and propensity for digital manipulation and impersonation, including using law enforcement to harass and frame.

c. Plaintiff was specifically warned by Jennifer Porter never to respond to any text messages from Keith, particularly those from unknown or suspicious numbers, as Keith would exploit any response to edit information and frame the recipient for threats or other false accusations.

82. DCSO's Deliberate Failure to Investigate Defendant Keith Bittner's Documented History

Despite this publicly available, documented history of severe violence, manipulation of digital evidence, and sophisticated deception, DCSO deliberately failed to consider or investigate this critical information when assessing the veracity of the fabricated "murder trap" message and pursuing charges against Plaintiff. This constitutes gross deliberate indifference and further compelling evidence that DCSO, through Deputy Townsell and others, was actively suppressing exculpatory evidence, protecting Defendant Keith Bittner, and knowingly participating in the conspiracy to maliciously prosecute Plaintiff.

83. Defendant Keith Bittner's Pattern of Anonymous Evidence Planting and False Accusations

Defendant Keith Bittner's modus operandi includes anonymously sending compromising

materials or information to third parties and then using their receipt of such materials as a basis for false accusations against them. In one documented instance, Defendant Keith Bittner anonymously sent sexual messages to a male coworker and then attempted to have that coworker terminated for his knowledge of what he himself had sent. This pattern demonstrates Keith Bittner's sophisticated understanding of how to manufacture false evidence trails and frame innocent individuals, the exact methodology he employed against Plaintiff in the fabricated "hacking" and "cyberstalking" allegations that form the basis of this action.

**E. Kara and Keith Bittner**

84. Coordinated Destruction of Forensic Evidence (Hair & Fingernails).

a. Shortly after the court declined to order drug testing, and following Defendant Keith Bittner's move into Defendant Kara Bittner's residence in August 2024, Defendants Kara Bittner and Keith Bittner engaged in coordinated and deliberate destruction of potential forensic evidence of drug use from C.C. and R.C.

b. On or about September 6th 2024, Plaintiff had taken R.C. for a professional haircut. The very next day through seeing the kids on September 9th and being told, while R.C. was in the care of Defendant Kara Bittner, Defendant Keith Bittner unilaterally cut R.C.'s hair, giving him a "buzz cut." C.C. also received a "buzz cut" at this time, despite having recently had his hair cut. Plaintiff possesses photographic evidence demonstrating the drastic change in R.C.'s hair length.

c. This drastic and unconsented hair cutting was not done for aesthetic reasons but was, upon information and belief, a deliberate act by Defendants Kara Bittner and Keith Bittner to remove hair samples that could have been drug tested. Hair analysis could have revealed drug exposure from the "hotboxing" incident months prior, with the drug metabolites being Detectable in the outer portions of the hair shaft.

d. Concurrently, Plaintiff observed that prior to R.C. going to Defendant Kara Bittner's residence, R.C. had noticeably long finger and toenails. Plaintiff clipped R.C.'s fingernails before the visit. When R.C. returned 2 days later, his fingernails had been clipped extremely short, almost to the skin, requiring a bandage due to bleeding. His toenails were also cut excessively short, with one showing signs of bleeding.

e. This excessive and injurious clipping of R.C.'s fingernails and toenails was, upon information and belief, a deliberate act by Defendants Kara Bittner and Keith Bittner to prevent potential drug testing via nail samples.

f. These acts of cutting C.C. and R.C.'s hair and severely clipping R.C.'s fingernails and toenails, causing physical injury to R.C., were performed without Plaintiff's consent or knowledge and were a direct and foreseeable consequence of the court's refusal to order drug testing for Defendant Kara Bittner.

g. These actions constitute child endangerment under Iowa Code Section 726.6 (causing physical and emotional harm, exposing children to hostile environments), and a deliberate attempt to obstruct justice and destroy evidence of child endangerment.

85. On September 16, 2024, Defendant Deputy Deavon Richards of the Dallas County Sheriff's Office ("DCSO") took a police report (DCSO Case 2024-00014193) from Defendant Kara

Bittner. Defendant Kara Bittner alleged harassment via text messages from an unknown number, which she believed to be from Shane Dewees. There had already been interactions with law enforcement prior to this and Shane was told he could keep trying to communicate with Kara as long as it was about getting his car title back. Once he did he stopped the communication attempts with her but the report was used as a framing opportunity to retaliate with Shane not allowing his vehicle to be stolen and for defence against Shane messaging Defendant Keith telling him about the recording of Keith impersonating law enforcement.

86. This September 16, 2024 report explicitly documents the following critical facts, establishing DCSO's actual knowledge of Defendant Keith Bittner's criminal pattern and the potential danger to the children:

a. The spoofed messages directly referenced Defendant Keith Bittner "sexually abusing children and being on the child abuse registry."

b. The spoofed messages claimed that the sender was "Kara's bf" and was "just messing around with her."

c. The spoofed messages also alleged Defendant Keith Bittner impersonated a police officer.

d. Defendant Deputy Richards attempted to call the spoofed number, and a male answered but hung up upon identification and would not answer again – a clear indicator of evasive and suspicious behavior.

e. The report notes that "Kara has cameras up at her residence."

f. The report explicitly states that Plaintiff and Defendant Kara Bittner had an upcoming child custody court hearing in December 2024, and that Shane Dewees had previously threatened to provide information Detrimental to Kara Bittner's case.

87. Despite these serious, corroborated allegations of potential child sexual abuse, police impersonation (a felony under Iowa Code Section 718.2, and a clear pattern of spoofed communications directly implicating Defendant Keith Bittner (who was living with Defendant Kara Bittner and the children), the DCSO took no investigative action against Defendant Keith Bittner. Instead, Defendant Deputy Richards advised Defendant Kara Bittner to block the number and stated he would only "start keeping documentation... if it is later proven to be him [Shane]."

88. Defendant DCSO's failure to investigate these credible allegations against Defendant Keith Bittner, particularly those involving child sexual abuse and felony impersonation, while simultaneously documenting their potential impact on Plaintiff's child custody dispute, constitutes:

a. Deliberate indifference to clearly established constitutional rights and public safety, particularly the safety of the minor children C.C. and R.C.

b. Selective enforcement of the law, protecting Defendant Keith Bittner despite serious criminal allegations.

c. An overt act in furtherance of a conspiracy to protect Defendant Kara Bittner's interests and maliciously target Plaintiff, as the investigation will later be used against him, transferring from Shane.

89. Upon information and belief, the DCSO, through Defendant Rebecca Moser (Administrative Clerk and Records Custodian), refused to provide Plaintiff investigative reports related to DCSO Case 2024-00014193, falsely claiming it is an 'open case' despite no charges ever being filed, constituting obstruction of public records in violation of Iowa Code Chapter 22.

**F. December 2024: Escalation and Fabricated "Hacking" Narrative**

90. In December 2024, at the custody modification trial, Defendant Kara Bittner, through her attorney Defendant Jaclyn Zimmerman, maliciously accused Shane Dewees of 'hacking' her devices and falsely implied Plaintiff's involvement.

91. Plaintiff's Warning from the Stand and Kara Bittner's Retaliatory Escalation of Hacking Accusations. During the custody modification trial held mid December 2024, Plaintiff refused to make eye contact with Defendant Kara Bittner until later on and only once. From the witness stand, Plaintiff directly warned Defendant Kara Bittner, "Keep our children away from Keith," based on his grave concerns for the children's safety. Defendant Kara Bittner, leveraging this protective warning as a perceived threat, immediately escalated her malicious campaign. It was at this precise juncture that the fabricated hacking accusations, previously aimed at Shane Dewees, were strategically redirected and amplified against Plaintiff. This swift and retaliatory pivot, occurring immediately after Plaintiff's direct warning, demonstrates Defendant Kara Bittner's intent to weaponize any perceived slight into a pretext for further malicious prosecution and harassment.

92. Plaintiff, aware of Defendant Keith Bittner's history of digital manipulation, offered to show the judge his phone of the December 5th, 2024 text messages he received from Keith, to show that it is their side playing games, but was prevented from doing so by objections from Defendant Zimmerman.

93. This shift from 'harassment' (September 2024) to 'hacking' (December 2024) was a deliberate and calculated attempt by Defendants Kara Bittner and Jaclyn Zimmerman to create a more serious and technically complex false narrative to frame Plaintiff and influence the custody proceedings

94. In early January 2025, mere weeks after a mid-December custody trial in which Defendant Kara's credibility and conduct were significantly challenged, and while the parties awaited the court's decision on custody, Defendant Kara unilaterally and without Plaintiff's knowledge or consent, took the minor children (C.C. and R.C.) to a therapist. At the time of these visits, the parties maintained shared legal custody under a 50/50 arrangement, requiring mutual consent for major decisions including mental health treatment. When Plaintiff learned of the first appointment as Defendant Kara was entering the facility, Plaintiff immediately objected and explicitly stated that he did not consent to this therapy, as was his right under the existing custody order.

95. Despite Plaintiff's clear and timely objection, Defendant Kara proceeded to take the children to this therapist on two additional occasions, for a total of three unauthorized therapy sessions, in direct violation of the court's custody order and Plaintiff's parental rights. This conduct occurred during the pendency of contested custody proceedings and appeared calculated to manufacture favorable expert testimony to counter the unfavorable evidence presented against Defendant Kara at the December trial. Plaintiff's attorney drafted a contempt motion documenting this violation; however, given the escalating pattern of Defendant Kara's violations and the associated costs of repeated contempt proceedings, the decision was made to document this violation for future proceedings rather than file immediately. This incident further demonstrates Defendant Kara's pattern of:

   a. Willfully violating court orders when it serves her litigation objectives;
   b. Disregarding Plaintiff's parental rights and the requirement for mutual consent on major decisions;
   c. Attempting to manufacture evidence through carefully selected professionals during contested proceedings.
   d. Acting in bad faith while simultaneously seeking to hold Plaintiff in contempt for trivial or fabricated violations.

96. The stark contrast between Defendant Kara's own repeated, substantive violations of court orders and her aggressive pursuit of contempt charges against Plaintiff for following law enforcement instructions (gas station incident) or ensuring his child's welfare (hoodie incident) underscores the malicious and retaliatory nature of her litigation conduct.

**G. January 4, 2025: The Fabricated "Phantom Texts", Deputy Westberg's Fabricated Report, and Unlawful Warrant**

97. On the evening of Saturday, January 4 2025, defendants Kara and Keith Bittner were together without C.C. and R.C. This is relevant to their coordinated efforts to fabricate the messages of the alleged "victimization."

98. On information and belief, Defendant Keith Bittner, while with Defendant Kara Bittner, knowingly and intentionally authored and sent a series of text messages to Defendant Kara Bittner's phone from a spoofed number (515-567-6635), impersonating Plaintiff. These messages contained specific Details known to be part of Defendant Keith Bittner's unique 'typing MO' and digital tactics, designed to falsely implicate Plaintiff.

99. Plaintiff was at home with his children on January 4, 2025, and did not send any messages to Defendant Kara Bittner. Plaintiff's phone records confirm zero outgoing communication to Defendant Kara Bittner or the spoofed number.

100. Defendant DCSO, months earlier, had received information from its own investigation (DCSO Case 2024-00014193) that Defendant Keith Bittner was suspected of impersonating a police officer and engaging in a pattern of digital manipulation, yet deliberately failed to act on this critical information or connect it to the ongoing pattern of digital manipulation. Plaintiff had

never received a legitimate text from Keith's actual phone number. This established pattern should have immediately raised red flags for any competent law enforcement officer about suspicious text messages allegedly involving Plaintiff.

101. On January 5, 2025, Defendant Deputy Wyatt Westberg took a report from Defendant Kara Bittner regarding the fabricated January 4th messages.

102. In this report, Defendant Deputy Westberg knowingly and falsely claimed: "I attempted to contact Theodore multiple times and he did not answer the phone"

103. Plaintiff's phone records for January 5, 2025, show zero incoming calls from Defendant Deputy Westberg or the DCSO. Defendant Deputy Westberg's statement was knowingly false.

104. Defendant Deputy Westberg also claimed he attempted to call the spoofed number (515-567-6635) and 'it stated the line is out of service.' This is a technical outdated and demonstrably false response; numbers without an assigned account like this typically say 'The number you are trying to call is busy, please try again later'. This indicates Defendant Deputy Westberg's statement was knowingly false or made with reckless disregard for the truth.

105. Defendant Deputy Westberg's report further stated Defendant Kara Bittner claimed 'only her, Theodore and another family member know that 1/6/2025 is the custody exchange day,' implying Plaintiff was the sender. This was a patently false claim; Defendant Keith Bittner (living with Kara Bittner for almost half a year), both families, and any party with access to court schedules would know this information. Defendant Deputy Westberg's reliance on this obvious falsehood demonstrates a deliberate intent to fabricate probable cause.

106. Deputy Westberg's Reliance on Fabricated Evidence and Disregard for Probable Cause

    a. Fabricated iCloud Tampering Allegation: Defendant Deputy Westberg's report of January 5, 2025, relied heavily on Defendant Kara Bittner's unsubstantiated claim of "iCloud tampering" by Plaintiff. Defendant Westberg, or the Dallas County Sheriff's Office (DCSO), through prior surveillance conducted to ascertain Plaintiff's phone numbers (which occurred between January 6, 2025, and January 16, 2025), would have known that Plaintiff does not and has never owned an Apple product, including iPhones. Therefore, the alleged "tampering with her phones by sending and deleting messages through the iCloud" by Plaintiff is a technical impossibility. Defendant Westberg's inclusion of this demonstrably false and technically impossible claim as a basis for Plaintiff's arrest demonstrates a willful and reckless disregard for the truth and a deliberate fabrication of probable cause.

    b. Deliberate Disregard for Child Abuse Allegations and Falsified Injury Origin: Defendant Westberg's report explicitly documented Defendant Kara Bittner's claim that she would not pick up the children on January 6, 2025, "due to an alleged child abuse issue." This constituted a direct report of alleged child abuse, triggering a mandatory duty for investigation under Iowa Code § 232.69. However, Defendant Westberg, and the

DCSO, deliberately failed to conduct any investigation into this serious allegation, including failing to contact the alleged child victim, R.C. Clark, in direct violation of Iowa Code Section 232.69

c. Manufactured Injury Narrative: The alleged child abuse issue, cited by Defendant Kara Bittner and accepted by Defendant Westberg, referred to an injury sustained by RC Clark. The text messages Plaintiff was accused of sending, and which Defendant Westberg relied upon, asserted this injury was caused by a "belt." This was a complete fabrication by Defendants Kara Bittner and Keith Bittner. In truth, RC Clark sustained an injury due to a bathtub accident. Plaintiff, on January 6, 2025, communicated with Christina regarding RC Clark's "bathtub accident" and had also notified Defendant Kara Bittner of her improper care of the injury, specifically her negligent application of a Band-Aid overnight that was left on. The Plaintiff's children informed him of the true origin of the injury. Further, on January 13, 2025, Defendant Kara Bittner herself messaged Plaintiff on the parenting app, confirming that RC Clark had "gotten hurt on the bathtub spigot again," directly contradicting the "belt" narrative. Defendant Westberg's failure to investigate these basic facts, despite the clear and readily available contradictory evidence, demonstrates a biased and malicious investigation aimed at falsely implicating Plaintiff rather than uncovering the truth.

d. Evidence of Surveillance and Improper Use of Non-Public Information: Defendant Westberg's report of January 5, 2025, correctly identified Plaintiff's known phone number. However, subsequent reports (e.g., January 16, 2025) listed a secondary phone number for Plaintiff that is not publicly accessible and was unknown to Plaintiff. This indicates that Defendant DCSO conducted unlawful surveillance on Plaintiff between January 6, 2025, and January 16, 2025, to obtain this non-public information. This secondary number was associated with Plaintiff despite his receiving numerous messages from strangers attempting to contact another individual, indicating an improper association or assignment of the number. Defendant Westberg, and the DCSO, leveraged this improperly obtained and non-public information, along with fabricated evidence, to pursue Plaintiff, further demonstrating a pattern of unlawful and biased investigation and an unconstitutional intrusion into Plaintiff's privacy

e. Conclusion of Westberg's Biased Investigation: Defendant Westberg's actions, as Detailed herein, demonstrate a profound lack of due diligence, a deliberate reliance on fabricated, technically impossible claims, a willful disregard for mandatory child abuse reporting, and an improper use of surveillance to secure Plaintiff's arrest. These actions constitute a malicious and unconstitutional deprivation of Plaintiff's rights under the Fourth and Fourteenth Amendments, including but not limited to, false arrest, malicious prosecution, and an unlawful search and seizure.

107. Defendant Deputy Wyatt Westberg, when preparing the report and seeking the arrest warrant, deliberately failed to accurately represent the nature of the underlying order. The order was a consented no-contact order issued in a civil/family law proceeding, not a criminal protective order. A violation of such a civil order requires judicial intervention (e.g., an application for rule to show cause for contempt of court) rather than an immediate criminal arrest warrant. Defendant Deputy Westberg had a duty to review the underlying court order,

which was a public record, and his failure to do so, or his deliberate misrepresentation of its contents, demonstrates his intent to mislead the magistrate into believing a criminal violation had occurred, thereby manufacturing probable cause where none existed.

108. Defendant Deputy Wyatt Westberg's report, which formed the basis for the arrest warrant, deliberately misrepresented the nature of the underlying order. Despite the order being a consented no-contact order, Defendant Deputy Westberg presented it as a standard 'no-contact order,' thereby inflating the apparent gravity of any alleged violation and further demonstrating his intent to manufacture probable cause against Plaintiff

109. Defendant Deputy Westberg, having a pre-existing personal relationship with Defendant Kara Bittner (high school acquaintance), acted with a clear and profound conflict of interest and a deliberate intent to fabricate probable cause against Plaintiff.

110. Based solely on this knowingly false report and the fabricated evidence, a warrant was issued for Plaintiff's arrest on January 6, 2025, at 10:34 AM, for Violation of No Contact Order, constituting a malicious and unconstitutional deprivation of Plaintiff's liberty, all from this illegal warrant.

## H. January 6 - January 16, 2025: DCSO's Deliberate Delay and Surveillance

111. Despite the warrant being issued on January 6, 2025, at 10:34 AM, Defendant DCSO deliberately and unlawfully failed to execute the warrant for eleven (11) days, a clear violation of standard law enforcement procedure for no-contact order violations and indicative of a malicious intent to use the warrant for ulterior purposes

112. DCSO's Targeted Surveillance and Acquisition of Non-Public Information

During this 11-day period (January 6 - January 16, 2025), Defendant DCSO actively engaged in targeted and unlawful surveillance and investigation of Plaintiff. This is evidenced by the January 16, 2025 police report (DCSO Case 2025-0000855), which lists Plaintiff's secondary, rarely-used phone number. This number was not publicly available, and not provided by Plaintiff to the Bittners. Plaintiff rarely used this phone for calls and did not even have the number memorized, primarily using it for Wi-Fi access. The Defendants' knowledge and inclusion of this non-public number in official reports demonstrates that they conducted extensive, targeted research and surveillance on Plaintiff, likely through unauthorized access to Plaintiff's phone records or email accounts, constituting an unconstitutional intrusion into Plaintiff's privacy and an abuse of police power.

113. DCSO's Prior Knowledge of Fabricated Evidence and Intent to Maliciously Prosecute

Prior to Plaintiff's arrest on or before January 9, 2025, Defendant Kara's attorney, Jaclyn Zimmerman, contacted Shane Dewees, explicitly seeking "proof of text messages" between Shane Dewees and Plaintiff. This request was a thinly veiled attempt to manufacture evidence,

designed to insinuate a plot between Shane Dewees and Plaintiff to "hack" or otherwise compromise Defendant Kara's communications, mirroring false allegations Defendant Kara had made in court weeks prior in mid-December 2024. Shane Dewees immediately recognized the manipulative intent behind this request and refused to provide any such fabricated "proof." Now DCSO contacted Shane Dewees in which he informed DCSO of this direct attempt by Defendant Kara's attorney to manufacture evidence. Therefore, prior to Plaintiff's arrest and prior to the initiation of any formal investigation, DCSO was on explicit notice of Defendant Kara's and her attorney's deliberate efforts to fabricate evidence and create a false narrative against Plaintiff. Despite this direct and credible information, DCSO proceeded with Plaintiff's arrest, the subsequent unconstitutional interrogations, and the pursuit of fabricated charges, demonstrating a profound and deliberate indifference to the truth, a knowing complicity in the conspiracy to manufacture evidence, and a malicious intent to prosecute Plaintiff based on demonstrably false pretenses. This prior knowledge on the part of DCSO regarding the accuser's attempts to fabricate evidence renders their subsequent actions particularly egregious. It establishes that DCSO's investigation was not impartial but was initiated and pursued with a preDetermined intent to target Plaintiff, regardless of his innocence, and to protect Defendants Kara and Keith Bittner. The fact that Defendant Kara's attorney, an officer of the court, engaged in such an abuse of process, and that DCSO was informed of it but proceeded to act upon the fabricated claims, further underscores the systemic nature of the conspiracy to deprive Plaintiff of his constitutional rights. This pattern of conduct continued with Defendant Kara's filing of a "Rule to Show Cause" application on January 20, 2025, an act directly predicated on the false narrative her attorney had attempted to manufacture. No reasonable officer, having been informed of an attorney's attempt to manufacture evidence, could believe that proceeding with an arrest based on those claims was lawful.

114. DCSO's Prior Knowledge of Fabricated Allegations from Shane Dewees (January 9, 2025)

On January 9, 2025, prior to Plaintiff's arrest, Defendants in the Dallas County Sheriff's Office contacted Shane Dewees as part of their investigation into Defendant Kara Bittner's allegations. They questioned Shane Dewees about allegations made by Defendant Kara Bittner, accusing Shane, Plaintiff, and Valerie (Defendant Keith Bittner's ex-wife) of cyberstalking Defendant Kara Bittner. Shane Dewees explicitly informed DCSO that he had never spoken to Plaintiff, had only recently exchanged text messages, and did not know Valerie. Shane further pointed out the implausibility of Plaintiff cyberstalking, along with any violence, to Defendant Kara Bittner over a long period, given that no such evidence had emerged during the many months Defendant Kara Bittner and Shane Dewees were together. Defendant DCSO, by contacting Shane Dewees and receiving this unequivocal exculpatory information, had direct knowledge that Defendant Kara Bittner's allegations of a coordinated cyberstalking effort were false, and that Plaintiff was not involved.

115. DCSO's Official Conclusion of 'Nothing Founded' Against Plaintiff and Shane Dewees (January 9, 2025)

After Shane Dewees provided this exculpatory information to the Dallas County Sheriff's Office on January 9, 2025, Shane Dewees was informed by DCSO that they had conducted an investigation into the allegations of cyberstalking against both him and Plaintiff, and that 'nothing was founded' against either individual. This direct communication to Shane Dewees unequivocally establishes that, eight days prior to Plaintiff's arrest, DCSO had already investigated the core allegations and officially concluded they were unfounded. Despite this official conclusion, and in direct contravention of their own findings, Defendant DCSO proceeded to obtain and execute an arrest warrant against Plaintiff on January 17, 2025, for charges directly related to these previously unfounded allegations. This demonstrates a deliberate, malicious, and unconstitutional disregard for established facts and Plaintiff's constitutional rights, including his rights to due process and freedom from false arrest.

116. If DCSO obtained Plaintiff's phone records through legal process during this period, they would have had unequivocal exculpatory evidence proving:

    a. Defendant Deputy Westberg's January 5th claim of 'multiple contact attempts' was a fabrication.

    b. Plaintiff did not send the January 4th 'phantom texts' and was demonstrably not the author.

    c. Plaintiff did not engage in any 'cyberstalking' activity as alleged by Defendant Kara Bittner.

    d. Plaintiff did not engage in conversation with Shane until after it was alleged and never conversed with Valerie, which would have immediately put DCSO on notice that false allegations were being made to suit their narrative.

117. DCSO's deliberate delay, active surveillance, and acquisition of non-public information, while simultaneously possessing (or deliberately avoiding) exculpatory evidence, demonstrates a malicious intent to use the January 6th warrant as a pretext for a later, more comprehensive and unlawful arrest, and to further the conspiracy against Plaintiff. This conduct was known to and approved by Defendant Chief Deputy Bret Maxwell, who reviewed the reports and failed to intervene or correct the unlawful course of action.

**I. January 12, 2025: The Murder Trap**

118. On the evening of January 12, 2025, Plaintiff received a series of three text messages from an unknown, spoofed number. These messages were designed to lure Plaintiff to Defendant Kara Bittner's residence under false pretenses.

119. The messages included a manipulated image, spliced together, purporting to be a Facebook post by Defendant Kara Bittner. This fake post alleged Defendant Keith Bittner had been arrested for choking her, and that she was 'terrified of being alone at the house with my kids tonight,' a cynical and deliberate appeal to Plaintiff's parental instincts and protective nature designed to lure him into danger.

120. The manipulated image contained:

a. A black bar splicing two images together.

b. The times below the black bar and above differ clearly indicate it being spliced together.

c. Outdated arrest photos of Defendant Keith Bittner from a 2020 arrest for choking Valerie (his ex-wife), used to falsely portray a current arrest. Plaintiff later found out Keith has used this same photo other times to fake his arrest as well.

d. Digital fingerprints indicating Defendant Keith Bittner's authorship, including a peculiar font and icons.

121. Plaintiff immediately attempted to call the spoofed number at 10:53 PM on January 12, 2025. The call went unanswered and, mysteriously, does not appear on Plaintiff's carrier phone records, evidence of sophisticated digital manipulation by the sender or external interference with Plaintiff's records designed to conceal the perpetrators' identities and actions.

122. Circumvention of Firearm Prohibitions

Defendant Keith Bittner was, and might still remain, legally prohibited from possessing firearms due to prior court orders. Despite this, there is evidence suggesting his non-compliance with these restrictions, and Defendant Kara Bittner actively facilitated this circumvention by providing false information to the courts recently at this time, regarding the removal of her firearm. This established pattern of firearm-related threats and the deliberate disregard for legal prohibitions on firearm possession by Defendant Keith Bittner provides crucial context for the gravity and credibility of the threats made against Plaintiff on January 12, 2025, and underscores the seriousness of the murder plot.

123. On January 15, 2025, Shane Dewees informed Plaintiff (and Plaintiff audio-recorded this conversation) that Defendant Kara Bittner and Defendant Randy Vodenik were actively plotting to ambush and murder Plaintiff if he came to Defendant Kara Bittner's residence. The plot included planting a 'ghost gun' on Plaintiff's dead body to stage a 'justified killing,' a premeditated act of extreme violence and a clear overt act in the overarching criminal conspiracy. Shane was a witness to the discussions between Kara and Randy of their plot, even commenting to Randy "I thought you were a Christian."

124. This January 12, 2025 message sequence, orchestrated by Defendants Kara Bittner and Keith Bittner, and knowingly facilitated by Defendant Randy Vodenik in the plot to ambush Plaintiff, constituted an attempted murder trap, designed to lure Plaintiff to his death.

**J. January 16, 2025: Manufactured Probable Cause and DCI Complicity**

125. On January 16, 2025, Defendant Keith Bittner orchestrated a fabricated "welfare check" on himself via Emily Martin of HHS, claiming Plaintiff was hacking his phones and using an "AllTracker" application. Defendant Deputy Jalen Townsell along with Defendant Sgt Nick Pearson meet with Keith at 18851 240th Street in the preplanned welfare check.

126. This "AllTracker" claim was a deliberate fabrication:

    a. Defendant Keith Bittner has a documented history of using "AllTracker" (watermarks from 2014-2023) and similar spyware on his partners (Valerie, Mandi).

    b. Defendant Keith Bittner actively impersonated others (Valerie, Mandi) through "man-in-the-middle" digital attacks.

    c. The "Application for Rule to Show Cause" later filed by Defendant Jaclyn Zimmerman contained mathematically impossible timelines and contradictory discovery dates for "AllTracker," proving its fabricated nature.

    d. Furthermore, "AllTracker" or similar spyware requires explicit, physical permission and active enablement on each individual device, and cannot automatically transfer across new devices or survive phone number changes. This is particularly true for modern operating systems (Android 6 and newer). Therefore, the allegation that Plaintiff could have installed "AllTracker" prior to the last time he had access to her device a long time prior to the 2022 divorce and maintained access across Defendant Kara Bittner's multiple new phones and phone numbers without re-installation or re-permission is a technical impossibility.

    e. The Declaration of Casey Gallagher confirms that:

        i there is no documented evidence that Mr. Clark had physical access to the alleged victim devices during the alleged timeframe;

        ii official AllTracker documentation requires local installation and permission granting on the target device;

        iii Android security architecture mandates visible user interaction and permission approval;

        iv no forensic evidence was provided demonstrating installation or operation of monitoring software;

        v communication attribution claims are unsupported by carrier or device-level forensic evidence; and

        vi the alleged conduct is technically infeasible under standard Android security architecture without physical access and user-granted permissions. Accordingly, the allegations made by Defendants Kara Bittner, Keith Bittner, and Jaclyn Zimmerman regarding Plaintiff's alleged use of "AllTracker" are wholly unsupported by technical forensic evidence and are demonstrably false.

    A 4 page report from the qualified digital investigator, attached hereto as Exhibit A.

127. Defendant Deputy Jalen Townsell took this fabricated report, which, combined with the pretextual January 6th warrant, formed the basis for Plaintiff's imminent arrest.

128. Defendant DCSO knew, or should have known through reasonable inquiry, that Defendant Keith Bittner's phone had been seized and a full Cellebrite extraction performed in 2023 by another law enforcement agency in Norwalk, Iowa. This Cellebrite data, which law enforcement agencies routinely share through established protocols and databases, would have unequivocally confirmed Defendant Keith Bittner's use of "AllTracker" and other spyware, providing critical exculpatory evidence for Plaintiff. DCSO deliberately failed to obtain this crucial evidence or willfully ignored it, despite having actual knowledge of its existence and ready

access through standard law enforcement channels, demonstrating a willful blindness to the truth and an active suppression of exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963)

129. Deputy Townsell's Deliberate Indifference to Child Welfare Allegations in January 16, 2025 Report.

    a. Documented Child Welfare Concerns: On January 16, 2025, Defendant Deputy Jalen Townsell was dispatched to 18851 240th Street for a welfare check on Defendant Keith Bittner. In his report, Defendant Townsell documented receiving emails from "firemedic115074@gmail.com" (attributed to Defendant Keith Bittner) containing explicit threats of harm against Defendant Keith Bittner, stating, "Terminate his rights before the end of the work day or we find a way to get rid of him," and "He will be lucky to see tomorrow." Defendant Townsell's report further noted that Emily Martin, a social work case manager with Warren County Health and Human Services, explicitly advised that "the mental health of Bittner has been a concern of hers throughout her case work with him."

    b. Failure to Initiate Child Abuse Investigation: Despite personally documenting these serious threats of harm against a parent and explicit concerns from a social worker regarding Defendant Keith Bittner's mental health – both of which directly implicate the safety and welfare of Defendant Keith Bittner's minor children, who were residing with him at the time – Defendant Deputy Townsell deliberately failed to initiate any child welfare investigation. The documented threats stated that Defendant Keith Bittner would be "lucky to see tomorrow," creating an immediate risk to any children in his care should harm befall him or should his documented mental health issues escalate. The report does not indicate any subsequent contact with HHS (beyond the initial welfare check call), any efforts to assess the safety of Defendant Keith Bittner's children, or any action to report potential child abuse or neglect as mandated by Iowa Code § 232.69. This deliberate failure to act on documented child welfare concerns demonstrates a profound dereliction of duty and a pattern of selective enforcement by Defendant Deputy Townsell and the Dallas County Sheriff's Office (DCSO)

    c. Disregard for Mandatory Reporting: Defendant Deputy Townsell, by ignoring the explicit threats of harm against a parent and the documented mental health concerns of a parent (Defendant Keith Bittner), violated his mandatory reporting obligations under Iowa Code § 232.69. This inaction directly reflects a policy or custom of deliberate indifference within the DCSO to allegations that do not align with their preDetermined narrative of targeting Plaintiff, even when such allegations involve the safety and welfare of children. Defendant Chief Deputy Bret Maxwell and Sheriff Adam Infante, as supervisory officials responsible for training, policy implementation, and oversight of mandatory reporting compliance, were aware or should have been aware of this pattern of selective enforcement and deliberate indifference, yet failed to take corrective action. This failure highlights the Defendants' systemic bias and their willingness to overlook serious threats when made by individuals they are protecting, further implicating Defendant Chief Deputy Bret Maxwell and Sheriff Adam Infante in a pattern of

unconstitutional conduct and establishing their personal liability under supervisory failure-to-train and failure-to-supervise theories pursuant to City of Canton v. Harris, 489 U.S. 378 (1989).

d. Willful Blindness to Obvious Technical Explanations for "Freaky" Messages and Deliberate Disregard for Payment Tracing Evidence: During the January 16, 2025 welfare check and report, both Defendant Keith Bittner and Defendant Randy Vodenik explicitly described "weird things going on" with phones, specifically "text messages have been sent between his phone and Kara's phone without either phone owner actually sending them," and observing "both Kara and Bittner's phones sitting next to each other and watching messages being sent from Bittner's phones to Kara's without Bittner actually sending them." This phenomenon, described by Randy Vodenik as "freaky," is a widely known and common function of scheduled future messages found on modern smartphones, including Samsung Galaxy devices which Defendant Keith Bittner frequently possessed, and messaging applications like WhatsApp. Despite this readily available explanation for the "freaky" behavior, and despite the fact that four individuals (Deputy Townsell, Sergeant Nick Pearson, Keith Bittner, and Randy Vodenik) witnessed or described this behavior, none of the DCSO officers involved (Townsell and Pearson) identified or investigated the possibility of scheduled messages. This willful blindness, particularly given Plaintiff's attempts to inform Deputy Townsell, Detective Jacobs, and Sergeant Vanderlust about Keith Bittner's known use of such tactics from his ex-partners like Mandi Hammer, demonstrates a deliberate failure to investigate exculpatory evidence. Moreover, the January 16, 2025 police report explicitly stated that "AllTracker" was a "subscription service." Despite knowing this, and despite the claim in the emails (attributed to Keith Bittner) that "Don't bother subpoena records the program we use is not based in the United States." Defendants Deputy Townsell and Sergeant Pearson deliberately failed to pursue the most obvious investigative avenue: subpoenaing payment records from U.S.-based payment processors (e.g., Visa, Mastercard, PayPal, or other common subscription payment platforms). Such records, routinely obtainable through standard law enforcement procedures under 18 U.S.C. § 2703 (Stored Communications Act) is law enforcement 101, without requiring international cooperation, would have immediately identified the paying subscriber of "AllTracker," thereby conclusively exonerating Plaintiff and implicating the true perpetrator (Defendant Keith Bittner, who paid for it). This deliberate failure to pursue readily available, highly exculpatory evidence, combined with the acceptance of a demonstrably false claim about subpoena limitations, demonstrates a profound and malicious indifference to the truth, a knowing suppression of exculpatory evidence under Brady v. Maryland, 373 U.S. 83 (1963), and active participation in the conspiracy to maliciously prosecute Plaintiff. This failure was known to and ratified by supervisory officials, including Defendant Chief Deputy Bret Maxwell and Sheriff Adam Infante, reflecting an official policy or custom of the Dallas County Sheriff's Office to prioritize preDetermined narratives over constitutional obligations.

e. AllTracker is based in Germany, as Defendant Deputy Townsell would have known when he did research about it, as he demonstrated he did with it appearing in the report. U.S. law enforcement routinely obtains records from German companies (Germany has

robust MLAT cooperation with the U.S.), and has no qualms in adhering to US subpoenas from law enforcement.

f. Defendant Deputy Townsell, acting under color of state law, deliberately failed to pursue readily available exculpatory evidence that would have conclusively disproven the allegations against Plaintiff. Despite investigating Plaintiff for alleged use of the "AllTracker" application, Deputy Townsell failed to subpoena Plaintiff's Google Play Store download history - a standard investigative procedure routinely employed in digital stalking and harassment investigations. Such a subpoena would have immediately revealed that Plaintiff had never downloaded, installed, or possessed the AllTracker application on any device. This investigative step is so fundamental and commonplace in modern law enforcement that its omission can only be characterized as deliberate indifference to the truth or, more accurately, willful blindness designed to support a preDetermined outcome. Deputy Townsell's failure to obtain this easily accessible evidence - which would have taken mere days to acquire through standard legal process - demonstrates a reckless disregard for Plaintiff's constitutional rights and a conscious decision to ignore exculpatory evidence in favor of securing an arrest based on fabricated allegations. This failure, combined with Deputy Townsell's reliance on demonstrably false statements, constitutes a violation of Plaintiff's Fourth Amendment right to be free from arrest without probable cause and Fourteenth Amendment right to due process.

g. DCSO's Disregard for Keith Bittner's Documented Pattern of Fabricated Suicide Threats: The emails documented in the January 16, 2025 police report, sent from "firemedic115074@gmail.com" (attributed to Defendant Keith Bittner), contained explicit threats of harm against Defendant Keith Bittner, stating, "Terminate his rights before the end of the work day or we find a way to get rid of him," and "He will be lucky to see tomorrow." This incident, where Defendant Keith Bittner was allegedly the target of threats, directly coincides with his well-documented pattern of both feigning suicide threats and, crucially, falsely attributing suicide threats to others through spoofed messages to manipulate and accuse. This pattern, known to Plaintiff through Keith Bittner's ex-partners like Valerie Bittner and Mandi Hammer (whom Plaintiff had identified to DCSO as potential witnesses), should have immediately raised a red flag for Deputy Townsell and Sergeant Pearson. Their failure to investigate this known modus operandi of Defendant Keith Bittner, particularly when the emails involved threats against Keith himself, demonstrates a deliberate and profound disregard for critical exculpatory information. Had DCSO contacted these readily available witnesses, they would have learned of Defendant Keith Bittner's history of fabricating such threats, which would have further undermined the credibility of the January 4th messages (where Plaintiff was accused of sending similar threatening messages) and exposed the malicious intent behind the "welfare check" itself.

## K. January 17-18, 2025: False Arrest, Illegal Search, and Constitutional Violations

130. The Ambush Arrest of Plaintiff and Trauma to Minor Child

On January 17, 2025, Plaintiff arrived at the Dallas County Sheriff's Office (DCSO) to report the January 12th murder trap and plot, as advised by his attorney. Instead of being met with an investigation into the credible threat against his life, Plaintiff was ambushed and arrested by Defendant Deputy Jalen Townsell, who had just taken Defendant Keith Bittner's fabricated "AllTracker" report.

131. This arrest was executed in a pretextual manner, using the stale January 6th warrant (for the fabricated January 4th texts) as cover for an arrest actually motivated by the fabricated January 16th hacking allegations. The arrest was further motivated by a pattern of discriminatory animus against Plaintiff, as Detailed herein.

132. At the time of Plaintiff's ambush and arrest, he was accompanied by his youngest son, R.C., then four years old. Defendant Deputy Jalen Townsell and the unnamed DeSoto Town police officer (acting under color of state law and in concert with DCSO) knew R.C. was present, having observed Plaintiff at the station with his son.

133. The arrest occurred in a manner that was unnecessarily public and profoundly traumatic for R.C. While Plaintiff was held in the back of the DeSoto Town police car, awaiting transfer to DCSO custody, R.C. was observed crying, attempting to break the police car window, trying to open the door, and attempting to break Plaintiff's handcuffs.

134. This severe emotional distress experienced by R.C. was a direct and foreseeable consequence of the Defendants' unlawful and pretextual arrest of Plaintiff. The actions of Defendants Deputy Jalen Townsell and the unnamed DeSoto Town officer, in executing a pretextual arrest in such a manner and in the presence of a vulnerable child, constituted child endangerment under Iowa Code Section 726.6, causing severe emotional harm to R.C. and violating his fundamental right to a safe and stable environment.

135. The Defendants' conduct, particularly the deliberate and pretextual nature of the arrest, knowing it would occur in front of Plaintiff's child, was extreme and outrageous, and caused Plaintiff severe emotional distress from witnessing his child's profound trauma and fear.

136. Plaintiff's Attempts to Report the Murder Plot and DCSO's Deliberate Obstruction

Upon Plaintiff's arrival at the DCSO on January 17, 2025, to report the January 12th murder trap and plot, he was immediately subjected to interrogation by Defendant Deputy Jalen Townsell. Plaintiff, even while being arrested, immediately informed Deputy Townsell, "just so you know, I came to you guys this morning about a threat against my life that just happened."

137. During this initial interview, Plaintiff provided extensive, credible Details to Deputy Townsell regarding the murder trap, including:
    a. The specific content of the January 12, 2025, spoofed text messages, the manipulated Facebook post, and the old booking photo of Defendant Keith Bittner, all designed to lure Plaintiff to Defendant Kara Bittner's residence.

b. His confirmation of the murder plot Details with Shane Dewees on the 15th, including the plan to use an old gun belonging to Plaintiff to stage a "justified killing." Plaintiff also informed Deputy Townsell that he possessed an audio recording of this conversation with Dewees.

c. His explicit knowledge of Defendant Keith Bittner's sophisticated digital manipulation tactics, stating that Keith Bittner "has been known to 'doctor things'" and specifically Detailing how Keith's ex-partners (including Valerie and Mandi) and their families had warned Plaintiff never to reply to Keith's text messages or answer his phone calls because Keith would "record his voice and switch it around and make you say things you didn't say."

d. His explanation that the custody dispute was the motive, stating, "Don't you understand this is because the judge any day is going to rule on me getting custody of my kids and not her."

e. His concerns regarding Defendant Erin Helleso's bias and her alleged plotting with Defendant Kara Bittner to take the children from Plaintiff.

f. His statements about Defendant Keith Bittner's pattern of avoiding capture by constantly changing phone numbers and threatening to frame others, including Shane Dewees.

g. His lawyer's advice to report the threat to the Sheriff's Office.

h. The December 5th, 2024 spoofed texts from Keith to Plaintiff.

138. Defendant Deputy Townsell, and subsequently other DCSO Defendants, deliberately ignored and actively misrepresented this Detailed and credible report of an attempted murder. Specifically:

a. Defendant Deputy Townsell included Plaintiff's warning about Keith Bittner's manipulation tactics in his report but deliberately mischaracterized it. Rather than documenting Plaintiff's legitimate concern about Keith Bittner's known pattern of digital fabrication, Deputy Townsell framed Plaintiff's statement as if he was admitting prior knowledge of the alleged "phantom texts" themselves, thereby twisting exculpatory evidence into an implication of guilt.

b. Defendants Deputy Townsell, Sgt. Neal Vanderleest, and Det. Adam Jacobs failed to document or pursue any investigation into the murder plot reported by Plaintiff, including failing to contact Shane Dewees, secure the audio recording Plaintiff mentioned, or investigate Defendant Kara Bittner.

c. Despite Plaintiff presenting Details of Keith Bittner's sophisticated digital manipulation and impersonation, Defendants failed to investigate these claims, instead focusing solely on the fabricated "hacking" allegations against Plaintiff.

139. Deputy Townsell's Deliberate Disregard of Exculpatory Evidence and Active Suppression of Fabrication

During the investigation into the January 12, 2025, attempted murder trap message, Plaintiff directly presented Defendant Deputy Jalen Townsell with compelling, objective evidence

demonstrating that the message was a fabrication. Plaintiff meticulously showed Deputy Townsell:

a. How the message had been visibly spliced together, evidenced by a black bar splicing images and misaligned timestamps above and below the bar, indicating an illicit alteration;

b. That the image in the message appeared to be an outdated arrest photo of Defendant Keith Bittner from a 2020 arrest for choking his ex-wife, Valerie, suggesting recycled and manipulated content;

c. Visible discrepancies in font types and sizes within the message, strongly indicating digital editing;

d. The presence of Snapchat icons, despite Plaintiff having no Snapchat account, and a fact later corroborated by Defendant Keith Bittner's use of Snapchat.

e. That the message was consistent with Defendant Keith Bittner's known history of editing, sending messages anonymously from spoofed numbers, and attempting to gain trust through deceptive means.

Despite Plaintiff's clear, Detailed, and verifiable demonstration of these indications of fabrication, Defendant Deputy Townsell exhibited a profound and deliberate lack of interest in investigating the veracity of the message. Plaintiff repeatedly urged Deputy Townsell to investigate Defendants Keith and Kara Bittner based on this compelling evidence of fabrication, but Deputy Townsell profoundly refused. Egregiously, acknowledged to the Plaintiff that he also observed signs of the message being fake. This deliberate refusal to investigate clear evidence of fabrication, coupled with Deputy Townsell's own admission, demonstrates that Deputy Townsell, acting in concert with other DCSO personnel and Defendants Kara and Keith Bittner, knowingly suppressed exculpatory evidence, lacked probable cause for Plaintiff's arrest, and actively participated in the conspiracy to maliciously prosecute Plaintiff based on fabricated charges, in direct violation of Plaintiff's Fifth and Fourteenth Amendment rights to due process.

140. Furthermore, a minimal and impartial investigation by Deputy Townsell would have revealed that this was not an isolated incident of digital fabrication by Defendant Keith Bittner. Specifically, in July 2023, approximately 18 months prior, Defendant Keith Bittner sent an identical photo spliced message, utilizing the same outdated 2020 arrest photo of himself, to Mandi's mother. This prior message, which forewarned of child abuse, was part of a harassment complaint documented at the Norwalk Police Department, a nearby jurisdiction. This readily discoverable information demonstrates that Deputy Townsell either: (1) failed to conduct even a rudimentary and impartial inquiry into the obvious signs of fabrication, despite explicit instruction from Plaintiff to do so, indicating gross deliberate indifference; or (2) more likely, was already aware of Defendant Keith Bittner's prior, identical act of fabrication and deliberately suppressed this critical exculpatory information to ensure the prosecution of Plaintiff without impediment. In either instance, Deputy Townsell's conduct constitutes a knowing and willful suppression of exculpatory evidence, a gross dereliction of duty, and an overt act in furtherance of the conspiracy to unjustly prosecute Plaintiff while shielding the true perpetrators.

141. Defendant Deputy Townsell further obstructed Plaintiff's attempts to report the murder trap by expressing suspicion regarding Plaintiff's delay in reporting the incident, questioning why

Plaintiff waited until the 17th. Plaintiff explained that the incident occurred late on January 12th, the plot was confirmed by Shane Dewees on January 15th (including Details of a "ghost gun" and a "justified killing" plan discussed between Defendant Kara Bittner and Defendant Randy Vodenik), and that Plaintiff's lawyer advised him to report it on January 17th after their conversation late on January 16th. Defendant Townsell's refusal to accept this explanation demonstrated his deliberate indifference to the truth and his focus on maintaining a preDetermined narrative against Plaintiff.

142. Defendant Deputy Townsell then witnessed Plaintiff have a 4-minute conversation with his family law lawyer in the interrogation room, but mischaracterized the call in his report, omitting his lawyer's acknowledgement the previous evening that she told Plaintiff to report the attempted murder to law enforcement the following day. This refusal to accept potentially exculpatory evidence demonstrated Defendant Deputy Townsell's deliberate indifference to the truth and his focus on maintaining a preDetermined narrative against Plaintiff.

143. During transport to jail, Plaintiff explicitly told Deputy Townsell: "I know what this could be about and involves me being warned that Keith fakes things." Plaintiff was specifically referring to the prior warning from Keith's ex-mother-in-law about Keith's pattern of fabricating and manipulating text messages and calls using spoofed numbers, a warning Deputy Townsell deliberately mischaracterized in his report. Plaintiff gave Deputy Townsell her name and number, in which he refused to call and verify this.

144. During Plaintiff's initial interrogation on January 17, 2025, Plaintiff discussed his concerns regarding the court evaluator, Defendant Erin Helleso, and her public display of anti-white male sentiment online. Plaintiff further articulated his belief that the judicial system, particularly in family law, exhibits significant bias against white men. Defendant Deputy Townsell harbored resentment at this and is why he displayed it in his report.

145. Plaintiff further attempted to inform Deputy Townsell that Shane Dewees, who had lived with Defendant Kara Bittner for nine months, could corroborate many of Plaintiff's claims about both Kara and Keith. This specific information was deliberately mischaracterized or ignored by Deputy Townsell and later directly contradicted by Defendant Detective Adam Jacobs' knowing falsehood that Shane and Kara were 'just friends'

146. Off-Camera Expression of Bias

Defendant Townsell, after exiting the interrogation room and deliberately moving beyond the view of the recording camera, confronted Plaintiff. Defendant Townsell stated to Plaintiff, "as a half black man, you are a racist" This statement, made outside the official record, unequivocally revealed Defendant Townsell's personal animus and a retaliatory, biased predisposition against Plaintiff based on Plaintiff's race, gender, and expressed viewpoint.

147. Defendant Townsell's expressed bias directly influenced his official duties concerning Plaintiff. His actions, including the alleged inaccuracies in the arrest report, his failure to properly

investigate crimes committed against Plaintiff by Defendant Keith Bittner and Defendant Kara Bittner, and his increased vigor in pursuing Plaintiff, were motivated by this discriminatory animus, rather than an impartial application of the law. This pattern demonstrates Defendant Townsell's refusal to act impartially and his willingness to allow personal prejudices to dictate his official conduct.

148. Prior Incidents of Unconstitutional Conduct by Deputy Jalen Townsell

Defendant Deputy Jalen Townsell has a documented history of engaging in unconstitutional conduct, including the use of excessive force and violations of federal disability rights law. In December 2022, Defendant Deputy Jalen Townsell was one of three deputies from the Dallas County Sheriff's Department involved in the arrest of Michael Nelson. During this arrest, despite Nelson not resisting or threatening officers, and identifying himself as a disabled military veteran, officers (including Defendant Deputy Townsell) allegedly dislocated and broke both of Nelson's elbows, requiring multiple surgeries. This incident, now the subject of a lawsuit filed in December 2024, further demonstrates Defendant Deputy Townsell's pattern of engaging in unconstitutional conduct, including the use of excessive force and failure to accommodate individuals with disabilities, and directly contradicts his duty to act impartially and within constitutional bounds.

149. While law enforcement officers are generally permitted to employ certain deceptive tactics during interrogations, this authority is not unlimited and is subject to clear constitutional constraints under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Deception that is employed to circumvent warrant requirements, fabricate legal authority, induce involuntary confessions through coercion, obstruct access to exculpatory evidence, or deny fundamental rights crosses the constitutional line and violates clearly established law. Defendants Sgt. Neil Vanderlust and Det. Adam Jacobs, beginning no later than January 17, 2025, and continuing through the present, deliberately fabricated evidence, misrepresented legal authority and material facts, and employed coercive tactics that far exceeded the bounds of permissible interrogation techniques. These Defendants, acting in concert with Defendants Kara Bittner, Keith Bittner, and other Dallas County Sheriff's Office personnel, including but not limited to Deputy Wyatt Westburg, and with the knowledge, acquiescence, or deliberate indifference of their supervisors, engaged in a coordinated scheme designed to:
  a. unlawfully access Plaintiff's electronic devices in violation of the Fourth Amendment;
  b. induce involuntary statements from Plaintiff in violation of the Fifth Amendment;
  c. obstruct Plaintiff's presentation of exculpatory evidence in violation of due process; and
  d. further the conspiracy to maliciously prosecute Plaintiff based on fabricated allegations. These actions directly and proximately caused violations of Plaintiff's Fourth, Fifth, and Fourteenth Amendment rights, resulting in unlawful Detention, coerced statements, suppression of exculpatory evidence, unlawful searches and seizures, and ongoing malicious prosecution, as further Detailed below. The following specific instances demonstrate the systematic nature and constitutional violations of Defendants' conduct:

150. Following Plaintiff's initial interrogation on January 17, 2025, and a purposely manipulative brief second interrogation, Plaintiff was placed in a holding cell at the Dallas County Jail. Despite Plaintiff's exhaustion from the day's events, including his arrest, prolonged interrogation in which Plaintiff was repeatedly ignored on purpose, worrying about his children, and the emotional trauma of being falsely accused, Defendants, through jail staff acting at their direction and/or interrogating officers Sgt. Neil Vanderlust and Det. Adam Jacobs, deliberately waited until just after Plaintiff fell asleep to wake him up for further interrogation. This is a well-documented and deliberate sleep deprivation tactic with an extensive history in coercive interrogation practices, specifically designed to induce disorientation, impair cognitive function, reduce resistance to questioning, coerce statements, and elicit false confessions. As part of the illegal campaign of deception and coercion described above, this tactic was employed to render Plaintiff more vulnerable to the subsequent fabrications and demands made by Defendants.

151. Upon information and belief, Defendants' tactics, including the timing of presenting the purported "warrant" for signature and the subsequent interrogations described below, were deliberately designed to exploit Plaintiff's severe physical and mental exhaustion and profoundly disoriented state, which were intentionally exacerbated by the non-standard hours of the interrogations and the deliberate sleep deprivation. This was done with the specific intent to render Plaintiff vulnerable and more susceptible to coercive pressure, to prevent him from effectively asserting his constitutional rights, to obtain involuntary consent and statements, and to facilitate the unlawful searches and seizures of his property, thereby violating Plaintiff's Fifth and Fourteenth Amendment rights to due process and freedom from self-incrimination.

152. Coerced "Consent" Through Fraud and Misrepresentation of Warrant Authority

Furthering the conspiracy Detailed in Paragraph 120, and exploiting Plaintiff's exhausted and disoriented state as described in Paragraphs 121 and 129, Defendants Sgt. Neil Vanderlust and Det. Adam Jacobs removed Plaintiff from the intake cell to an interrogation room in the early morning hours of January 18, 2025. At this time, Defendants presented Plaintiff with a document purporting to be a warrant to access his cellular phones and demanded that Plaintiff "sign it." Defendants explicitly and falsely stated that Plaintiff needed to sign this "warrant" first before he could be permitted to show them evidence on his phone regarding the January 12, 2025, attempted murder plot against Plaintiff and other exculpatory information that Plaintiff had repeatedly attempted to present. This demand was legally nonsensical and a deliberate fabrication of legal authority, as search warrants, once validly issued by a neutral and Detached magistrate, require no signature from the subject of the search. No lawful search warrant requires the subject's signature for execution or validity.

153. The demand for Plaintiff's signature on this purported "warrant," made under these coercive circumstances, through this explicit misrepresentation of legal authority and procedure, and while exploiting Plaintiff's severe exhaustion and desperation to present exculpatory evidence, constituted:

a. An attempt to obtain involuntary and constitutionally invalid consent to search in violation of the Fourth Amendment, as any purported "consent" obtained under these circumstances was the product of deception, coercion, and exploitation of Plaintiff's impaired state, rendering it involuntary under established Fourth Amendment jurisprudence governing voluntariness of consent, as articulated in Bumper v. North Carolina, 391 U.S. 543 (1968).

b. A deliberate and calculated effort to manufacture retroactive authorization or the appearance of consent for Defendants' already unlawful seizure of Plaintiff's devices and their planned unlawful access to those devices, demonstrating Defendants' consciousness of the illegality of their intended actions;

c. A calculated and malicious exploitation of Plaintiff's profoundly impaired cognitive state, his severe exhaustion, and his legitimate and desperate desire to present exculpatory evidence to clear his name, thereby using Plaintiff's own innocence and desire for justice against him; and are compelling evidence of Defendants' consciousness of guilt regarding the fabricated nature of the charges and their deliberate attempt to conceal the fraudulent, coercive, and unconstitutional tactics they were employing to obtain evidence and statements from Plaintiff.

This conduct violated clearly established Fourth Amendment law, and no reasonable officer could have believed that demanding a subject's signature on a purported search warrant, under threat of withholding access to present exculpatory evidence, and while exploiting severe exhaustion and disorientation, was lawful conduct.

154. As part of the systematic scheme to unlawfully access Plaintiff's electronic devices, during a subsequent interrogation while Plaintiff remained in his severely exhausted and disoriented state, and while Plaintiff attempted to operate his cellular devices as coerced and directed by Defendants Sgt. Neil Vanderlust and Det. Adam Jacobs, Defendant Sgt. Neil Vanderlust physically seized Plaintiff's secondary phone from Plaintiff's hands (which Defendants erroneously believed to be Plaintiff's primary device), opened the camera application on the device, and repeatedly swiped the screen to prevent the device from automatically locking due to inactivity. Defendants then compelled Plaintiff to input his numeric passcode into the device dozens of times in their direct and unobstructed view, explicitly and repeatedly demanding that Plaintiff hold the device in a position and manner that prevented him from concealing his passcode input from their observation and deliberately preventing Plaintiff from using biometric authentication methods (such as fingerprint recognition) that would have shielded the passcode from their view. Crucially, when Plaintiff, in an attempt to protect his privacy, briefly attempted to obscure his hand while inputting the passcode, Defendant Adam Jacobs immediately hit Plaintiff's hand away, sternly stating, "You can't do that." This forceful intervention, accompanied by the false assertion that Plaintiff might attempt to delete evidence—a technical impossibility within the mere 3 seconds of inputting a passcode while being under constant observation and having his device held by the Defendants—unequivocally demonstrates Defendants' active coercion and their premeditated intent to steal Plaintiff's passcode rather than obtain voluntary consent. This coercive tactic stands in stark contrast to Plaintiff's experience during jail intake, where he was permitted to access his phone under observation to retrieve contact numbers

without being forced to repeatedly input his passcode or have his efforts to obscure it physically prevented.

155. These actions, undertaken in coordination between Defendants Sgt. Neil Vanderlust and Det. Adam Jacobs, constituted a deliberate, premeditated, and coordinated scheme to memorize, steal, and unlawfully obtain Plaintiff's passcodes, thereby circumventing the Fourth Amendment's warrant requirement and enabling Defendants to unlawfully access the contents of Plaintiff's mobile phones without a valid search warrant, without probable cause, and without Plaintiff's knowing and voluntary consent. This conduct violated clearly established Fourth Amendment law under Riley v. California, 573 U.S. 373 (2014), which unequivocally holds that warrantless searches of the digital contents of cell phones are per se unconstitutional, even incident to a lawful arrest. Plaintiff personally observed Defendants Sgt. Neil Vanderlust and Det. Adam Jacobs retained possession of his cellular phone after successfully acquiring and testing his passcode, providing them unfettered and unlawful access to its entire digital contents in violation of the Fourth Amendment.

156. Moreover, the unlawful access to Plaintiff's cellular devices and the coercive tactics employed to obtain Plaintiff's passcodes, as Detailed above, were further compounded by the absence of any lawful basis for Plaintiff's Detention. Plaintiff's initial arrest itself was illegal, having been executed without probable cause and pursuant to an illegal and stale warrant. Therefore, any subsequent search or seizure conducted during this unlawful Detention is inherently tainted. Furthermore, at no time during the January 17-18, 2025 interrogations did Defendants Sgt. Neil Vanderlust or Det. Adam Jacobs articulate, establish, or demonstrate the existence of any exigent circumstances that would justify their warrantless searches of Plaintiff's cellular devices or their coercive and deceptive tactics to obtain Plaintiff's passcodes. Plaintiff was in unlawful custody, his phones were secured, and no emergency existed that would have prevented Defendants from obtaining a proper, lawfully issued search warrant through constitutional means and established legal procedures. The absence of any exigent circumstances, combined with the underlying illegal arrest and warrant, further demonstrates the knowing, deliberate, and egregious nature of Defendants' Fourth Amendment violations, and their conscious disregard for Plaintiff's constitutional rights.

157. DCSO, through Defendants Sgt. Nick Pearson, Sgt. Neil Vanderlust, Det. Adam Jacobs, and other unnamed officers and agents acting under their direction or with their knowledge, illegally accessed Plaintiff's cellular phones by memorizing Plaintiff's passcode as described above, testing the passcode outside the interrogation room to confirm its accuracy, and subsequently accessing the devices' contents without a warrant. Defendants then deliberately and falsely represented to Plaintiff and others that they were "not getting past password" and could not access the devices, a statement demonstrably false given their prior successful memorization and testing of the passcode. This false statement was made to conceal their unlawful access, to justify further coercive demands upon Plaintiff, and to further the conspiracy to fabricate evidence and obstruct justice.

158. Consistent with their pattern of Fourth Amendment violations and unlawful searches described above, upon Plaintiff's arrival at the Dallas County Jail on January 17, 2025, Plaintiff's car key was confiscated along with his other personal possessions as part of standard intake procedures. However, sometime after midnight on January 18, 2025, while Plaintiff remained in a holding cell, jail workers, acting at the direction of Defendants or other DCSO personnel, entered Plaintiff's cell and presented Plaintiff with his car key, demanding that Plaintiff sign a document purporting to acknowledge the key's presence at the jail and its return to Plaintiff. This incident occurred after Plaintiff's vehicle had been left parked on a public street approximately one block from Plaintiff's residence. The only reasonable inference from Defendants' prior possession of Plaintiff's car key, which had been secured with Plaintiff's other personal property, and the subsequent middle-of-the-night return of that key with a demand for Plaintiff's signature acknowledging its presence, is that Defendants Sgt. Neil Vanderlust and Det. Adam Jacobs, personally or through other DCSO personnel acting at their direction and in furtherance of the conspiracy, unlawfully removed the car key from Plaintiff's secured possessions and used it to access, enter, and search Plaintiff's vehicle without a search warrant, without probable cause, without exigent circumstances, and without Plaintiff's knowledge or consent, in direct violation of the Fourth Amendment. No search warrant for Plaintiff's vehicle was ever presented to Plaintiff, and upon information and belief, no such warrant ever existed or was sought.

159. Deliberate Focus on Fabricated Charges While Ignoring Exculpatory Evidence

As part of the coordinated scheme to obstruct justice and suppress exculpatory evidence, during the prolonged interrogations on January 17-18, 2025, involving Defendants Sgt. Neil Vanderlust and Det. Adam Jacobs, these Defendants relentlessly and almost exclusively focused their questioning on the fabricated hacking allegations and Plaintiff's cellular phone setup, security measures, and technical configurations, while simultaneously and deliberately ignoring, dismissing, and refusing to investigate Plaintiff's repeated, Detailed, and specific attempts to present compelling evidence of the January 12, 2025, attempted murder trap and plot against Plaintiff orchestrated by Defendants Kara and Keith Bittner. This tactical focus on fabricated charges, combined with the deliberate exploitation of Plaintiff's profoundly disoriented and exhausted state, was specifically designed to:
> a. prevent Plaintiff from presenting exculpatory evidence that would immediately exonerate him and expose the Bittners' criminal conduct;
> b. coerce Plaintiff into making statements or admissions regarding offenses he did not commit;
> c. create a false record suggesting Plaintiff was uncooperative or evasive; and
> d. further the conspiracy to protect Defendants Kara and Keith Bittner from criminal accountability while ensuring Plaintiff's wrongful prosecution.

160False Claim of Attorney-Client Privilege to Block Exculpatory Evidence

During an interrogation with Defendant Sgt. Neil Vanderlust and Defendant Det. Adam Jacobs, Plaintiff again attempted to present critical exculpatory evidence, specifically the content and context of Plaintiff's recorded conversation with his family law attorney regarding the January

12, 2025, murder plot and trap. Defendant Det. Adam Jacobs explicitly and immediately stopped Plaintiff from presenting this evidence, falsely and deliberately claiming that he was "not allowed to look at communication with my lawyer and that is privileged." This statement was a knowing, deliberate, and material falsehood, and constituted a calculated tactic to prevent Plaintiff from presenting crucial exculpatory evidence that would have immediately demonstrated:

a. Plaintiff's innocence of the fabricated charges;

b. the Bittners' criminal conduct and conspiracy;

c. Plaintiff's good faith and legitimate fear for his safety; and

d. the baseless and retaliatory nature of the charges against Plaintiff. Any privilege concern was inapplicable to the fabricated criminal charges;

> (ii) Plaintiff was offering to waive any potential privilege and voluntarily present the evidence;
>
> (iii) the attorney-client privilege belongs to the client (Plaintiff), not to law enforcement, and Plaintiff had the absolute right to waive it; and
>
> (iv) the evidence was directly relevant and exculpatory to the charges against

161. Plaintiff. Defendant Det. Adam Jacobs explicitly stated to Plaintiff that if he were to look at the communication with Plaintiff's lawyer, he "could get in trouble for doing this," and further elaborated that even after the purported warrant to go through Plaintiff's phone, he would face consequences if he reviewed such communication Defendant Det. Adam Jacobs's deliberate refusal to review this information, which he knew to be material, relevant, and exculpatory, constituted:

a. a deliberate obstruction of justice;

b. a violation of Plaintiff's due process rights to present exculpatory evidence;

c. a further act of deliberate indifference to Plaintiff's constitutional rights; and

d. additional evidence of the conspiracy to suppress evidence favorable to Plaintiff and to ensure his wrongful prosecution regardless of his actual innocence.

162. Refusal to Provide Interrogation Videos

Defendants' subsequent and ongoing refusal to provide Plaintiff with copies of the interrogation videos, despite Plaintiff's formal requests as Detailed later in this Complaint, constitutes further compelling evidence of Defendants' consciousness of guilt and their deliberate, ongoing attempt to conceal the fraudulent, coercive, and unconstitutional tactics they employed to obtain Plaintiff's purported "consent," to access his phones, and to elicit statements from him. Defendants are fully aware that the interrogation videos would irrefutably expose and document:

a. the full extent and egregious nature of their misrepresentation of legal authority;

b. the coercive conditions and tactics employed;

c. Plaintiff's profoundly disoriented, exhausted, and impaired state throughout the interrogations;

d. Defendants' deliberate suppression of exculpatory evidence;

e. the fabricated and pretextual nature of the charges; and

f. the conspiracy between Defendants and the Bittners. The deliberate withholding of this evidence constitutes spoliation, obstruction of justice, and a continuing violation of Plaintiff's due process rights.

163. Detective Jacobs' Refusal to Identify Obvious Crimes Committed by the Bittners

During the interrogation with Sgt. Neil Vanderlust and Det. Adam Jacobs, demonstrating either profound incompetence, willful blindness, or deliberate protection of Defendants Kara and Keith Bittner as part of the conspiracy, Plaintiff directly asked Defendant Det. Adam Jacobs what crimes Defendants Kara and Keith Bittner would be charged with for fabricating evidence that led directly to Plaintiff's false arrest. This question was asked after Plaintiff had presented a Detailed hypothetical scenario (which in fact described the actual events) in which individuals fabricated text messages and other evidence to cause someone's arrest. Defendant Det. Adam Jacobs, under video recording that he knew was being made, responded that he "couldn't think of anything they would be charged with" after explicitly accepting the premise of the scenario involving fabricated evidence leading to false arrest.

164. Plaintiff immediately and appropriately retorted that for a man of Defendant Det. Adam Jacobs' age and experience, having spent his entire adult life in law enforcement and in positions of authority and investigation, this response was deeply concerning, profoundly troubling, and powerfully indicative of a deliberate and profound bias in favor of Defendants Kara and Keith Bittner and against Plaintiff. For Defendant Det. Adam Jacobs, an experienced Detective, to claim inability to identify even one of the following obvious and directly applicable criminal statutes is not credible and demonstrates deliberate protection of the Bittners and knowledge of the fabricated nature of the charges against Plaintiff:

a. Iowa Code Section 718.6 (False Reports to Public Safety Entities)
b. Iowa Code Section 720.5 (Perjury)
c. Iowa Code Section 720.6 (Subornation of Perjury)
d. Iowa Code Section 714.2 (Theft by Deception/Fraud)
e. 18 U.S.C. § 241 (Conspiracy Against Rights) (federal statute);
f. 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law) (federal statute).

This exchange, captured on video, constitutes powerful evidence that:

(i) Defendant Det. Adam Jacobs already knew the arrest was based on fabricated evidence;
(ii) Defendant Det. Adam Jacobs had no intention of investigating or charging Defendants Kara and Keith Bittner regardless of the evidence of their criminal conduct;
(iii) Defendant Det. Adam Jacobs was actively protecting the Bittners as part of the conspiracy;
(iv) the entire arrest and interrogation was pretextual and designed to target Plaintiff while shielding the actual criminals.

165. Sergeant Vanderlust's Admission Regarding Warrant Scope

During the interrogation, after Defendant Det. Adam Jacobs temporarily left the interrogation room, leaving only Defendant Sgt. Neil Vanderlust present with Plaintiff, Plaintiff reiterated to Defendant Sgt. Neil Vanderlust that any competent attorney would only allow a client's phones to be searched for the specific accusation that formed the basis for the warrant and nothing more, consistent with the Fourth Amendment's particularity requirement. Defendant Sgt. Neil Vanderlust explicitly agreed with Plaintiff's statement, on camera, acknowledging the legal principle that search warrants must be limited in scope to the specific alleged crime.

166. This exchange, captured on video, provides further compelling proof that:
a. the arrest on the stale illegal warrant was not genuinely about the fabricated text messages at all, but rather was a pretext for a broader, unlawful, and unconstitutional fishing expedition into Plaintiff's entire digital life;
b. Defendants were fully aware of the constitutional limitations on search warrant scope;
c. Defendants intended to exceed those limitations; and
d. Defendants' true purpose was to search for any information that could be used against Plaintiff, regardless of relevance to the stated charges, in furtherance of the conspiracy to ensure Plaintiff's prosecution and to gather intelligence for the Bittners' benefit. Plaintiff had also communicated to DCSO during these interrogations that Defendant Keith Bittner had explicitly threatened to use his law enforcement contacts to ruin people's lives, a threat that Defendants deliberately ignored and failed to investigate. Indeed, throughout the interrogation, the consistent pattern of lies, obfuscation, and deliberate disregard for Plaintiff's attempts to present exculpatory evidence, combined with the peculiar focus on Defendant Keith Bittner's connections, created an unmistakable impression that Defendants Sgt. Neil Vanderlust and Det. Adam Jacobs were fulfilling Defendant Keith Bittner's documented threats to "use people he knows in law enforcement to ruin lives and plant things" on his victims. This conduct demonstrated that the interrogation was not an impartial search for truth, but rather an active component of the conspiracy, designed to "do a favor" for Defendant Keith Bittner or his associates at Plaintiff's expense.

167. Detective Jacobs' Suspicious Focus on Keith Bittner's Employment History

During Plaintiff's interrogations, Defendant Detective Adam Jacobs exhibited a peculiar, persistent, and highly suspicious interest in ascertaining the extent of Plaintiff's knowledge regarding Defendant Keith Bittner's employment history, both past and current. Detective Jacobs was specifically and noticeably "hung up" on obtaining Detailed answers from Plaintiff regarding Keith Bittner's various occupations and professional positions. This line of questioning, which appeared immediately suspicious and legally irrelevant to Plaintiff at the time, bore no direct or apparent relevance to the fabricated text messages DCSO claimed Plaintiff was arrested for or to any legitimate investigative purpose related to those charges.

168. Upon information and belief, Defendant Detective Jacobs' persistent and pointed inquiries regarding Keith Bittner's employment were a deliberate attempt to gauge and assess the extent of Plaintiff's knowledge concerning Defendant Keith Bittner's extensive prior professional

contacts, relationships, and connections within law enforcement agencies, first responder communities, and related governmental entities. This probing and assessment suggests that Defendant Detective Jacobs, and/or other DCSO personnel acting in concert with him, were already aware of Defendant Keith Bittner's connections within law enforcement and related fields, and were attempting to ascertain the extent of Plaintiff's.

169. Systemic Bias and Gender-Based Discrimination

Defendant Deputy Jalen Townsell's personal bias, as evidenced by his off-camera statement ("as a half black man, you are racist"), directly influenced his official duties concerning Plaintiff. His actions, including the alleged inaccuracies in the arrest report, his failure to properly investigate crimes committed against Plaintiff by Defendant Keith Bittner and Defendant Kara Bittner, and his increased vigor in pursuing Plaintiff, were motivated by this discriminatory animus, rather than an impartial application of the law. This pattern demonstrates Defendant Townsell's refusal to act impartially and his willingness to allow personal prejudices to dictate his official conduct.

170. This personal bias is further reflected in and contributes to a broader pattern of discriminatory enforcement within the Sheriff's Department. Plaintiff observed clear instances of disparate treatment based on gender during his Detention.

171. Disparate Treatment in DUI Arrests

In the early morning hours of January 18, 2025, while Plaintiff was Detained, a male individual was arrested for Driving Under the Influence (DUI) after being involved in an accident where his vehicle was struck by another car running a red light. This male was processed and Detained.

172. Preferential Treatment for Female Suspect

Later that same early morning, the male arrestee's girlfriend arrived at the jail, clearly intoxicated, and having driven to the facility. Despite being visibly impaired and having driven to the jail in that condition (an act that would constitute DUI and potentially endangerment), Sheriff's Department deputies did not arrest her. Instead, they actively facilitated her departure by instructing her to take an Uber home, sober up, and return later to bail out her boyfriend.

173. Contrast in Enforcement

This incident starkly contrasts the treatment of the male arrestee (who was processed and Detained for DUI after an accident) with that of his female counterpart, who was allowed to avoid arrest for a similar, if not more egregious, offense of driving while intoxicated. This differential treatment demonstrates a clear pattern and practice by Sheriff's Department personnel of providing preferential treatment to women, and conversely, applying more stringent and punitive enforcement against men, particularly in scenarios involving intoxication and driving offenses.

## 174. Pattern of Gender-Based Disparity

This observed incident is not isolated but is consistent with a broader pattern of gender-based discriminatory practices within the Sheriff's Department, as further evidenced by the experiences of other male Detainees and the general societal bias Plaintiff articulated to Defendant Townsell. The Sheriff's Department's actions in this instance reflect a custom or policy of deliberate indifference to the Equal Protection rights of male individuals.

## 175. Corroborating Accounts of Systemic Bias from Other Detainees

While Detained, Plaintiff spoke with another male inmate, who was the only other inmate Plaintiff was in proximity to, who was arrested for violating a court order related to his ex-partner. This inmate asserted he was falsely accused, having been at work during the alleged violation, and stated that this was not the first time his ex-partner had him falsely arrested on zero evidence. He further expressed that, because of his extensive legal background from a juvenile age, "No One Believes him" and he is routinely arrested solely on his false accuser's word. This account corroborates Plaintiff's experience of being subjected to false accusations and arrests based on unverified claims from female accusers. This makes 3 out of 3 that show differential treatment of men and women in relation to the DCSO.

## 176. Advice to Abandon Children

The male DUI arrestee, while intoxicated and unfiltered, repeatedly advised Plaintiff to "give up my children" and stated it "wasn't worth it" to fight for them against a biased system. This reflects a pervasive sentiment among men who have experienced similar injustices within the family law and criminal justice systems. His unfiltered statements, while not directly attributable to Sheriff's Department policy, highlight the severe and damaging impact of such systemic biases on male parents.

177. The coordinated sequence of constitutional violations—pretextual arrest, unlawful vehicle search, coercive interrogations conducted during sleep deprivation, forced passcode disclosure, and warrant circumvention—demonstrates a deliberate pattern and practice by Defendants to deprive Plaintiff of his constitutional rights under color of law, rather than isolated incidents of negligence or mistake.

## L. Post-Arrest Obstruction, Evasion Regarding Seized Phones, and Deliberate Failure to Investigate Exculpatory Evidence (January - March 2025)

178. DeSoto Police Complicity in Jurisdictional Shell Game and Obstruction of Murder Plot Investigation

In February 2025, following Plaintiff's January 17, 2025 arrest and subsequent confirmation of the murder plot with Shane Dewees, Plaintiff again sought to report the January 12, 2025

attempted murder trap. Having been repeatedly sent away by the Dallas County Sheriff's Office (DCSO) under the false pretense that they lacked jurisdiction to investigate such a multi-jurisdictional threat, Plaintiff was directed by DCSO to report the incident to the Town of DeSoto Police Department. Plaintiff complied, providing a DeSoto police officer with Detailed information regarding the credible threat against his life and implicating Defendant Randy Vodenik in the plot. However, the DeSoto officer, upon receiving Plaintiff's report, immediately forwarded all information directly to the Dallas County Sheriff's Office without conducting any independent investigation himself. When Plaintiff questioned why his report was being forwarded rather than investigated by DeSoto PD, the officer stated he "had to" forward it to DCSO. This sequence of events reveals a deliberate and deceptive scheme: DCSO actively sent Plaintiff away under the false pretense of lacking jurisdiction, only to then covertly obtain the very same information via the DeSoto police. This subterfuge allowed DCSO to obtain Plaintiff's critical intelligence regarding the murder plot without direct engagement or accountability, presumably to scrutinize it for information to use against Plaintiff rather than to investigate the credible threat to his life. Following this, the DeSoto officer dismissed Plaintiff's Detailed allegations as "he said/she said" and refused to take any investigative action, concluding the matter. This multi-agency pattern of jurisdictional deflection and pre-emptive, covert information gathering demonstrates a pervasive and coordinated effort to ensure Plaintiff's criminal complaints against the Bittner Defendants were systematically ignored or suppressed, thereby actively furthering the conspiracy to deprive Plaintiff of his constitutional rights and denying him access to effective law enforcement. This deliberate manipulation of jurisdictional protocols directly undermined Plaintiff's trust in the DeSoto police force and compelled him to seek assistance from the Iowa State Police.

179. Following Plaintiff's unlawful arrest on January 17, 2025, Plaintiff's criminal defense attorney, Sean Spellman, initiated communication with the Dallas County Attorney's Office to inquire about the case, including the status of Plaintiff's two seized cell phones and the investigation into the alleged threatening text messages.

180. On or about February 20, 2025, Mr. Spellman corresponded with Assistant County Attorney John Judisch, specifically requesting "any reports and videos" and inquiring about the seized cell phones, noting, "We believe they may contain exculpatory evidence. If they cannot be released, then we will have to discuss other arrangements for them to be examined."

181. Mr. Judisch's initial response provided limited discovery and stated, "I have also reached out to the Deputy to see what evidence, if any, we have that ties the Defendant to the number used to send the text messages to the victim." Notably, Mr. Judisch did not clarify the status or location of Plaintiff's seized phones.

182. On or about February 20, 2025, Mr. Spellman reiterated his concern regarding the seized phones, stating, "Specifically, we are interested in the status of the two cell phones taken from him. It's not clear to me who has them but I suspect DCSO does... I hope that law enforcement can take some steps to further their investigation-- including Determining the origins of the

messages sent from 515-567-6635. There MUST be some way to backtrack the message and Determine sender information or even an originating IP address."

183. In the same communication, Mr. Spellman explicitly informed the County Attorney's Office: "To be clear, Mr. Clark denies these allegations. We suspect that the protected party and her current boyfriend fabricated the messages. It is very complicated with many tentacles and I am glad to share more sometime when we meet to discuss this case." This unequivocally put the County Attorney's Office on direct notice of the fabrication allegations.

180. Despite Mr. Spellman's repeated inquiries, Mr. Judisch, on or about February 20, 2025, responded vaguely, "I am still trying to connect with the DCSO regarding the phones, etc., and once I have an update, I will let you know." This evasive response failed to provide any clear information about the status, location, or intended forensic examination of Plaintiff's seized phones.

184. On or about March 3, 2025, Mr. Spellman again pressed for information, writing, "Have you had any success in tracking down the phones that were taken for Mr. Clark? Is there any insight as to whether there's been any investigation on the phone number that sent the messages that issue in this case? Are there other reports or discovery that we do not yet have? We're kind of stuck until we can figure some of these things out."

185. Later on March 3, 2025, Mr. Spellman, after engaging his own cell phone forensics expert, provided the County Attorney's Office with specific, actionable exculpatory information regarding the spoofed phone number (515-567-6635):
   a. The number was active on January 4, 2025.
   b. Its origin was Ames, IA.
   c. It was associated with "Onvoy LLC bt. by intelliquent."
   d. It was identified as a non-fixed VoIP (Voice over Internet Protocol) number.
   e. A public "Reddit hit" on the number was also noted.

186. Mr. Spellman explicitly advised the County Attorney's Office: "As I view this case, the next move would be for either you or us to issue a subpoena to the above entity to get specific data info for the date / time in question." He further reiterated, "Again, my client denies sending the messages in this case and denies any association with the phone number."

187. Despite being provided with this precise, actionable, and exculpatory information, the Dallas County Attorney's Office, and by extension the DCSO, deliberately failed to:
   a. Issue a subpoena to Onvoy LLC to Determine the true sender of the spoofed messages.
   b. Pursue any investigation into the origins of the spoofed messages, thereby ignoring a clear path to exculpatory evidence.
   c. Provide clear, consistent, or truthful information regarding the status, location, or forensic examination of Plaintiff's seized phones.

188. The repeated passing of the case between Assistant County Attorneys (from John Judisch to Caleb, and then to Eric) further demonstrates a systemic failure to address the critical issues raised by Plaintiff's counsel, particularly concerning the seized phones and the investigation into the spoofed number.

189. This deliberate obfuscation, evasion, and failure to investigate, despite direct and actionable information from Plaintiff's counsel, constitutes a pattern of obstruction of justice and suppression of exculpatory evidence by the Dallas County Attorney's Office and the DCSO, in furtherance of the malicious prosecution against Plaintiff.

**M. Post-Arrest Escalation: Continued Malicious Prosecution and State Complicity (January - December 2025)**

190. Continued Malicious Prosecution by Kara Bittner and Jaclyn Zimmerman. Following Plaintiff's unlawful arrest on January 17, 2025, Defendants Kara Bittner and Jaclyn Zimmerman escalated their malicious prosecution efforts, continuing to weaponize the legal system against Plaintiff with fabricated allegations.

191. After Plaintiff's false arrest, Defendant Jaclyn Zimmerman also attempted to concoct a story with Shane Dewees, asking him to make false statements about Plaintiff's alleged cyberstalking, demonstrating her active and knowing participation in the conspiracy, in which Shane refused and Zimmerman became upset.

192. On January 20, 2025, Defendant Kara Bittner filed her effectively third fraudulent Ex Parte Protection Order (EPO) against Plaintiff, based entirely on the fabricated "AllTracker" claims, despite the Dallas County Sheriff's Office (DCSO) already possessing exculpatory evidence proving Plaintiff's non-involvement.

193. Defendant Jaclyn Zimmerman, acting as Defendant Kara Bittner's attorney, filed an "Application for Rule to Show Cause" against Plaintiff, making numerous false allegations regarding "AllTracker" cyberstalking (354 counts) and Plaintiff's mental health. This motion was later struck down by the Court.

194. The Application for Rule to Show Cause, dated January 20, 2025, presented a bewildering and contradictory narrative designed to ensnare Plaintiff, including:
    a. Conflicting Discovery Timelines and Deliberate Discrepancies:
    Defendant Kara Bittner claimed she "learned that All Tracker was attached to her device" on January 12, 2025. This directly contradicted Defendant Keith Bittner's sworn police report of January 16, 2025 (DCSO Case 2025-0000855), wherein he alleged he discovered "AllTracker" on his and Kara's device around December 26, 2024. This glaring 17-day discrepancy between the two primary conspirators' sworn accounts of discovery, occurring within days of each other, demonstrates a coordinated yet sloppy attempt to fabricate a narrative, where even the "discovery date" of the alleged hacking could not be consistently maintained.

b. Technically Impossible Allegations of Continuous Access:

    i. The Application brazenly asserted that "All Tracker was attached to her device, and through that access to all subsequent devices without Kara's knowledge or permission, since prior to the parties' divorce in 2022." This claim is technically impossible and demonstrably false for multiple reasons:

        1. Plaintiff had not seen Defendant Kara Bittner for over seven months prior to their divorce in late August 2022 (Plaintiff last saw Kara in late January 2022).

        2. Defendant Kara Bittner has changed her phone number a minimum of three times since late January 2022 and has acquired multiple new physical devices during this period.

        3. As confirmed by Plaintiff's hired digital forensic expert, "AllTracker" or similar spyware requires explicit, physical permission and active enablement on each individual device, and cannot automatically transfer across new devices or survive phone number changes, particularly with modern operating systems (Android 6 and newer).

    ii. The Application's allegations of "continuous 'real time camera streaming'," "continuous audio monitoring," and "constant 'geolocation' monitoring" from "prior to the parties' divorce in 2022" through multiple new devices and phone numbers, without any re-installation or re-permission, were technically absurd and known to be impossible by any competent digital forensic analysis.

c. Egregious Punishment Recommendation and Abuse of Judicial Power:

    i. The Application sought to hold Plaintiff in contempt for "30 days on each and every count" for the alleged "354 counts" of cyberstalking (excluding January 4, 2025). This recommendation, based on the demonstrably false and contradictory claims outlined above, would amount to a staggering 29 years of incarceration (354 counts * 30 days/count = 10,620 days / 365 days/year = approximately 29.09 years). This grotesque and malicious recommendation, made in a civil family law proceeding, demonstrates extreme malice, a profound abuse of judicial process, and a deliberate attempt to weaponize the court system for personal vengeance and to permanently incapacitate Plaintiff.

    ii. This punitive recommendation was made despite the fact that family law judges, while having broad discretion, generally do not impose criminal sentences of such extreme duration, particularly for non-violent alleged technical violations, highlighting the malicious intent behind the request.

d. Fabricated Mental Health Non-Compliance Allegations:

    i. The Application falsely alleged that Plaintiff "has not continued therapeutic services during the pendency of this case as required and in violation of the Order" (see Paragraph 6 of Application). This was a knowing falsehood. Plaintiff had diligently complied with the court's order to "continue therapeutic services" through a licensed mental health therapist, who, after multiple sessions, released Plaintiff from her care, providing a printed letter stating that Plaintiff did not require further therapy as his only life stressors stemmed directly from Defendant Kara Bittner's malicious actions. This full compliance, including the therapist's

report, had been extensively discussed and confirmed in court during the custody modification trial from December 17-19, 2024.

ii. Defendant Jaclyn Zimmerman, as an attorney of the court who had just participated in the December 2024 trial, would have possessed direct knowledge of Plaintiff's full compliance and the therapist's report, rendering her assertion in the Application a deliberate misrepresentation of facts to the Court.

195. The Dallas County Sheriff's Department arrested Ted on January 17, 2025 (not January 17, 2024, as erroneously stated in the Application) for violating the No Contact Order that didn't exist, as there wasn't an NCO, but only charged Ted with violations that occurred on January 4, 2025 as communications from "the stalker" that day reveal Ted was the party responsible for the stalking. This selective charging, based on a single alleged incident, further highlights the manufactured nature of the 354 "cyberstalking" counts and the systemic effort to create a pretext for Plaintiff's arrest and prosecution.

196. Following Plaintiff's arrest, the DCSO, through Defendant Detective Jacobs and other command staff, continued its pattern of deliberate indifference and obstruction, actively protecting Defendants Kara Bittner and Keith Bittner while denying Plaintiff any avenue for redress.

197. On January 29, 2025, Plaintiff attempted to contact Defendant Detective Jacobs (or his supervisors) at the DCSO to report additional evidence of the fraudulent crimes committed against Plaintiff by Defendants Keith Bittner and Kara Bittner. During this contact, Plaintiff specifically was inquiring about potential crimes and investigation for the Bittners' actions, which involved fabricating text messages, making false reports, and other unlawful acts (including those previously discussed in this Complaint such as police impersonation, perjury, and child endangerment).

198. When the said Defendant Detective Jacobs was not in Plaintiff requested to speak with a supervisor regarding the deliberate inaction and refusal to investigate the Bittners' crimes. Despite this, Plaintiff was denied access to Defendant Detective Jacobs' chain of command. Furthermore, during this documented attempt to report crimes and seek supervisory intervention, the DCSO operator or dispatcher, after Plaintiff's request for Defendant Detective Jacobs and subsequent request for a supervisor, deliberately terminated the call by hanging up on Plaintiff, while on hold. This act of hanging up on Plaintiff, while attempting to report serious crimes and seek redress, was captured on video and demonstrates a departmental policy or custom of non-engagement and an internal "do not contact" order regarding Plaintiff, effectively obstructing his right to report crimes and access law enforcement. No attempt was made to contact Plaintiff back, confirming it was a deliberate act by design. Plaintiff's lawyer at the time subsequently advised him not to contact the DCSO again.

199. On June 9, 2025, Plaintiff again attempted to report crimes committed against him, turning in a massive amount of evidence of crimes committed against him up until early May to an unnamed Sergeant (identified as "Unnamed Sergeant Badge #6"). This Sergeant initially

attempted to obfuscate this evidence, claiming lack of jurisdiction, despite the fact that all parties (Kara Bittner, Keith Bittner, and Plaintiff) reside in the same county. He reluctantly accepted the evidence only after being informed of the contact based assault occurrence in the evidence. The Sergeant deliberately signed his name illegibly on the receipt, and Plaintiff never heard anything directly from DCSO regarding this report. The identity of this "Unnamed Sergeant Badge #6" has been deliberately withheld from Plaintiff during records requests, indicating a systematic policy of concealment and obstruction.h 30, 2025, defendant Kara sent messages to Keith via TikTok, saying "you were right" and "Keith beat me". Shane called DCSO the following day and they went out there for a welfare check. That day Kara posted on her Facebook that she had been hacked. A similar message exchange happened later in the year in which Shane blocked her profile afterwards.

201. On or before March 30th, 2025, Valarie received messages from defendant Kara's Facebook profile, where she was trying to gain Valorie's trust saying that she isn't with defendant Keith anymore. This tactic of setting her Facebook profile to single will be used in the future and is a historical MO of Keith Bittner.

202. Following Plaintiff's arrest, Defendant Keith Bittner continued his long-standing pattern of evidentiary fabrication and systemic manipulation, actively working to frame Plaintiff and obstruct justice.

203. Fabricated Recording Scheme (April 9, 2025): On or before April 9, 2025, Defendant Keith Bittner orchestrated a sophisticated scheme to fabricate evidence against Plaintiff. This involved Defendant Keith Bittner recording a lengthy phone conversation between himself and an unnamed attorney in which his name and background were deliberately edited out, during which he discussed Plaintiff and the ongoing custody battle with Defendant Kara Bittner, and falsely asserted that the FBI was investigating Plaintiff for hacking. This recording was deliberately edited to remove the attorney's identifying information and was then anonymously distributed via email to around ten (10) individuals, including Valerie Bittner and numerous child welfare workers involved in Keith's TPR cases.

204. Intent to Frame Plaintiff and Fabricate a Hacking Conspiracy with Valerie Bittner

The email accompanying this recording, sent on April 9, 2025—only a single day after the Dallas County criminal charges against Plaintiff were officially dropped—explicitly stated: "I'm releasing to you what I and the mother in this case deemed as a threat. (Keith is pretending to be a woman named Jessica in this, who is his ex wife Valories friend, and someone he has spoofed messages to before) I cannot go into Detail on how this was obtained but I can tell you it will help this case tremendously." This communication, originating from Defendant Keith Bittner despite its anonymous appearance, demonstrates a clear, premeditated intent to fabricate evidence and maliciously frame Plaintiff for hacking. The elaborate nature of the scheme, involving an hour-long edited recording designed to obscure the identity of the unnamed lawyer and his background, strongly implies that the recording and its preparation were executed prior to April 9, 2025. The scheme was specifically designed to create a false

narrative that Plaintiff was secretly communicating with Valerie Bittner (Defendant Keith Bittner's ex-wife) and that Valerie was acting as an unDetectable conduit for Plaintiff to hack Keith and Kara. This elaborate fabrication is demonstrably false: Plaintiff had never communicated with Valerie Bittner in any capacity until October 2025, more than six months after this fabricated scheme was initiated. This malicious act of fabricating a connection with Valerie was intended to poison child welfare proceedings and influence multiple parties involved in Plaintiff's case. Defendant Kara Bittner was present during the recording, indicating her direct complicity in this scheme.

205. Dallas County Sheriff's Office Complicity in Orchestrating Retaliation

The pre-planned, retaliatory "fabricated recording scheme" by Defendants Keith Bittner and Kara Bittner, commencing only one day after the official dismissal of criminal charges against Plaintiff, provides strong circumstantial evidence of active complicity by the Dallas County Sheriff's Office (DCSO). Upon information and belief, DCSO, as the prosecuting agency, was monitoring the status of Plaintiff's criminal case and communicated the dismissal of charges to Defendants Kara Bittner and/or Keith Bittner. This communication, likely facilitated through their established illicit channels with law enforcement, enabled the Bittner Defendants to initiate the next phase of their pre-meditated attack against Plaintiff. The speed, sophistication (including pre-editing of a lengthy recording), and intent to obscure the unnamed lawyer's identity all point to a coordinated effort between state actors and private conspirators to retaliate against Plaintiff for the favorable termination of his criminal case and to continue the malicious prosecution by other means.

206. Pattern of False Filings and Blame-Shifting

This pattern of fabrication extended to court filings. On April 25, 2025, Defendant Keith Bittner filed a motion asserting the FBI's involvement in Plaintiff's case and the Plaintiff firing his court appointed lawyer. This demonstrates a deliberate and malicious attempt by Defendant Keith Bittner to shift blame, obstruct justice, and weaponize court processes against Plaintiff, using Plaintiff's name and alleged actions to explain away his own egregious conduct and to harass Plaintiff's legal representation. This happened one day after I told defendant Kara Bittner in the parent messaging app to use a legal car seat for R.C., showing yet more retaliation.

207. Further Procedural Manipulation

Defendant Keith Bittner further engaged in transparent attempts to manipulate judicial proceedings, including filing a motion the day before a court date on June 2, 2025, seeking the recusal of a judge based on a distant 'relationship' of a 2017 judgement of his half sister that he didn't grow up with being sent to prison for confessing she fatally shook her boyfriend's infant in 2016. This was known to him for years in the case but only raised at the last minute. Subsequently, on June 3, 2025, Keith filed a motion to appear virtually. During the critical hearing regarding the termination of his parental rights for three of his children, Defendant Keith Bittner filed stating that all previous motions, except the one that morning, were filed not by him

(referring to Plaintiff). He also falsely claimed that a signature on a document relinquishing his parental rights was not his. His court appointed attorney Tara Elcock of the Law Shop Iowa, who he got fired and reinstated to waste time and use to get Plaintiff falsely accused of multiple computer crimes, had to testify to Judge Kevin Parker that her client signed the consent form for termination and she called him to verify right after he did so. The court record was left open for approximately 30 minutes after the ruling. During this period, Defendant Keith Bittner, appearing virtually, engaged in a sustained outburst, sending threats and "going crazy" towards the judge and the court panel. These actions illustrate Defendant Keith Bittner's profound disregard for the integrity of legal processes and his repeated attempts to commit perjury, impersonation, and fraud within the judicial system.

208. Defendant Keith Bittner's Second Termination of Parental Rights (TPR) Case and Continued Manipulation

In a separate Termination of Parental Rights (TPR) case in a different Iowa county, involving three additional children, Defendant Keith Bittner engaged in a pattern of harassing and coercing court-appointed attorneys to withdraw from his representation. This behavior, which included sending harassing messages to an attorney who subsequently withdrew from the case, mirrored his conduct in other legal proceedings and demonstrates a deliberate strategy to obstruct justice and impede the legal process. Defendant Keith Bittner's repeated firing of court-appointed counsel, occurring at least three times in this specific case and in other cases involving other parties, highlights his profound disregard for legal representation and his manipulative tactics.

209. Fabricated Hacking Allegations

In this TPR case, Defendant Keith Bittner falsely asserted to the court that Defendant Valerie Bittner had "hacked him," claiming to be at an unfair disadvantage due to this alleged hacking. While direct evidence of an explicit claim linking Plaintiff and Defendant Valerie Bittner in a hacking conspiracy in this specific case is not yet available, this allegation is consistent with Defendant Keith Bittner's broader pattern of falsely accusing others of hacking to deflect from his own actions and to gain an advantage in legal proceedings.

210. Fabricated Threats Against Valerie Bittner

During this TPR case, Defendant Keith Bittner fabricated evidence to the court, specifically by editing messages to falsely suggest that Defendant Valerie Bittner was threatening to shoot him. This act constitutes a deliberate subversion of the judicial process through the creation of false evidence, demonstrating Defendant Keith Bittner's willingness to commit perjury and fraud.

211. Death Threats Against His Own Children and Law Enforcement's Failure to Investigate

On R.C.'s birthday in June, while Plaintiff had custody of the children and was engaged in family activities, Defendant Keith Bittner was scheduled for a supervised visitation with his children in

this second TPR case. En route to the visitation, Defendant Keith Bittner sent anonymous text messages to the two court-appointed supervisors stating that if he were allowed to see his children, "they would die." This anonymous message was a deliberate attempt by Defendant Keith Bittner to impersonate Plaintiff and to falsely attribute death threats against his own children to Plaintiff, thereby playing a malicious game to implicate Plaintiff in criminal activity, rather than attending a scheduled visit with children he had not seen for approximately six months.

214. Uninvestigated Death Threats and Obstruction

Despite these explicit death threats against minor children being reported to the supervisors and presumably to the relevant law enforcement agency. This failure to adequately investigate serious death threats against children, particularly when the threats were made by a parent with a documented history of manipulation and evidence fabrication, constitutes a profound dereliction of duty by law enforcement. It further demonstrates a deliberate indifference to child safety and a pattern of enabling Defendant Keith Bittner's criminal and manipulative behavior.

215. Allegations of Suicide Threats and Manipulation

When law enforcement contacted Defendant Keith Bittner regarding the cancelled visit, he claimed to be present for the visitation and subsequently threatened to commit suicide if his parental rights were terminated. This threat, made in the context of a child welfare case, demonstrates Defendant Keith Bittner's manipulative use of self-harm threats to obstruct legal proceedings and evade accountability.

216. Suspect Vehicle and Occupants at Visitation Site

Defendant Valerie Bittner, having been informed of the cancellation, proceeded to the visitation site without the children and observed a black Jeep Cherokee, an unfamiliar vehicle, with a man and a woman slouched down suspiciously inside. This observation suggests a potential attempt by Defendant Keith Bittner to create a false narrative or to engage in further manipulative actions at the visitation site.

217. DCSO's Knowledge and Withholding of Evidence

Plaintiff asserts that Defendant DCSO likely possesses extensive evidence and reports submitted by Defendant Keith Bittner regarding this incident and many others, which they have knowingly withheld from Plaintiff. This withholding of exculpatory evidence and evidence of Defendant Keith Bittner's criminal conduct is a deliberate act of obstruction, preventing Plaintiff from fully defending himself against these false accusations and from pursuing justice.

218. Plaintiff's Repeated Attempts to Report Crimes and Systematic Referral to DCI

Plaintiff made three to four separate visits to Iowa State Police facilities at two different locations seeking investigation of the criminal conduct and civil rights violations being perpetrated against Plaintiff by Sheriff's Department personnel across multiple Iowa counties. After these repeated attempts to access state-level law enforcement assistance, ISP personnel finally directed Plaintiff to speak with Agent Matthew Papin. Plaintiff reasonably believed Agent Papin was a State Police investigator and that this referral represented ISP's response to Plaintiff's reports of ongoing crimes. Agent Papin identified himself as being with "DCI," which Plaintiff understood to be a subdivision or investigative unit within the Iowa State Police structure, not a separate agency with different jurisdictional policies. On June 13, 2025, Plaintiff informed Defendant DCI Agent Matthew Papin of the scope of the conspiracy in a nearly two-hour conversation, including the January 12th attempted murder trap, the January 4th and January 16th fabrications, the April 25, 2025 motion alleging Plaintiff of crimes, the April 9, 2025 fabricated recording scheme, and DCSO's prior knowledge of Defendant Keith Bittner's criminality.

219. Two Independent Statutory Grounds Mandating DCI Investigation

Plaintiff's report to Agent Papin triggered two separate and independent grounds, that the Plaintiff identified, requiring DCI to open an investigation under Iowa law, either of which alone would mandate action:

a. First Mandatory Ground: Multi-Jurisdictional Criminal Activity. Plaintiff presented evidence of coordinated criminal conduct spanning multiple Iowa counties, involving law enforcement personnel and criminal conspiracies crossing county boundary lines. Iowa Code Section 80.28 expressly grants DCI authority and responsibility to investigate crimes that exceed single-county jurisdiction. The multi-county nature of the criminal activity Plaintiff reported removed any discretion from DCI - this was precisely the type of case requiring state-level investigation because no single county Sheriff possessed both jurisdiction over all the criminal acts and the institutional independence to investigate fairly.

b. Second Mandatory Ground: Investigation of Corrupt Law Enforcement Agency. Plaintiff reported that the Sheriff's Department itself was the perpetrator of crimes against Plaintiff and was demonstrably biased, corrupt, and actively engaged in criminal conduct. Iowa Code Section 80.28 specifically empowers DCI to investigate criminal activity by public officials and law enforcement officers. When the local law enforcement agency is itself the subject of criminal allegations, DCI's independent investigative authority becomes the only viable mechanism for accountability. A corrupt Sheriff's Department cannot investigate its own crimes - this basic principle of due process and conflict of interest required DCI to assume investigative responsibility.

220. DCI's Unlawful Refusal Despite Dual Statutory Triggers

Despite both mandatory grounds being present and explicitly communicated by Plaintiff, Defendant Agent Matthew Papin refused to open an investigation or even accept Plaintiff's extensive evidence, of which he told there were more copies. Instead, Agent Papin informed Plaintiff that DCI could only investigate if the Sheriff's Department requested DCI's assistance.

This response violated Iowa Code Section 80.28's grant of independent investigative authority and created an absurd requirement that the corrupt agency committing crimes must invite investigation of its own criminal conduct.

221. Agent Papin's Admission of Unlawful Subordination Policy

When Plaintiff questioned this jurisdictional barrier, Defendant Agent Matthew Papin explicitly stated that while Iowa State Police are theoretically equal in authority to Sheriff's Departments under Iowa law, they operate subordinate to Sheriffs "in practice" due to budget constraints and statewide coverage responsibilities. Agent Papin further informed Plaintiff that other states structure their State Police agencies with explicit authority over Sheriff's Departments, but Iowa does not. This admission reveals that DCI has adopted an extra-statutory policy of deference to Sheriff's Departments that directly contradicts Iowa Code Section 80.28's grant of independent investigative power and creates a zone of absolute immunity for Sheriff's Department crimes.

222. Impossibility of Remedy Under DCI's Fabricated Policy

The effect of Defendant Agent Papin's refusal was to deny Plaintiff any avenue for investigation despite presenting two independent statutory grounds requiring state action. With the Sheriff's Department being both the perpetrator and the entity whose "permission" DCI claimed to require, Plaintiff faced an impossible Catch-22. The multi-jurisdictional nature of the crimes meant no single county could investigate completely, yet DCI refused to exercise its statewide authority. The corruption of the Sheriff's Department meant local investigation was impossible, yet DCI refused to investigate corrupt law enforcement without the corrupt agency's consent. This systematic denial of investigative recourse violated Plaintiff's Fourteenth Amendment rights to due process and equal protection.

223. DCI's Refusal to Accept Evidence

Most egregiously, Defendant Agent Matthew Papin refused to even accept or review the substantial evidence Plaintiff had compiled documenting the multi-county criminal conspiracy and Sheriff's Department corruption. This refusal to accept evidence demonstrates that DCI's decision was preDetermined and not based on any assessment of the allegations' merit or the evidence's sufficiency. By closing the door to investigation before examining any evidence, DCI acted with deliberate indifference to Plaintiff's constitutional rights and demonstrated a custom or policy of protecting Sheriff's Departments from accountability regardless of the evidence presented. He also informed Plaintiff that he was going to talk to the DCSO to see if they would "let their agency be involved."

224. DCI's Baseless Blame-Shifting Despite Overwhelming Evidence

Defendant Agent Matthew Papin repeatedly asserted that Plaintiff "must have not uncovered and given the Nexus for DCSO to get involved" in investigating Defendants Kara and Keith Bittner. This assertion was patently false and made in profound bad faith. Plaintiff had, in fact,

presented Agent Papin with a meticulously organized, extensive binder of evidence, exceeding 300 pages, Detailing the crimes against Plaintiff from the Bittners, including a removable hard drive with links to audio, video, and photographic evidence, as well as a binder of parenting application conversations. This physical binder of evidence, which contained the very "nexus" Agent Papin claimed was missing, was sitting directly in front of him on the table throughout their conversation. Agent Papin's claim, therefore, was not merely a misstatement but a deliberate and demonstrable falsehood, designed to shift blame onto Plaintiff for DCI's own refusal to investigate. This blame-shifting occurred despite Agent Papin having refused to even accept or review the evidence during the June 13, 2025 meeting, meaning he made this assessment without ever examining what Plaintiff had "uncovered." This conduct further evidences DCI's deliberate indifference, its active participation in suppressing exculpatory information, and its role in the overarching conspiracy to deny Plaintiff access to justice.

225. DCI's Implicit Threat and Obstruction of Plaintiff's Defense

In a further demonstration of pervasive bias and active obstruction, Defendant Agent Matthew Papin explicitly advised Plaintiff that the extensive binder of evidence Plaintiff had compiled against Defendant Keith Bittner "would be suspicious if law enforcement found it on you [Plaintiff]." Agent Papin elaborated that it "would look like you [Plaintiff] were up to something gathering all of this information against him" and recommended "not carrying it in my vehicle and keeping it at home." This statement, made by a DCI agent in the context of refusing to investigate Plaintiff's credible complaints, constituted an implicit threat and a direct interference with Plaintiff's fundamental right to gather and preserve evidence for his defense. Agent Papin's concern was not the veracity of the evidence, but the "suspicion" Plaintiff would incur for possessing it, revealing a systemic bias within DCI that viewed Plaintiff, the victim, as a potential suspect for defending himself. This advice, effectively hindering Plaintiff's ability to prepare for future false arrests or allegations, further evidences DCI's deliberate indifference to Plaintiff's rights and its active participation in the conspiracy to obstruct justice and deny Plaintiff access to effective law enforcement.

226. On or about June 28, 2025, while Plaintiff's children were with Defendant Kara Bittner and Defendant Keith Bittner, Defendant Dallas County Sheriff's Office (DCSO) deputies came to their residence. A DCSO deputy handed Defendant Kara Bittner a paper, and Plaintiff's son, C.C. Clark, overheard the discussion. The deputies were delivering a "warning" to Defendant Kara Bittner that Plaintiff was contemplating a move.

227. Lack of Legal Basis and Abuse of Authority

This intervention by Defendant DCSO was entirely without legal basis and constituted a blatant abuse of authority. At this time, Plaintiff held full legal and primary physical custody of his children, a status recently affirmed on appeal, and there was no court order or legal restriction preventing Plaintiff from moving. The DCSO, like other law enforcement agencies, routinely asserts that it does not intervene in purely civil matters. Yet, in this instance, Defendant DCSO

actively intervened by delivering a hand-delivered "warning" in a purely civil custody matter where they had no legitimate law enforcement purpose or jurisdiction.

228. Clear Evidence of Bias and Collusion

This incident provides unequivocal evidence of Defendant DCSO's overt bias and collusion with Defendants Kara Bittner and Keith Bittner. The DCSO actively assisted Defendants Kara Bittner and Keith Bittner in a civil dispute, utilizing their official capacity "under color of state law" to intimidate Plaintiff and interfere with his parental rights. This occurred despite Plaintiff having delivered compelling evidence of numerous serious crimes committed by Defendants Kara Bittner and Keith Bittner to Defendant DCSO only nineteen (19) days prior, which Defendant DCSO deliberately refused to prosecute or investigate. This stark contrast in actions demonstrates a deliberate policy or custom by Defendant DCSO of protecting Defendants Kara Bittner and Keith Bittner while actively targeting and interfering with Plaintiff's constitutional rights.

229. Violation of Due Process and Equal Protection

The DCSO's actions in delivering this unwarranted "warning" interfered with Plaintiff's fundamental parental rights without any lawful basis, thereby violating his due process rights under the Fourteenth Amendment. Furthermore, by selectively intervening in a civil matter on behalf of Defendants Kara Bittner and Keith Bittner while simultaneously ignoring their criminal conduct and targeting Plaintiff, Defendant DCSO violated Plaintiff's equal protection rights by treating him disparately without a rational basis.

230. Defendant DCI Agent Matthew Papin, on Plaintiff trying to get ahold of him, on June 30, 2025, acting under color of state law, refused to investigate. He had talked with DCSO and said the claimed Plaintiff's phones had "extra levels of encryption" that prevented forensic extraction by Cellebrite/GrayKey, and that the crimes evidence he turned into them weeks ago has stalled. The plaintiff immediately retorted that they were lying. They could not investigate Defendant Keith Bittner's crimes because Plaintiff had not "proven that it wasn't me who sent those text messages on January 4th" - a shocking reversal of the burden of proof.

231. DCI's Deliberate Misapplication of Established Law to Protect Defendant Keith Bittner and Obstruct Justice

Defendant DCI Agent Matthew Papin, after being explicitly informed by Plaintiff on multiple occasions (June 13, 2025, and June 30, 2025) of Defendant Keith Bittner's documented admission during couples therapy regarding his use of spoofed numbers to create family strife, and after Plaintiff specifically articulated the applicability of the well-established "crime-fraud exception to privilege" (a doctrine recognized by the United States Supreme Court since at least Clark v. United States, 289 U.S. 1 (1933), and codified in Federal Rule of Evidence 501), deliberately misrepresented the controlling legal standard. During their conversation on June 30, 2025, when Plaintiff stated, "Yeah, how come they've never asked me for anything? Like, I can

lead you to the therapist that says, yes, Keith has admitted to me that he spoofs numbers and fakes things all the time. And, like, I can lead him," Agent Papin falsely asserted, "The biggest problem there is then why the therapist is violating." Plaintiff immediately corrected Agent Papin, stating, "No, no, technically you can get around it with involving a crime and you don't even have to actually use her at all because I've never spoken to her. You can use directly through the old place where you should work at where she submitted the file, where she was submitting her notes on her therapy notes." Agent Papin then conceded, "She still had to testify to it in court," but deliberately failed to pursue this critical lead. This direct dialogue, memorialized in a contemporaneous audio recording preserved in forensically sound manner, unequivocally demonstrates Agent Papin's knowing and deliberate refusal to investigate, constituting deliberate indifference to Plaintiff's constitutional rights under Connick v. Thompson, 563 U.S. 51 (2011), and his deliberate misapplication of black-letter law. Immediately following Plaintiff's insistence on the crime-fraud exception, Agent Papin abruptly pivoted the conversation to Plaintiff's "encrypted phones," stating, "The contact they have with you is when they asked you to dump both your phones. They said that you had encrypted stuff on your phone." This sudden and clearly deflective shift demonstrates Agent Papin's and DCI's active suppression of critical exculpatory evidence and direct evidence of Defendant Keith Bittner's criminal pattern and ongoing conspiracy, further cementing their knowing participation in the overarching conspiracy to deprive Plaintiff of equal protection and due process, in violation of 42 U.S.C. §§ 1983, 1985(3), and demonstrating deliberate indifference to Plaintiff's constitutional rights.

232. Agent Papin's Deliberate Refusal to Investigate Despite Actionable Intelligence

On June 30th 2025, Plaintiff provided Defendant Agent Matthew Papin with Detailed information regarding Defendant Keith Bittner's documented history of using "AllTracker" and similar spyware on former partners' phones, his pattern of digital manipulation and impersonation, and specific witnesses who could corroborate these facts. Agent Papin explicitly refused to initiate an investigation, stating: "They're basically saying they've lacked enough to move forward. So it becomes inactive until things become available. Like there's nothing for them to chase after based on what they've received so far. There's no dots connected right now." When Plaintiff immediately offered to "connect these dots" by stating, "I can lead you to the therapist that says, yes, Keith has admitted to me that he spoofs numbers and fakes things all the time... A simple phone call to these people I've talked to will tell you this as well," Agent Papin maintained DCI's refusal to investigate, stating: "I haven't seen exactly what the Detectives from Dallas County have, and this still remains there... it just basically comes down to it. Unless they can get more information, there's nothing to move forward on." Agent Papin further admitted that DCI's internal investigation corroborated Plaintiff's account, stating: "From what it explained to me, it has been matching up with what you said." Despite this corroboration and Plaintiff's explicit offer of additional witnesses and evidence, Agent Papin refused to pursue any investigative action.

233. Agent Papin's Acceptance of False Narratives and Suppression of Exculpatory Evidence

Agent Papin accepted DCSO's demonstrably false justification for Plaintiff's arrest, repeating the claim that the threatening messages contained "information that only you and the expectation

that you and Kara would only know." Plaintiff immediately rebutted this false premise, explaining that multiple individuals knew the information in the messages, that he had never withheld the children from Defendant Kara as the messages threatened, and that "no one's ever came to me and said, hey, we ran into this" regarding any investigation of his account. Agent Papin similarly accepted without question DCSO's representation of a "full dump of both of their phones" from Kara and Keith Bittner, despite Plaintiff's immediate rebuttal that "Keith doesn't have just two phones, though. He has dozens of phones" and Plaintiff's offer to provide testimony from Kara's ex-boyfriend who had personally observed these multiple devices. Agent Papin dismissed this specific, actionable intelligence, stating: "They have, they cannot... they need to be able to have factual proof that they can actually know where those little phones are going to be at, not like a suspicion or a thing." This selective acceptance of unsubstantiated claims from the Bittners while simultaneously dismissing corroborated, specific evidence from Plaintiff demonstrates DCI's active participation in suppressing exculpatory evidence and maintaining the false narrative supporting Plaintiff's malicious prosecution.

234. Further demonstrating DCI's deliberate deception and active participation in the conspiracy, Agent Papin provided Plaintiff with directly contradictory and false information regarding the forensic extraction of Defendant Keith Bittner's phones. Approximately four to five minutes prior to claiming that "Keith and Kara both came down and permitted them to have a full dump of both of their phones," Agent Papin explicitly stated in the same recorded conversation that DCSO "weren't able to do a full extraction on Keith's phone." This intentional self-contradiction, coupled with Agent Papin's persistent attempts to convince Plaintiff to surrender his phones with passcodes, reveals a calculated effort to mislead Plaintiff, cover up DCI's and DCSO's investigative failures regarding Keith Bittner, and acquire Plaintiff's personal property (mobile phones) under false pretenses. Agent Papin's actions, including relaying and perpetuating known falsehoods while actively seeking access to Plaintiff's devices, constitute a direct overt act in furtherance of the conspiracy, designed to ascertain the extent of Plaintiff's knowledge of the ongoing misconduct and to suppress further exculpatory evidence.

235. Further evidencing DCI's and DCSO's coordinated strategy to obstruct justice and protect the Bittner Defendants, Agent Papin repeatedly attempted to deflect DCI's investigative responsibility by claiming lack of jurisdiction, despite the clear multi-county and multi-defendant nature of Plaintiff's reports of criminal activity. Agent Papin insisted that DCI could not act unless the Dallas County Sheriff's Office requested assistance, and further reiterated that the matter primarily fell under the jurisdiction of the Town of DeSoto police. This jurisdictional gamesmanship directly mirrored Plaintiff's initial experience when attempting to report the January 12, 2025 attempted murder trap to the DeSoto police. This multi-agency pattern of jurisdictional deflection and pre-emptive contact with conspirators demonstrates a pervasive and coordinated effort to ensure Plaintiff's criminal complaints against the Bittner Defendants were systematically ignored or suppressed, thereby actively furthering the conspiracy to deprive Plaintiff of his constitutional rights and denying him access to effective law enforcement.

236. The Defendant DCI Agent Matthew Papin advised that he should go to DCSO and volunteer his phones and give them the passcodes. This was stated multiple times, and it was

clear he was doing this to protect DCSO, as they were wanting Plaintiff's phones to help them with their evidence fabrication in the hacking investigation and to see how much Plaintiff knew about what they did to him.

237. Defendant DCI Agent Matthew Papin said from his conversation with DCSO that they couldn't access Keith's phones either. This directly contradicts Detective Jacobs' claim that they analyzed his phones (when Kara and Keith were accusing Plaintiff of the January 4th messages) and knew it was legit. This undermines the probable cause for Plaintiff's arrest.

238. These actions by DCI constitute deliberate indifference and an active cover-up of DCSO's misconduct and the Bittners' criminal enterprise. DCI was created to investigate cases where local law enforcement are lacking resources, have a conflict of interest, are corrupt, or involve multi-jurisdictional crimes. Plaintiff's case had all four, making DCI's refusal exponentially more egregious.

239. Failure to Respond to Certified Mail Requests

Plaintiff, through certified mail, formally requested the opened case number he gave me to get the identity of "Unnamed Sergeant Badge #6" and related documentation from Defendant DCSO on two separate occasions:
    a. The first certified letter, delivered and signed for on or about November 21, 2025, explicitly requesting this information, was entirely ignored by Defendant DCSO.
    b. The second certified letter, reiterating the request for this identity and additional information, was delivered and signed for on or about December 4, 2025, and was also ignored by Defendant DCSO.

240. The acknowledged receipt and subsequent non-response to these formal requests demonstrate a deliberate policy or custom by Defendant DCSO to obstruct Plaintiff's efforts to identify and seek redress from individuals involved in the constitutional violations against him.

241. Intent to Impede Litigation

The persistent refusal by Defendant DCSO, including through individuals such as Rebecca Moser who later acknowledged receipt of these requests but glossed over their content, to provide the identity of "Unnamed Sergeant Badge #6", among so much more is an act in furtherance of a conspiracy to obstruct justice and impede Plaintiff's efforts to litigate his civil rights claims. This refusal is intentional and calculated to prevent Plaintiff from holding all responsible parties accountable.

## N. Professionals Conspiracy

242. Defendants Kara Bittner and Keith Bittner, as primary conspirators, actively engaged in fabricating evidence, making false accusations, impersonating others, and orchestrating illegal surveillance tactics against Plaintiff.

243. As a court-appointed custody evaluator, Defendant Erin Helleso, acting individually and as an agent of Candor Recovery & Counseling, Inc, functioned as an arm of the court's fact-finding process and exercised power possessed by virtue of Iowa state law. Her appointment by the court and the direct influence of her report and testimony on judicial decision-making establish that her actions were taken "under color of state law" for purposes of 42 U.S.C. Section 1983.

244. Shane Dewees was present for all of the conversations and meetings between defendant Kara Bittner and defendant Erin Helleso, prior to moving out of the home, right around the beginning of August. In the first meeting, Shane witnessed Erin Helleso dismiss Kara Bittner's hedonistic past, saying "it's in your past and doesn't matter", among other things witnessed, when Kara brought up Plaintiff having her Facebook Messages from the end of 2021, that Detailed her past child abuse in her hedonistic prioritization of herself, becoming her shield the first time meeting Kara.

245. Defendant Helleso engaged in a pattern of uncooperative and unprofessional communication with Plaintiff throughout her involvement. Despite being appointed as a neutral evaluator, Defendant Helleso consistently failed to return Plaintiff's phone calls or respond to his email inquiries, creating a deliberate barrier to communication. This pattern included approximately eight and a half months during which Defendant Helleso never answered Plaintiff's call, texted him, nor did she respond to the majority of his emailed questions or statements.

246. On one occasion, after Defendant Helleso emailed Plaintiff accusing him of avoiding communication, Plaintiff, feeling provoked by the false accusation and frustrated by her unresponsiveness, attempted to contact her by phone. After unanswered and unreturned calls, Plaintiff drove to Defendant Helleso's office during business hours. Although her office door inside of the place was closed, Plaintiff believed she might be inside, intentionally avoiding his calls. Defendant Helleso later testified that this visit constituted an unacceptable crossing of boundaries, despite Plaintiff's right to visit a public business during business hours.

247. Defendant Helleso further misrepresented Plaintiff's actions by testifying about a phone call Plaintiff allegedly made to her in the middle of the night. In reality, this call occurred when Plaintiff was attempting to defensively verify whether Defendant Helleso had called him from an unrecognized number by plugging her personal phone number (which he had obtained for this purpose) into his phone to search his call history. During this process, his phone inadvertently dialed her number, and Plaintiff immediately hung up. Defendant Helleso deliberately twisted this accidental occurrence into an accusation of harassment and boundary violation, demonstrating her consistent pattern of mischaracterizing Plaintiff's actions to his Detriment. All of these facts were explained at trial by Plaintiff.

248. Defendant Erin Helleso, as a court-appointed custody evaluator, demonstrated clear bias and unprofessional conduct, aligning with Defendants Kara Bittner and Keith Bittner to Plaintiff's Detriment. Upon information and belief, Defendant Helleso openly displays prejudiced views

against "white males" on her public social media, demonstrating a fundamental lack of impartiality. Defendant Helleso also refused to recuse herself when confronted with her extreme bias, instead threatening to call the police on Plaintiff for reviewing her public social media.

249. Politically Motivated Interrogation and Deliberate Taunting by Defendant Helleso

In 2024, during her interview with Plaintiff, Defendant Erin Helleso engaged in a politically motivated interrogation disguised as a professional inquiry. Specifically, with Plaintiff's children then aged three and five, Defendant Helleso asked Plaintiff, "how about when it comes to you and Kara agreeing on things such as flu shots or the covid vaccine?" This question, which Plaintiff has under audio recording, was objectively irrelevant to a neutral assessment of parental fitness. It served as a political litmus test, designed to ascertain Plaintiff's ideological alignment rather than his parenting capabilities, particularly given the highly politicized nature of COVID-19 vaccine decisions for young children in 2024. In a further act of deliberate taunting and bias, Defendant Helleso also asked Plaintiff during the interview if he possessed a medical degree. This question directly mirrored Defendant Kara Bittner's prior provocative taunt to Plaintiff during a child exchange on January 19, 2024, when she repeatedly shouted, "Are you a doctor!? Are you a doctor!?" Defendant Helleso, aware Plaintiff was not a medical doctor, posed this question not for a legitimate professional purpose, but to mock Plaintiff's legitimate parental concerns and to align herself with Defendant Kara Bittner's malicious narrative. Plaintiff responded by asserting that a medical degree is not a prerequisite for making informed parental decisions regarding a child's medical care. This politically motivated interrogation and deliberate taunting, combined with Defendant Helleso's selective investigation favoring Defendant Kara Bittner, demonstrates a coordinated effort to manufacture findings against Plaintiff rather than conduct an objective evaluation, all with the intent of undermining Plaintiff's parental fitness and facilitating a custody transfer to Defendant Kara Bittner.

250. Defendant Helleso's Biased and Coercive Demands for Plaintiff's Medical History

Defendant Erin Helleso further demonstrated her profound bias and unprofessional conduct by demanding Plaintiff sign a release form for his entire medical history, stating that "judges typically go by what they say and it wouldn't be good for me if I didn't give her access to this." This statement constituted a coercive, veiled threat designed to intimidate Plaintiff into providing irrelevant, highly private information under duress. Despite this aggressive demand for Plaintiff's comprehensive medical history, Defendant Helleso's final report included no mention of Defendant Kara Bittner's significant medical history, specifically her undergoing TMS Transcranial Magnetic Stimulation to the brain multiple times a week over a three-month period in the fall of 2020. This critical information, which Plaintiff specifically brought to Defendant Helleso's attention, was deliberately ignored or suppressed. This selective and biased investigation, demanding extensive and potentially irrelevant medical history from Plaintiff while omitting serious and highly relevant medical history from Defendant Kara Bittner, constitutes a severe breach of Defendant Helleso's professional duties, evidences her deliberate intent to undermine Plaintiff, and is an overt act in furtherance of the conspiracy to deprive Plaintiff of his parental rights.

251. Defendant Helleso's bias and unprofessional conduct were pervasive throughout her evaluation. Despite being appointed by the court and holding herself out as an impartial professional, Defendant Helleso exhibited a profound lack of objectivity and engaged in ethically questionable practices that deviated significantly from the standards of care for a custody evaluator in Iowa.

252. Defendant Helleso's Weaponization of Pseudoscientific Diagnosis Based on Prejudicial Stereotypes

Defendant Helleso's unauthorized diagnostic activity was further exacerbated by her apparent reliance on prejudicial stereotypes. Upon information and belief, Defendant Helleso, aware of Plaintiff's lifetime sobriety, implicitly or explicitly attributed Plaintiff's perceived social difficulties to Autism Spectrum Disorder or Obsessive Compulsive Personality Disorder. This pseudoscientific pathologizing of Plaintiff's character, based on a prejudicial stereotype that sober individuals (particularly those who avoid alcoholic environments) are socially deficient or autistic, demonstrates Defendant Helleso's fundamental bias and her willingness to use unsubstantiated diagnoses to discredit Plaintiff. This conduct further evidences Defendant Helleso's deliberate intent to undermine Plaintiff's parental fitness and is an overt act in furtherance of the conspiracy. If anything, the exact opposite is true, with those seeking to be intoxicated or high, are the very individuals with social deficiencies.

253. Specifically, Defendant Helleso engaged in unauthorized diagnostic activity, exceeding the scope of her professional license as a Licensed Independent Social Worker (LISW). In her evaluation, Defendant Helleso stated, "It is highly likely that Ted's mother may also fit these patterns and symptoms as Autism is genetic, and personality disorders are also genetically linked," and "Ted exhibits several traits, behavior patterns, and obsessive thought processes that indicate he may likely be on the Autism Spectrum and/or have a personality disorder such as OCPD (Obsessive Compulsive Personality Disorder)."

254. Under Iowa Code Section 154C.1(2) the practice of social work does not extend to formal psychological diagnosis of complex disorders like Autism Spectrum Disorder (ASD) or Obsessive Compulsive Personality Disorder (OCPD). Such diagnoses fall squarely within the scope of practice of a licensed psychologist or psychiatrist, as defined by Iowa Code Section 147.151(1). Defendant Helleso's speculative and unauthorized diagnoses demonstrate a severe professional overreach and a fundamental lack of competency in the areas she purported to assess.

255. Defendant Helleso's conduct was further characterized by an apparent bias against Plaintiff and a systematic minimization of Defendant Kara Bittner's documented issues. Defendant Helleso consistently pathologized Plaintiff's behavior, making statements such as: "Ted struggles socially and with interpersonal skills... This was apparent in conversation cues, give and take of typical casual discussion, body language, voice intonation, cadence, and volume, and his ability to handle information that did not match with his very specific world perception."

She further characterized Plaintiff's attempts to communicate as "aggressive or threatening" and asserted that "Ted's behavior throughout this evaluation supported the reason for Kara having obtained a protective order and the level of concerns she shared."

256. In stark contrast, Defendant Helleso minimized or outright ignored concerns regarding Defendant Kara Bittner. For example, she dismissed Plaintiff's genuine, religiously-based concerns about Defendant Kara Bittner's involvement in witchcraft practices with the unprofessional and sarcastic remark, "This includes the statements regarding Kara engaging in witchcraft practices, which are more common today and widely accepted as a spiritual belief system. We do not live in 1600's Salem." This statement demonstrates a clear lack of impartiality and an inability to maintain professional boundaries.

257. Defendant Helleso also made a glaring omission by stating, "Kara has areas to focus on as well... No observed concerns throughout this process on behalf of Kara are noted," despite Defendant Kara Bittner's documented history of substance abuse, domestic violence incident against Plaintiff and later Shane, history of false allegations, selfish life choices, history of mental health issues, and other significant issues raised by Plaintiff. This selective interpretation of information evidenced confirmation bias, where Defendant Helleso appeared to have formed a conclusion about Plaintiff early on and then interpreted all data to fit that conclusion.

258 Defendant Helleso's investigation was fundamentally unbalanced and incomplete. She failed to thoroughly investigate Plaintiff's collateral contacts, making only perfunctory attempts to coordinate statements with Plaintiff's siblings and dismissing positive input from Plaintiff's friend, Christina, after a conversation that lasted less than five minutes despite being scheduled for an hour. Defendant Helleso also dismissed Plaintiff's mother's testimony as "emotional, grandiose, and impulsive," while giving disproportionate weight to unsubstantiated allegations from anonymous sources, which Plaintiff later identified as likely Defendant Keith Bittner.

259. Defendant Helleso deliberately failed to investigate Defendant Keith Bittner, who had been in Defendant Kara Bittner's life for approximately three and a half months and residing with her for much of that time during the evaluation period, despite his significant troubling history and Plaintiff's expressed concerns. This runs counter to her first meeting with Plaintiff, in which she said she runs background checks. This failure to investigate a key figure in the children's environment, while rigorously scrutinizing Plaintiff and his family, further demonstrates Defendant Helleso's bias and lack of professional diligence.

260. Defendant Helleso engaged in unprofessional conduct and demonstrated personal antagonism towards Plaintiff and his family. She included highly Detailed, negative personal interactions with Plaintiff's mother, who was not a party to the case, in her formal report. This included a retaliatory narrative about Plaintiff's mother making "demands and requests" and a Detailed account of an alleged 2:43 AM phone call to Helleso's private cell phone, with sound reasoning told about it. Such inclusions transformed the report from an objective evaluation into a personal grievance.

261. In a profound act of hypocrisy, Defendant Helleso, who previously maintained a public website advocating for the acceptance of autistic individuals, weaponized the diagnosis of Autism Spectrum Disorder against Plaintiff, without him even having it. Shane witnessed at the initial meeting, Kara Bittner suggested to Erin Helleso that the Plaintiff had autism, then her call to Kara to say that after meeting with Plaintiff, she thinks he has autism. She broadly and unscientifically applied autism traits to Plaintiff, his mother, and both minor children, C.C. and R.C., without proper testing or qualification, as part of a concerted effort with Defendant Kara Bittner to undermine Plaintiff's parental fitness.

262. During interviews with Plaintiff's children, C.C. and R.C., Defendant Helleso exhibited manipulative and leading questioning. In an interview with R.C., then three years old, Defendant Helleso attempted to insinuate that R.C.'s play activity was related to inappropriate conduct in Plaintiff's home, specifically suggesting multiple individuals in the shower, including Plaintiff, R.C., and an unidentified woman. This constitutes an egregious attempt to manufacture false allegations from a vulnerable child, demonstrating Defendant Helleso's preDetermined objective to generate evidence harmful to Plaintiff. Later it was found out that Erin wasn't even play certified at this time.

263. Defendant Helleso further demonstrated her profound bias and willingness to manipulate evidence by mischaracterizing a drawing made by R.C., then three years old, while in the care of Defendant Kara Bittner. Defendant Helleso claimed this drawing was "disturbing" and indicative of co-parenting problems, specifically because it depicted Plaintiff, R.C., and his brother, C.C., but excluded Defendant Kara Bittner. Defendant Helleso presented this interpretation as clear evidence of Plaintiff being the problem in co-parenting, without allowing Plaintiff or his counsel to inspect the drawing or providing any photographic evidence of it. Any reasonable, unbiased professional would recognize that a young child's drawing depicting his immediate family without one parent, particularly given the child's age and drawing capabilities, more plausibly reflects the child's current emotional state or primary attachments rather than a deliberate omission to signify parental dysfunction on Plaintiff's part. Defendant Helleso's interpretation of this drawing, twisting its meaning to fit her preDetermined narrative against Plaintiff, is yet another example of her biased and unprofessional conduct. At trial, Plaintiff presented evidence of R.C.'s actual drawing capabilities at the time, further demonstrating the absurdity of Defendant Helleso's interpretation.

264. Plaintiff, confirms that there was minimal communication between Defendant Helleso and the children, and that the children's words were twisted and misinterpreted to fit Defendant Helleso's biased conclusions. This manipulation is evident, with long periods of silence and a clear lack of trust from the children towards Defendant Helleso.

265. When confronted by Plaintiff regarding her public social media posts and extreme bias, Defendant Helleso refused to recuse herself and instead threatened to call law enforcement, falsely alleging that Plaintiff was stalking her. This retaliatory conduct further underscores her lack of impartiality and professional integrity.

266. Defendant Helleso further obstructed the legal process by submitting her evaluation report so it wouldn't be able to be countered with the 30 day deadline for hiring an expert witness to counter her obvious bias report, so the judge would have no expert counter testimony to be accessible. Furthermore, when it was submitted, it was inaccessible, until the next day, as it was encrypted and couldn't be opened for a timely review and preparation by Plaintiff's counsel. This deliberate act of obfuscation was designed to prejudice Plaintiff's ability to present a full defense. This is in spite of the last declared meeting with either Plaintiff or Defendant Kara Bittner, being 173 days before the opening of the report and 29 days till the trial.   trial, Defendant Helleso's testimony compounded her unprofessional conduct. She made additional damning allegations, including bringing up an anonymous family member who allegedly contacted her with unspeakable information about Plaintiff, but refused to identify the source or the specific information. This anonymous source was likely Defendant Keith Bittner, given his history of impersonation and harassment.

267. Obstruction of Due Process and Misrepresentation by Defendant Zimmerman

Following the delayed submission of Defendant Helleso's custody evaluation report on November 18, 2024 (less than thirty days before the scheduled trial dates of December 17-19, 2024, in direct violation of the August 20, 2024 Order for Custody Evaluation in Case No. CDCD104373, which required submission "not less than thirty (30) days before trial"), Plaintiff had his attorney file a Motion to Continue Modification Trial. This motion,sent on November 25th sought additional time for Plaintiff to secure a rebuttal expert, a necessity created by Defendant Helleso's non-compliance with the court's deadline. Defendant Zimmerman, counsel for Respondent Kara Clark, actively opposed this continuance, arguing, among other reasons, that she intended to move permanently to a Central American country approximately one month after the scheduled trial. This representation by Defendant Zimmerman was a significant factor in the court's denial of the continuance, thereby effectively preventing Plaintiff from presenting a rebuttal expert and countering Defendant Helleso's biased report during the modification trial. However, on December 18, 2024, the second day of the three-day trial, Defendant Zimmerman, when questioned by Plaintiff's counsel about her relocation plans, admitted that she was no longer moving out of the country. This admission, made just weeks after her representations to the court regarding her impending departure, demonstrates a calculated and bad-faith effort by Defendant Zimmerman to obstruct Plaintiff's ability to present a full defense, manipulate the judicial process, and ensure Defendant Helleso's report remained unchallenged due to the lack of time for Plaintiff to secure a rebuttal.

268. Defendant Helleso falsely testified that Plaintiff was the "worst romantic partner" Defendant Kara Bittner had ever had, yet refused to specify any actions by Plaintiff to support this claim. This testimony was based on information allegedly supplied by Defendant Kara Bittner, which included fraudulent allegations of sexual and physical abuse during their marriage, which Plaintiff has evidence to refute. Erin even excused herself during the trial during cross examination and came back with more vindictive animosity.

269. Defendant Helleso's report and testimony caused significant harm to Plaintiff, including increased legal fees, severe emotional distress, and reputational damage. Despite Defendant Helleso's biased and unprofessional evaluation and testimony, the family court ultimately awarded Plaintiff primary legal and physical custody of his children, a decision that was affirmed on appeal, thereby implicitly rejecting Defendant Helleso's recommendations and finding her evaluation to be flawed, biased, and unreliable.

270. Judicial Findings of Defendant Kara Bittner's Deception and Manipulation

The Family Court Judge, in his ruling on the custody modification, explicitly acknowledged Defendant Kara Bittner's pervasive pattern of deception and manipulation, noting that Plaintiff was consistently honest throughout the proceedings, whereas Defendant Kara Bittner was continually attempting to manipulate the court and other parties. The Judge's ruling also noted Defendant Kara Bittner's inconsistent testimony regarding Defendant Keith Bittner's presence in her home, where she initially denied his residency but later admitted they were "exploring" a relationship, despite Keith Bittner having resided with her since August 2024. The Judge further noted Defendant Kara Bittner's denial of child sexual accusations against Keith Bittner, while simultaneously admitting to child physical abuse accusations against him. These judicial findings provide independent corroboration of Defendant Kara Bittner's profound dishonesty and manipulative character, which permeated all aspects of her conduct.

O. The Family Conspiracy

271. Defendants George Millard (Kara's grandfather), Beverly Derry (Kara's great-aunt), Deborah Vodenik (Kara's aunt), Randy Vodenik (Kara's uncle), Shelby Caruso (Kara's sister), and Penny Scott (Kara's mother) (collectively, "Family Conspirators"), knowingly and intentionally provided substantial financial, logistical, and emotional support to Defendants Kara Bittner and Keith Bittner, actively enabling and participating in their criminal enterprise to harass Plaintiff and deprive him of his children.

   a. Defendant George Millard explicitly stated his intent to "spend his last penny to take the kids from the Plaintiff," and has provided significant financial support to the conspiracy. Despite being shown evidence of Defendant Kara Bittner's misconduct and Defendant Keith Bittner's abusive tendencies, and despite personally witnessing the minor child R.C. unbuckled and unsecured in his vehicle for an extended period at highway speeds on October 13, 2025, in direct violation of Iowa Code Section 321.446 (child restraint requirements, demonstrating both the dangerous environment Defendants Kara Bittner and Keith Bittner created and Defendant Millard's deliberate indifference to the children's safety despite this first hand knowledge. Defendant Millard continued his support and funding of the conspiracy. This is especially bad when Defendant Millard realized his granddaughter stole $2500 from him, blamed it on Shane, and gave her financial support, even after he was shown proof of Kara's theft. This occurred in Spring of 2025, with George showing up at Shane's place of employment and was shown the March 30th Tik Tok messages, the video of Shane handing Kara the

envelope of money, and the messages of Kara sending to Shane bragging of stealing the money from her grandpa and blaming Shane.

b. Defendant Beverly Derry provided substantial financial support, including paying for a lawyer and paying rent for Defendant Kara Bittner, paying her monthly rent from approximately August 2024 to at least August 2025, knowing that Defendant Keith Bittner resided there and that this support enabled the ongoing abuse, and malicious prosecution against Plaintiff. Beverly would also go to Kara and Keith residence to babysit the kids on occasion for the two of them.

c. Defendant Randy Vodenik actively participated in the conspiracy by perjuring himself in court and providing false corroboration to DCSO on January 16, 2025. Defendant Vodenik also denied knowledge of Defendant Kara Bittner's reckless behavior (the 'brown boy incident' where on February 24, 2024, she brought a man home with children and her boyfriend present) despite having been contacted to intervene and having done so, thereby demonstrating his deliberate intent to conceal her misconduct. Shane was witness to the entire event and sent the Plaintiff text messages of the communication between Kara and himself from it.

d. Defendant Deborah Vodenik was aware of Defendant Kara Bittner's extensive history of sexual manipulation, prostitution, drug use, and other misconduct (as communicated by Shane Dewees) yet continued to financially and emotionally support Defendant Kara Bittner, including providing tens of thousands of dollars for her wedding to Defendant Keith Bittner. Defendant Vodenik explicitly refused to review evidence of Defendant Kara Bittner's financial motivations when offered by Plaintiff's mother, demonstrating deliberate indifference to the truth and willful blindness to the harm being inflicted upon Plaintiff and the children, a legal standard that establishes knowledge for conspiracy purposes under Iowa law. Both Deborah and Randy showed up at Shane's place of employment in the fall of 2025, to discuss Shane not paying back Defendant George the $2500 that Defendant Kara had stolen from her grandfather.

e. Defendant Shelby Caruso, Defendant Kara Bittner's sister, engaged in reckless and dangerous behavior around the minor children. On or about June 29th 2024, while C.C. and R.C. were present in the backseat of a vehicle, Defendant Shelby Caruso was observed smoking a substance, likely marijuana, with the windows rolled up, thereby "hotboxing" the minor children and exposing them to harmful smoke. Defendant Caruso's presence and activities in Defendant Kara Bittner's home also led to Shane witnessing heroin in the home, brought in by Shelby and he demanded her be removed, demonstrating a dangerous environment for the children which Defendant Kara Bittner enabled. These actions constitute child endangerment under Iowa Code Section 726.6

f. Defendant Penny Scott, Plaintiff's former mother-in-law, has consistently demonstrated a willful blindness to Defendant Kara Bittner's dangerous and irresponsible conduct, prioritizing the protection of her family's reputation over the safety and well-being of her grandchildren, C.C. and R.C.

g. Defendant Kara Bittner also engaged in a pattern of financially exploiting her romantic partners, including Shane Dewees, who paid over $50,000 for her and her children's expenses during their nine-month cohabitation, based on her false narratives about Plaintiff. This conduct, known to the Family Conspirators, demonstrates a pattern of

financial manipulation and fraud. After such an extensive amount provided for her, Kara still was given large amounts of money from her family, showing she didn't need their large financial gifts.

272. Approximately one month prior to the June 29, 2024 incident where Defendant Shelby Caruso engaged in "hotboxing" the children and heroin was discovered in Defendant Kara Bittner's residence, Plaintiff's mother, Mary Beth, met with Defendant Penny Scott at Defendant Scott's home. During this meeting, Defendant Scott, after attempting to enlist Defendant Deborah Vodenik's presence, engaged in a conversation with Mary Beth that was recorded. Mary Beth sought to convey concerns about Defendant Kara Bittner's conduct and its impact on the children, but Defendant Scott, along with Defendant Deborah Vodenik, explicitly refused to review evidence of Defendant Kara Bittner's past misconduct from 2021, repeatedly stating that such matters were "in the past and doesn't matter."

273. During this recorded conversation, Defendant Scott made a critical admission demonstrating her knowledge of, and complicity in, Defendant Kara Bittner's drug use. Initially, Defendant Scott falsely claimed, "Kara doesn't do drugs, never has. She hasn't, I can vouch for that for sure." However, when confronted by Mary Beth stating, "well she got her weed from you," Defendant Scott immediately admitted, "she's had some but she's got a medical card." This admission, made under the pretense of denying drug use, proves Defendant Scott's knowledge of Defendant Kara Bittner's drug consumption, her direct involvement in supplying marijuana, and her willingness to lie to conceal Defendant Kara Bittner's illicit activities.

274. Both Defendant Scott and Defendant Deborah Vodenik, during this conversation, implicitly acknowledged Defendant Kara Bittner's history of more severe drug use. They described 2022, when Defendant Kara Bittner resided with Defendant Scott, as "incredibly hectic" due to Defendant Kara Bittner's behavior, which was clearly indicative of hard drug use following the finalization of her divorce from Plaintiff.

275. Further demonstrating their profound indifference and strategic enablement of Defendant Kara Bittner's malicious conduct, during the recorded conversation, Defendant Penny Scott and Defendant Deborah Vodenik explicitly admitted their awareness of Defendant Kara Bittner's uncontrollable and problematic nature. When Plaintiff's mother, Mary Beth, suggested that they might now have influence over Kara, Defendant Deborah Vodenik retorted, "I don't think we have, not with her," a sentiment Defendant Penny Scott immediately agreed with. This admission, further reinforced by Deborah Vodenik's statement that Kara "can do it herself" (implying Kara's independent and self-directed maliciousness), and by the deceased grandmother's prior warnings to Mary Beth, unequivocally proves Defendant Scott's and Defendant Vodenik's long-standing knowledge that Defendant Kara Bittner is an individual prone to engaging in harmful and uncontrollable conduct. Despite this explicit knowledge, they continued to provide substantial financial support to Defendant Kara Bittner, including tens of thousands of dollars for her wedding and legal fees, thereby actively enabling her to pursue a malicious legal campaign against Plaintiff and to inflict further harm upon the children, all while being fully aware that Kara was beyond their influence or control. This constitutes a direct

admission of willful blindness and reckless disregard for the consequences of their financial and emotional support.

276. Defendant Scott's profound indifference to the children's welfare is starkly demonstrated by Plaintiff's final text message to her, sent on November 26th 2021, during the 2021 EPO, stating, "help for RC and CC." Defendant Scott never replied to this desperate plea, cementing her stance of prioritizing family reputation over the immediate safety and long-term well-being of her own grandchildren.

## P. Continuous Patterns of Child Endangerment, Custodial Interference, and Parental Alienation (January 17, 2025 - Present)

277. Plaintiff holds sole legal custody and primary physical custody of C.C. (born 2018) and R.C. (born 2020), affirmed on appeal. Despite this, Defendants Kara Bittner and Keith Bittner, often with the complicity of other Defendants, have engaged in a systematic pattern of child endangerment, custodial interference, and parental alienation, causing profound harm to the children and Plaintiff.

278. January 17, 2025: False Arrest & Undermining Parental Role

Plaintiff's false arrest, based on fabricated evidence orchestrated by Defendants Kara and Keith Bittner, created profound instability and directly undermined Plaintiff's parental role in the children's eyes, causing significant emotional distress to both Plaintiff and the children. This constitutes child endangerment (emotional harm) under Iowa Code Section 726.6.

279. January 18-22, 2025: Custodial Interference & Withholding Following False Arrest

Immediately following Plaintiff's release from jail, Defendant Kara Bittner refused to return C.C. and R.C. to Plaintiff during his court-ordered custody time. Despite Plaintiff having legal custody and scheduled parenting time, Defendant Kara Bittner withheld the children, claiming R.C. was sick, and told she was advised not to give the children. When Defendant Kara Bittner eventually transported the children, she deliberately concealed the destination from them. Four-year-old R.C. prayed aloud to God, expressing hope they were going to see their father, demonstrating the children's desperation and emotional distress. This violated Iowa Code Section 598.41 (actions contrary to children's best interests) and Iowa Code Section 726.6 (child endangerment - emotional harm).

280. Late January - February 2025: Reckless Endangerment During Custody Exchanges

Throughout late January and February, Defendants Kara and Keith Bittner deliberately violated court-ordered exchange protocols by parking away from security cameras and forcing four-year-old R.C. to walk unaccompanied across multiple active gas pump lanes. On at least one occasion, a truck was actively driving through the pump area while R.C. was crossing, creating an immediate risk of serious injury or death. This constitutes child endangerment

(physical safety) under Iowa Code Section 726.6 and reckless endangerment under Iowa Code Section 726.4.

281. Deliberate Manipulation and Endangerment During Child Transfer

On February 24, 2024, at the scheduled 8:00 a.m. child transfer, Plaintiff was already present at the designated location. Defendant Keith Bittner, accompanied by R.C., arrived just before the transfer time, a deviation from the usual practice of arriving well in advance. Rather than parking in Plaintiff's typical, camera-visible spot, Defendant Keith Bittner purposely parked in an intersection, out of view of the gas station's surveillance cameras and other local businesses, a location Plaintiff had previously identified and challenged as being outside camera coverage. This deliberate choice of parking, designed to control the narrative and avoid independent verification, was consistent with Defendant Keith Bittner's known pattern of digital manipulation and manufacturing false evidence. Upon arrival, Defendant Keith Bittner immediately began looking at his phone, conspicuously ignoring Plaintiff. Recognizing this as a tactic to provoke an incident, Plaintiff briefly repositioned his vehicle to a spot directly adjacent to Defendant Keith Bittner's to indicate awareness of Defendant Keith Bittner's presence and manipulative games, before returning to his original parking location. Immediately thereafter, Defendant Keith Bittner began filming Plaintiff, then released R.C., who was only four years old, to walk across the parking area to Plaintiff's vehicle, a significant distance that posed safety risks, especially with other traffic present, as had been previously communicated to Defendants. Subsequently, messages were sent in the parenting application, falsely accusing Plaintiff of endangering R.C.'s life by almost hitting their car. This entire sequence, including the deliberate parking, the feigned ignorance, the manufactured filming, the unsafe release of a young child, and the subsequent false accusations, was a calculated attempt by Defendants Keith Bittner and Kara Clark to create a false narrative and manufacture an incident against Plaintiff, consistent with their established pattern of weaponizing child transfers and circumventing court orders restricting Plaintiff from exiting his vehicle.

282. February 28, 2025: School-Based Custodial Interference & Manufactured Allegations

Defendant Kara Bittner, employed at C.C.'s school, orchestrated an incident where C.C. was instructed not to board the bus to Plaintiff's residence, contradicting the established custody schedule. Following this, Defendant Kara Bittner sent disparaging messages to Plaintiff, falsely claiming he failed to pick up his child. This constitutes custodial interference, parental alienation, and child endangerment (emotional harm) under Iowa Code Section 726.6.

283. Deliberate Custodial Interference and Manufactured Incident on February 28, 2024, Exploiting Mischaracterized Protection Order

On February 28, 2024, Plaintiff Theodore Clark arrived at the designated gas station transfer location for the 8:00 a.m. child exchange, only to find Defendants Kara Clark and Keith Bittner, along with R.C., completely absent. This absence was a deliberate act of custodial interference, as the court order stipulated transfers were to occur at the gas station until the Consented

Protection Order (CPO), entered on February 22, 2024, expired. Plaintiff reasonably believed the CPO was a one-year agreement, based on its entry date and the subsequent weekday, and that it would have expired on February 23, 2025. This reasonable belief was further reinforced by a prior transfer occurring at the gas station between February 23rd and February 28th, and by the fact that Plaintiff had previously inquired with his counsel about the transition of transfers to the residence versus the gas station, without receiving clarification before this incident. Unbeknownst to Plaintiff, the CPO had been unilaterally modified by the court to a term of one year and five days, a change not communicated to Plaintiff and deliberately exploited by Defendant Kara Clark to create a pretext for custodial interference. Upon realizing that R.C. was not at the gas station, Plaintiff was subjected to a barrage of messages in the parenting application from Defendant Kara Clark, implicitly denying Plaintiff the ability to pick up R.C. from her home, creating an impossible scenario designed to further antagonize and frustrate Plaintiff, and prevent him from exercising his parenting time. Defendant Kara Bittner's messages further compounded the confusion by erroneously referring to the CPO as a "No Contact Order" (NCO) – a critical mischaracterization that transformed a civil agreement into a purported criminal prohibition, consistent with the false narrative used to secure Plaintiff's arrest warrant on January 6, 2025. Given Defendants' documented history of manufacturing incidents, Plaintiff could not simply proceed to the residence without risking a false accusation and arrest. When Plaintiff was finally able to pick up R.C. from the residence, Defendant Keith Bittner was outside, mocking Plaintiff and filming with multiple cameras, consistent with his known pattern of manufacturing evidence. The driveway leading to the residence was deliberately blocked with trash cans, positioned just after a turn from the highway, making them nearly invisible until Plaintiff's vehicle was upon them, pulling in from highway speeds. Plaintiff was forced to stop abruptly to avoid significant impact, at which point Defendant Keith Bittner filmed the incident, falsely claiming Plaintiff damaged their property by hitting the trash cans. The trash cans, being municipal property, were not knocked over, nor were they significantly impacted. Throughout this incident, Defendant Keith Bittner, despite not being specifically named in the custody order prohibiting parties from exiting their vehicles or homes during transfers, was outside the residence, actively participating in the harassment and filming, falsely insinuating that his absence from the order granted him immunity from its spirit and intent, and directly contradicting Defendant Kara Bittner's sworn testimony in December 2024 that she and Defendant Keith Bittner were not dating. Later that day, Plaintiff received a message insinuating that Defendant Keith Bittner had contacted DCSO to attempt to trespass Plaintiff from the property, further demonstrating a calculated effort to weaponize law enforcement against Plaintiff using manufactured evidence, as evidenced by video footage showing Defendant Keith Bittner making what appears to be a feigned phone call during the incident.

284. February - Present: Custodial Interference via Digital Impersonation

Defendant Keith Bittner repeatedly accessed Defendant Kara Bittner's parenting app account to send messages to Plaintiff, circumventing court-ordered communication channels. This is evidenced by a distinct digital writing style consistent with Defendant Keith Bittner's known patterns. This constitutes custodial interference and interference with official acts under Iowa Code Chapter 719.

285. March 3, 2025: Vehicular Assault & Reckless Endangerment of Children

During a custody exchange, Defendant Keith Bittner positioned a vehicle with high-beam headlights aimed directly at Plaintiff's vehicle, intentionally blinding Plaintiff and forcing him to back out onto a highway with high-speed traffic, all while the children were present. Defendant Keith Bittner then pursued Plaintiff's vehicle, before turning around at the next intersecting road. This constitutes assault (Iowa Code Section 708.1), reckless endangerment (Iowa Code Section 726.4), and child endangerment (Iowa Code Section 726.6).

286. March 14, 2025: Physical Assault in Presence of Child

During a custody exchange, Defendant Keith Bittner struck Plaintiff's vehicle window twice at face level within three feet of four-year-old R.C. R.C. subsequently expressed a desire for "revenge," demonstrating severe emotional trauma. Defendant Kara Bittner failed in her parental duty to prevent this incident. This constitutes assault (Iowa Code Section 708.1) and child endangerment (Iowa Code Section 726.6). This incident was reported to "Unnamed Sergeant, Badge Number 6 (2025)" on June 9, 2025, who initially attempted to deflect jurisdiction before taking the evidence and doing nothing with it.

287. March 2025 through Summer 2025: Obstruction of Filming Rights and Deliberate Hindrance of Evidence Gathering

During child exchanges from March 2025 through the summer of 2025, Defendant Kara Bittner repeatedly asserted that Plaintiff was not permitted to film on her rented property, demonstrating a deliberate attempt to prevent documentation of incidents and hinder evidence gathering. Plaintiff's filming during child transfers is a lawful and necessary measure for self-protection against Defendants' documented pattern of manufacturing false evidence and fabricating incidents. This right to record is rooted in several legal principles:
>    a. Right to Record in Public or Semi-Public View: Plaintiff's vehicle, from which all filming occurs, remains on public or semi-public property (e.g., a public street or driveway accessible from the highway with a semi-public view), and Plaintiff does not exit his private vehicle. The area of filming is not a private domicile where an expectation of privacy would prohibit such recording, particularly given its visibility from a public thoroughfare. Courts have consistently recognized a First Amendment right to record in public spaces, and this principle extends to areas visible from public vantage points.
>    b. Absence of Reasonable Expectation of Privacy: While Defendant Kara Bittner's residence is rented, the exterior portions of the property, especially those visible from the highway and driveway, do not afford an absolute expectation of privacy that would preclude recording from a public or semi-public vantage point. The act of receiving a child during a court-ordered exchange, often involving a vehicle entering a driveway, is not inherently a private activity shielded from observation or recording when conducted in open view.

c. Defense Against Manufactured Evidence and False Accusations: Plaintiff's filming is primarily defensive, aimed at countering Defendants' established pattern of manufacturing false evidence, fabricating incidents, and making false accusations to law enforcement, as Detailed herein. When a party has a documented history of manipulating events and communications to create false narratives, the opposing party has a compelling and legally recognized right to document interactions to protect themselves from such malicious tactics. Denying this right would effectively sanction the continued fabrication of evidence and undermine due process.

d. Filming from Private Property (Plaintiff's Vehicle): Plaintiff conducts all filming from within his private vehicle, which constitutes his private property. He does not trespass onto Defendant Kara Bittner's rented premises. Recording from one's own private property, even if capturing activity on adjacent property visible from that vantage point, is generally permissible absent specific, legally protected privacy interests that are not present in this context.

e. Defendants' Own Recording Practices: Defendant Kara Clark's assertion that Plaintiff need not film because "they have cameras there" is disingenuous and further demonstrates her intent to control the evidentiary narrative. Defendants themselves, particularly Defendant Keith Bittner, have a documented history of filming Plaintiff and others, often in a manipulative manner, including the incident on February 24, 2024, where Defendant Keith Bittner filmed Plaintiff following a manufactured incident. This selective opposition to Plaintiff's filming, while engaging in their own recording, highlights a double standard and an attempt to obstruct Plaintiff's ability to protect himself from their documented tactics.

Defendant Kara Bittner's repeated attempts to obstruct Plaintiff's legitimate efforts to document these exchanges constitute a deliberate and bad-faith effort to suppress exculpatory evidence, facilitate the continued fabrication of incidents, and hinder Plaintiff's ability to defend against Defendants' ongoing malicious conduct.

288. March 30, 2025: Public Defamation & Parental Alienation

Defendant Kara Bittner publicly accused Plaintiff of hacking her social media accounts and cyberstalking via a public Facebook post, presenting Plaintiff as dangerous and mentally unstable. This constitutes defamation and parental alienation (Iowa Code Section 598.41).

289. April 7, 2025: Law Enforcement Collusion & Harassment

During a custody exchange, Defendant Keith Bittner engaged in a confrontational phone call. A DCSO daily summary later confirmed a "return phone call" to Defendant Kara Bittner's address occurring about seven minutes after Plaintiff videotaped Defendant Keith Bittner's behavior, indicating Defendant Keith Bittner bypassed standard 911 to contact a specific, aligned deputy. This demonstrates an established, illicit channel to law enforcement, used to manufacture "incidents" for harassment, constituting abuse of process and interference with official acts (Iowa Code Chapter 719).

290. Chilling Effect on Parental Rights and Fear of Orchestrated Traps (April 2025)

The pervasive pattern of false allegations, law enforcement complicity, and the demonstrated ability of Defendants Kara and Keith Bittner to manipulate events forced Plaintiff to make parenting decisions not based on his children's best interests, but on the need to protect himself from malicious prosecution. In April 2025, Defendant Kara Bittner messaged Plaintiff via the parenting app regarding C.C. taking him to his music concert. While Plaintiff would normally always take C.C. to such an event, he was reluctant to do so, fearing Defendant Kara Bittner would utilize his known presence as an opportunity to manufacture false accusations. Defendant Kara Bittner further taunted Plaintiff by referencing that he did not take C.C. to the concert the previous year. This omission was not due to a lack of interest, but explicitly on the advice of Plaintiff's attorney who, after the April 2024 "hoodie incident" and subsequent contempt proceedings, advised Plaintiff to avoid the concert to prevent Defendant Kara Bittner from using his presence as a trap to call law enforcement and instigate a false arrest. This was already discussed in December 2024 trial.

291. Deliberate Concealment of Children's Activities Due to Fear of Fabricated Evidence

This pervasive fear of fabricated evidence and law enforcement collusion directly impacted Plaintiff's ability to share information about his children's lives. Plaintiff was subsequently compelled to cease informing Defendant Kara Bittner of having her take C.C. to baseball practices and later the games, after she refused before realizing it could be used as a trap. This deliberate concealment was necessary due to the reasonable apprehension that, with the Dallas County Sheriff's Department demonstrably biased against him, Defendants Kara and Keith Bittner could easily manipulate location data. Specifically, Keith Bittner, with his documented history of digital manipulation and access to multiple phones, could plant a hidden device at these coordinates to send a scheduled message, threatening message to Kara or himself, which the DCSO would then "eat up" as another opportunity to arrest Plaintiff. This tactic mirrors Defendant Keith Bittner's historical pattern of abusing location information, such as when he would contact doctors' offices where his ex-mother-in-law was taking his grandchildren, falsely claiming an active child abuse case against her in order to harass her and impede his own children's medical care. This chilling effect on Plaintiff's parental rights constitutes ongoing emotional distress, abuse of process, and interference with his ability to co-parent effectively.

292. April 11, 2025: School Interference & Manufactured Truancy Allegations

Defendant Kara Bittner failed to transport C.C. to school, claiming she was "sick." This was part of a calculated plan to blame Plaintiff for C.C.'s school absences and create false allegations of educational neglect against Plaintiff to undermine his parental fitness. This constitutes parental alienation and child endangerment (educational neglect) under Iowa Code Section 726.6.

293. April 24, 2025: Child Safety Violation & Willful Disregard for Legal Authority

Plaintiff, as sole legal custodian, informed Defendant Kara Bittner that she was using a legally non-compliant backless booster seat for four-year-old R.C., in direct violation of Iowa Code Section 321.446(2). Defendant Kara Bittner adamantly refused to comply, demonstrating willful and reckless disregard for R.C.'s physical safety and deliberate defiance of Plaintiff's parental authority. This constitutes child endangerment (physical safety) under Iowa Code Section 726.6.

294. April 25, 2025: Retaliatory Judicial Abuse

One day after Plaintiff advocated for R.C.'s car seat safety, Defendant Keith Bittner filed a retaliatory motion in his Termination of Parental Rights (TPR) case, falsely accusing Plaintiff of firing his court-appointed lawyer. This demonstrates a clear pattern of judicial abuse and evidences the ongoing conspiracy between Defendants Kara and Keith Bittner to harass and undermine Plaintiff.

295. Taunting and Financial Harassment (April 2025)

In April 2025, Defendant Kara Bittner engaged in deliberate and malicious taunting via the parenting application. She demanded that Plaintiff, who now had primary physical custody, provide her with items for the kids when they were in her care. This demand was made despite her own consistent failure to provide such items for Plaintiff during his custody time from 2022-2023, as mandated by the Kansas divorce judgment, in which she failed to provide.This act was a clear and direct taunt, reveling in her past non-compliance and highlighting her ongoing pattern of financial exploitation and harassment.

296. CONTINUOUS PATTERNS (January 17, 2025 - Present)

    a. Surveillance & Remote Punishment: C.C. and R.C. reported a camera in their playroom, with Defendant Keith Bittner watching "all the time" and using it to remotely punish R.C. This creates pervasive anxiety and emotional distress, particularly given Defendant Keith Bittner's documented history of severe child abuse and TPR removals. This constitutes child endangerment (emotional harm, invasion of privacy, psychological abuse) under Iowa Code Section 726.6.
    b. Withholding Children During Exchanges: Defendants Kara and Keith Bittner consistently refused to release the children to Plaintiff until the exact minute of scheduled exchange times, using the children as tools for control and punishment, creating unnecessary anxiety. This constitutes child endangerment (emotional harm) under Iowa Code Section 726.6 and actions contrary to children's best interests (Iowa Code Section 598.41).

297. May 5, 2025: Deliberate School Interference & Parental Neglect

Defendant Kara Bittner again failed to take C.C. to school, informing him it was due to an "appointment," a claim contradicted by observations. She also failed to ensure C.C. had a filled water bottle, indicating a broader pattern of neglect, repeated many times. This constitutes child

endangerment (educational neglect, general neglect) under Iowa Code Section 726.6 and parental alienation. The school administrators were informed by Plaintiff that this would be the last time he would take C.C. to school if Kara would not.

298. May 9, 2025: Strategic Educational Alternative & Retaliatory Undermining

After Defendant Kara Bittner's repeated failures to transport C.C. to school, Plaintiff did not take C.C. to school. During pickup, Defendant Keith Bittner was captured on video attempting to flank Plaintiff, yelling and making an offensive gesture (flipping Plaintiff off) in front of the children. Defendant Kara Bittner later submitted this video to Plaintiff's lawyer, attempting to frame Plaintiff. Plaintiff engaged C.C. and R.C. in educational and enriching activities, which Defendant Kara Bittner later dismissively claimed involved "nothing but play in the hose water," attempting to undermine Plaintiff's positive parenting. This constitutes parental alienation and actions contrary to children's best interests (Iowa Code Section 598.41).

299. May 19, 2025: Physical Intimidation, Judicial Abuse & False Reporting

Defendant Kara Bittner again failed to take C.C. to school, misinterpreting the custody order. Subsequently, a welfare check was initiated against Plaintiff by local law enforcement based on a report that he had not taken C.C. to school. This constitutes judicial abuse, physical intimidation, and the weaponization of law enforcement to harass Plaintiff and create false narratives. This constitutes child endangerment (exposure to hostile environment, intimidation) under Iowa Code Section 726.6 and abuse of process. Then on May 23, 2025, prior to the end of the school year, Defendant Kara Bittner failed to take C.C. to school for the fifth and final time, continuing her pattern of deliberate school interference and neglect. This constitutes child endangerment (educational neglect) under Iowa Code Section 726.6.

300. June 6, 2025: Confinement & Restricted Access to Basic Needs

Plaintiff was informed by the children that they are now forbidden from leaving their bedroom and attached playroom in the mornings until Defendant Kara Bittner explicitly comes to get them, restricting access to basic necessities (e.g., bathrooms, kitchen). This constitutes child endangerment (restriction of basic needs, psychological confinement) under Iowa Code Section 726.6.

301. June 16, 2025: Animal Abuse in Children's Presence & Emotional Trauma

C.C. and R.C. witnessed Defendant Keith Bittner violently throw his dog down several steps and into a wall, followed by whimpering sounds from an upstairs room. R.C. reported the incident to Defendant Kara Bittner, who ignored his concerns. Defendant Keith Bittner has a documented history of harming animals. Witnessing such violence traumatizes the children and fosters an unsafe environment. This constitutes animal abuse (Iowa Code Section 717B.2) and child endangerment (exposure to violence, emotional harm) under Iowa Code Section 726.6.

302. Mid-June, 2025: Witnessed Domestic Violence & Emotional Trauma

Around R.C.'s fifth birthday, R.C. witnessed Defendant Keith Bittner throw what he described as a large cake pan at Defendant Kara Bittner, striking her, which resulted in Defendant Kara Bittner crying and the birthday celebration being postponed. This constitutes child endangerment (Iowa Code Section 726.6(1)(e) - present during domestic abuse assault) and actions contrary to children's best interests (Iowa Code Section 598.41).

303. Summer 2025 (Prior to August)

Displacement and Prioritization of Unborn Child. C.C. and R.C. were forcibly relocated from their conjoined bedroom and playroom upstairs to a single, smaller downstairs bedroom to accommodate an unborn child of Defendant Keith Bittner. This premature relocation demonstrated a prioritization of an unborn child over C.C. and R.C.'s comfort and stability, causing emotional harm. This violates Iowa Code Section 598.41 and Iowa Code Section 726.6 (emotional harm).

304. July 13, 2025: Humiliating Punishment & Emotional Abuse

R.C. (age 5) was subjected to humiliating punishment by Defendant Keith Bittner for an age-appropriate accident (urinating in swimming trunks outside of the home and pool). Defendant Keith Bittner made him stand in a corner while others swam. This constitutes child endangerment (emotional abuse) under Iowa Code Section 726.6.

305. July 14, 2025: Coordinated Humiliating Punishment & Emotional Abuse

The following day, R.C. experienced an identical humiliating punishment administered by Defendant Kara Bittner for the same age-appropriate accident, mirroring Defendant Keith Bittner's actions. This demonstrates a coordinated pattern of emotional abuse and humiliating punishment, violating Iowa Code Section 726.6.

306. July 18 & 19, 2025: Reckless Disregard for Child Safety (Vehicle Restraints)

C.C. reported that both Defendants Kara and Keith Bittner frequently drive off before the children are fully buckled into their car seats, particularly Defendant Keith Bittner, who often pulls onto the highway with unrestrained children. This constitutes child endangerment (physical safety) under Iowa Code Section 726.6 and a violation of Iowa Code Section 321.446(1).

307. July 28, 2025: Deliberate Obstruction of Custody Exchange & Creation of Hazard

Defendants Kara and Keith Bittner deliberately moved trash bins into the driveway and onto the highway shoulder to prevent Plaintiff from safely executing a U-turn and attempting to coerce him into striking a bin. A truck was also positioned to block the driveway. This created a hazardous driving environment for the children. This constitutes child endangerment (physical

safety) under Iowa Code Section 726.6 and interference with official acts (Iowa Code Chapter 719).

308. July 31, 2025: Retaliatory Punishment for Affection & Parental Alienation
Both children were punished by Defendants Kara and Keith Bittner (denied video games, forced to watch Defendant Keith Bittner play) for R.C. running to Plaintiff's vehicle is a clear act of parental alienation, violating Iowa Code Section 598.41 and causing emotional abuse under Iowa Code Section 726.6.

309. August 9, 2025: Vicarious Punishment & Lack of Due Process for Child

R.C. was punished by Defendant Keith Bittner (placed in corner) for the actions of Defendant Keith Bittner's dog, without allowing R.C. to explain. This constitutes child endangerment (emotional abuse) under Iowa Code Section 726.6.

310. August 11, 2025: Escalated Retaliatory Punishment for Affection
After C.C. ran to Plaintiff's vehicle, he was subjected to prolonged and severe corner punishment (minimum 1.5 hours) upon returning to Defendant Kara Bittner's residence. This excessive and retaliatory punishment for expressing affection towards Plaintiff is a clear act of parental alienation and severe emotional abuse, violating Iowa Code Section 726.6.

311. August 18, 2025: Continued Excessive Punishment & Psychological Manipulation

C.C. was again punished (extended cornering) for "jogging" to Plaintiff's vehicle. During this incident, C.C. revealed Defendants Kara and Keith Bittner were actively manipulating the children's perceptions and trust (falsely claiming concern about a "hole" in the driveway) to control their behavior and alienate them from Plaintiff. C.C. after his punishment asked his mother to show him the hole in the driveway, who he knew what she was referring to. This constitutes severe emotional and psychological abuse, violating Iowa Code Section 726.6.

312. August 28, 2025: Continued Harassment & Strategic Avoidance of Accountability

Plaintiff sent a message to Defendant Kara Bittner instructing her not to punish C.C. for moving briskly to his vehicle. Defendant Kara Bittner and Keith Bittner discussed Plaintiff's message with C.C. but did not apologize. This demonstrates Defendant Kara Bittner's awareness of the impropriety of her actions, her strategic avoidance of accountability, and her continued use of the children as conduits for conflict.

313. September 26, 2025: Manufactured Incident & Abuse of Process

Upon arriving for an exchange, Plaintiff observed a trash bin knocked over by the mailbox, which Plaintiff reasonably believed was a manufactured incident to create fabricated evidence against him. This is indicative of a continuing pattern of abuse of process and harassment.

314. November 3, 2025: Deliberate Creation of Road Hazard & Obstruction

Defendants Kara and Keith Bittner deliberately altered the normal placement of trash bins to prevent Plaintiff from safely pulling in diagonally off the highway, intending for him to strike a trash can. This constitutes child endangerment (physical safety) under Iowa Code Section 726.6 and interference with official acts (Iowa Code Chapter 719).

315. November 10, 2025: Intentional Blinding During Custody Exchange

During the exchange, a camera with its flash continuously activated was aimed at Plaintiff's vehicle while he was securing the children and preparing to depart. This prolonged and intentional use of a bright camera flash was designed to blind Plaintiff, creating a hazardous condition. This constitutes child endangerment (physical safety) under Iowa Code Section 726.6 and interference with official acts (Iowa Code Chapter 719).

316. Spring 2025 (Disclosed November 22, 2025)

Severe Physical Abuse & Psychological Coercion. C.C. was subjected to severe physical abuse by Defendant Keith Bittner (spanking causing urination) for a minor transgression. He was then forced into a corner. This incident was concealed by the children for approximately six months due to Defendant Keith Bittner's documented history of threatening children to maintain silence. R.C. also consistently experienced frequent spankings from Defendant Keith Bittner. This constitutes severe child abuse (Iowa Code Section 232.2(4)(a)(2)) and child endangerment (physical/emotional abuse) under Iowa Code Section 726.6.

317. December 4, 2025: DHS Interview & Alleged Policy Violations

The Iowa Department of Human Services ("DHS") interviewed C.C. and R.C. at school. Despite Plaintiff's persistent efforts and providing extensive evidence, DHS concluded there was no evidence of child abuse. Defendant Kara Bittner questioned the children about the interview the same evening, raising concerns about DHS's adherence to policies (e.g., timely parental notification) and potentially constituting emotional abuse under Iowa Code Section 726.6. DHS also failed to request any evidence from Plaintiff, despite being informed of its existence.

318. December 12-15, 2025: Retaliatory & Excessive Punishment for Nocturnal Enuresis

R.C. (age 5) experienced three instances of bedwetting and was subjected to prolonged and excessive corner standing/sitting (up to 2.5 hours for a single incident) as punishment, being told he was being punished for "lying" to avoid anticipated punishment. This constitutes severe child endangerment (emotional abuse) under Iowa Code Section 726.6.

319. December 15, 2025: Parental Neglect & Blaming Child for Parental Oversight

R.C. was sent to school by Defendant Kara Bittner without his backpack, who then blamed R.C. for forgetting it. This is a clear instance of parental neglect and shifting parental responsibility onto a young child, constituting child endangerment (injurious to welfare) under Iowa Code Section 726.6 and failure to act in the child's best interests (Iowa Code Section 598.41).

**Q. Post-Arrest DCSO Collusion and Continued Abuse of Authority (June - December 2025)**

320. June 28, 2025: DCSO's Unwarranted Intervention Regarding Plaintiff's Potential Move

On or about June 28, 2025, Defendant Dallas County Sheriff's Office (DCSO) deputies engaged in an unwarranted and unlawful intervention in Plaintiff's private family matters. While Plaintiff's children were with Defendant Kara Bittner and Defendant Keith Bittner, a DCSO deputy came to their residence and delivered a hand-written paper to Defendant Kara Bittner. Plaintiff's son, C.C. Clark overheard the discussion, which revealed the deputy was delivering a "warning" to Defendant Kara Bittner that Plaintiff was contemplating a move. This intervention further demonstrates that Defendant DCSO was engaged in ongoing and unlawful surveillance of Plaintiff, gathering non-public information about his private intentions and personal life without any legal basis, and then improperly disseminating this information to Defendants Kara Bittner and Keith Bittner.

321. This intervention by Defendant DCSO was entirely without legal basis and constituted a blatant abuse of authority. At this time, Plaintiff held full legal and primary physical custody of his children, a status recently affirmed on appeal, and there was no court order or legal restriction preventing Plaintiff from moving. The DCSO, like other law enforcement agencies, routinely asserts that it does not intervene in purely civil matters. Yet, in this instance, Defendant DCSO actively intervened by delivering a hand-delivered "warning" in a purely civil custody matter where they had no legitimate law enforcement purpose or jurisdiction.

322. This incident provides unequivocal evidence of Defendant DCSO's overt bias and collusion with Defendants Kara Bittner and Keith Bittner. The DCSO actively assisted Defendants Kara Bittner and Keith Bittner in a civil dispute, utilizing their official capacity "under color of state law" to intimidate Plaintiff and interfere with his parental rights. This occurred despite Plaintiff having delivered compelling evidence of numerous serious crimes committed by Defendants Kara Bittner and Keith Bittner to Defendant DCSO only nineteen (19) days prior (on June 9, 2025), which Defendant DCSO deliberately refused to prosecute or investigate. This stark contrast in actions demonstrates a deliberate policy or custom by Defendant DCSO of protecting Defendants Kara Bittner and Keith Bittner while actively targeting and interfering with Plaintiff's constitutional rights.

323. The DCSO's actions in delivering this unwarranted "warning" interfered with Plaintiff's fundamental parental rights without any lawful basis, thereby violating his due process rights under the Fourteenth Amendment. Furthermore, by selectively intervening in a civil matter on behalf of Defendants Kara Bittner and Keith Bittner while simultaneously ignoring their criminal

conduct and targeting Plaintiff, Defendant DCSO violated Plaintiff's equal protection rights by treating him disparately without a rational basis.

324. December 19, 2025: Suspicious "Public Assistance" Call and Deliberate Obscurement

On December 19, 2025, at approximately 6:25 PM, Defendant DCSO responded to the residence of Defendant Kara Bittner and Defendant Keith Bittner for an incident classified solely as "Public Assistance" in official records. Defendant DCSO utilizes numerous specific classifications for various types of assistance (e.g., "car trouble," "welfare check," "domestic dispute"), with 88 classification types available. The use of the deliberately vague "Public Assistance" classification, which was the only such listing for that residence on that entire day, raises strong suspicion that the true nature of the intervention was deliberately obscured in official records to conceal an improper interaction.

325. This officially recorded, yet suspiciously classified, intervention further contributes to the established pattern of Defendant DCSO's unjustified and biased presence at the residence of Defendants Kara Bittner and Keith Bittner. This pattern demonstrates Defendant DCSO's continuous and active involvement in the lives of Defendants Kara Bittner and Keith Bittner, in a manner that consistently favors them and undermines Plaintiff's parental and legal rights, all while Defendant DCSO refuses to investigate numerous credible criminal allegations against Defendants Kara Bittner and Keith Bittner. This ongoing collusion forms part of a larger conspiracy to deprive Plaintiff of his constitutional rights.

326. December 26, 2025: Unrecorded DCSO Intervention and Evidence of Conspiracy

On December 26, 2025, at approximately 11:30 AM, immediately upon the arrival of Plaintiff's children at the residence of Defendant Kara Bittner and Defendant Keith Bittner following a holiday custody exchange, a Dallas County Sheriff's Office (DCSO) vehicle was already present. Plaintiff's son, C.C. Clark observed a white vehicle with the word "Sheriff" on the side. The children were directed to enter the residence while Defendant Keith Bittner engaged in a conversation with the DCSO deputy outside for a significant period.

327. Plaintiff's son, C.C., remarked that Defendant Keith Bittner "didn't get arrested," noting the unusual nature of law enforcement's presence without an arrest. A subsequent review of Defendant DCSO's public activity logs for that date revealed absolutely no official record of any DCSO activity at the residence of Defendant Kara Bittner and Defendant Keith Bittner. This unrecorded intervention, occurring immediately prior to the recent escalation of the Child in Need of Assistance (CINA) case, constitutes compelling evidence of Defendant DCSO's unofficial meddling in Plaintiff's custody matters and active collusion with Defendants Kara Bittner and Keith Bittner.

328. The absence of an official record, despite the presence of a marked patrol vehicle, indicates a deliberate attempt to operate outside transparent and lawful channels to further the interests of Defendants Kara Bittner and Keith Bittner. Furthermore, Defendant Keith Bittner did

not appear upset following the conversation with the DCSO deputy, suggesting the interaction was not an admonishment but rather a discussion or coordination. This further supports the inference that Defendant DCSO was actively assisting Defendants Kara Bittner and Keith Bittner in their ongoing campaign against Plaintiff, rather than engaging in legitimate law enforcement duties.

329. Defendant Rebecca Moser's and DCSO's Deliberate Obstruction of Public Records to Conceal Misconduct and Evade Civil Rights Liability

Defendant Rebecca Moser, acting in her official capacity as Administrative Clerk and Records Custodian for the Dallas County Sheriff's Office (DCSO), and other unnamed DCSO personnel, engaged in a systematic and deliberate pattern of obstructing Plaintiff's lawful access to public records, in direct violation of Iowa Code Chapter 22. This obstruction was not merely procedural; it was a calculated and malicious strategy designed to conceal the extensive pattern of constitutional violations perpetrated by DCSO personnel, to prevent Plaintiff from fully uncovering the scope of the conspiracy against him, and ultimately, to evade civil liability under 42 U.S.C. § 1983 and other federal and state laws. Upon information and belief, DCSO had already conducted internal investigations into the misconduct of its officers and their conspiratorial actions with the Bittner Defendants, and deliberately orchestrated this plan to impede Plaintiff's access to justice and protect its members from legal accountability.

330. On or about November 30, 2025, Plaintiff submitted a comprehensive Open Records Request via certified mail to the Dallas County Sheriff's Department, specifically addressed to the Attn: Open Records Officer (Defendant Rebecca Moser). This request meticulously Detailed the records sought, including:

a. All records related to Plaintiff's arrest on January 17, 2025, including interrogation videos, jail logs, and phone seizure records.

b. Complete personnel files for all involved officers (Wyatt Westberg, Jalen Townsell, Adam Jacobs, Neal Vanderleest, and Sgt Badge #25-6, and other unnamed officers), including internal affairs investigations and citizen complaints.

c. All incident and investigation records related to Keith Bittner and Kara Mae Bittner from January 1, 2012, to present, including records of false reports and digital manipulation.

d. All records related to specific investigations where Plaintiff was accused of harassment or hacking, including Case No. 2025-00000694, Case No. 2025-00000778 (Plaintiff's arrest), and Case No. 2024-000014193 (Shane hacking investigation later attributed to Plaintiff).

e. All records related to Plaintiff's own complaints and evidence submissions, including the 300+ page report submitted in June 2025, and the investigatory report for the incident Plaintiff reported on June 12, 2025, for which he received a receipt.

331. Despite this comprehensive and clearly articulated request, Defendant DCSO, through Defendant Rebecca Moser, deliberately obstructed access to these records. Specifically, Defendant Moser denied Plaintiff access to investigatory reports for five separate cases:

a. Case No. 2025-00000694 (harassment/hacking accusation against Plaintiff), Case No. 2025-00000778 (Plaintiff's arrest), and Case No. 2024-000014193 (Shane hacking investigation later attributed to Plaintiff), claiming these were "ongoing investigations" despite Plaintiff being a named suspect or involved party, despite being 11 and 15 months old at the time with nothing happening but trying to wait out the statue of limitations.
b. Case No. 2025-00000169 (fabricated text messages Plaintiff never sent), despite this case being officially closed since April 8, 2025, thereby invalidating any "ongoing investigation" justification and demonstrating a knowing misrepresentation of law.
c. The investigatory report for the incident Plaintiff reported on June 12, 2025, for which Plaintiff possesses a receipt, an indefensible obstruction of a reporting party's right to access their own case file.

332. In addition to denying specific investigatory reports, Defendant Moser and the DCSO also refused to provide Plaintiff with critical custodial records, including complete jail records (comings and goings of Detainees, inmate movement logs), disciplinary records for deputies, and video recordings of Plaintiff's interrogations, all of which were explicitly requested.

333. Defendant DCSO, through Defendant Rebecca Moser, systematically ceased communication with Plaintiff and refused to answer his questions regarding these denials, even after Plaintiff explicitly cited Iowa Code Chapter 22 violations to her. This was intended to impede Plaintiff's ability to identify all responsible parties, effectively prepare a federal civil rights lawsuit, and demonstrate the merits of his case to prospective legal counsel, thereby forcing Plaintiff to pursue litigation pro se and significantly hindering his access to justice. This conduct, by denying Plaintiff access to public records essential for litigation, violates Plaintiff's Fourteenth Amendment Right of Access to Courts and First Amendment Right to Petition for Redress of Grievances.

334. DCSO's Deliberate Withholding of Investigatory Reports for False Accusations

Beyond merely denying access to reports related to Plaintiff's own complaints and arrest, Defendant DCSO, through Defendant Rebecca Moser and other unnamed personnel, has also deliberately and systematically withheld complete investigatory reports for numerous other accusations made against Plaintiff, and for falsified evidence turned in by the Bittner Defendants. Plaintiff has only received introductory reports, which are insufficient to understand the full scope, nature, and evidence underlying these accusations. This deliberate withholding of information is not merely a violation of public records law, but a calculated strategy to prevent Plaintiff from fully comprehending the range of fabricated claims and evidence being used against him. This practice significantly hinders Plaintiff's ability to adequately defend himself against past, present, and future false allegations, and demonstrably obstructs his right to due process and his fundamental right of access to courts by denying him the necessary information to prepare a defense and pursue legal redress.

335. The acknowledged receipt of Plaintiff's certified mail requests (delivered and signed for on November 21, 2025, and December 4, 2025), coupled with the subsequent and persistent non-response, demonstrates a deliberate policy or custom by Defendant DCSO to obstruct Plaintiff's efforts to identify and seek redress from individuals involved in the constitutional violations against him. This refusal, directly attributable to Defendant Rebecca Moser's actions and omissions, is intentional and calculated to prevent Plaintiff from holding all responsible parties accountable, thereby furthering the broader conspiracy to obstruct justice and impede Plaintiff's efforts to litigate his civil rights claims and evade civil liability under 42 U.S.C. § 1983 and other federal and state laws.

336. Plaintiff has incurred substantial legal fees and suffered profound emotional distress defending against these malicious and fabricated legal actions.

337. The Digital Scarlet Letter: Perpetual Harm from False Allegations

The cumulative effect of these false allegations, fabricated police reports, and malicious legal proceedings initiated by Defendants Kara Bittner and Keith Bittner, and then perpetuated by law enforcement, has created a permanent and pervasive record within law enforcement and judicial databases across the country. Even after exoneration from false arrest, this history of accusations remains. Any law enforcement officer conducting a routine background check, even for a minor infraction such as a traffic stop, will access a lengthy and damning history of allegations against Plaintiff, dating back to 2021. This digital scarlet letter ensures that Plaintiff will be subjected to heightened scrutiny, presumptive guilt, and increased likelihood of punitive action for the rest of his life, regardless of actual innocence or subsequent exoneration. This constitutes a perpetual harm, inflicting ongoing emotional distress, reputational damage, and an unconstitutional deprivation of liberty without due process.

338. Weaponization of Systemic Bias Against Male Litigants in Family Court

This lasting digital record of false allegations is made even more insidious by the documented systemic bias against men, particularly fathers, within family court and related legal systems. Plaintiff's attorney in 2024 informed him that it is extremely rare for a father to successfully a EPO and to consent without admitting fault, as less than 2% of cases are men successful in fighting these, like the one he was able to beat in 2021. This pervasive bias ensures that even demonstrably false accusations, once entered into the system, carry disproportionate weight against male litigants. Defendants Kara Bittner and Keith Bittner, acting in concert with law enforcement, knowingly exploited this systemic vulnerability, weaponizing the inherent gender bias within the legal system to inflict maximum harm upon Plaintiff and systematically undermine his parental rights, liberty, and reputation. This exploitation of known systemic bias further evidences the malicious intent and discriminatory nature of the defendants' actions, contributing to Plaintiff's ongoing constitutional violations under the Equal Protection and Due Process Clauses of the Fourteenth Amendment.

339. Plaintiff reserves the right to present additional facts, Details, and evidence, which may be discovered during the course of litigation or which may further elaborate upon the allegations contained herein. Plaintiff further reserves the right to identify and add additional Defendants as their identities and involvement become known through discovery, and to add additional claims as warranted by further investigation and discovery. These allegations are based upon Plaintiff's current knowledge and belief, and Plaintiff anticipates that further discovery will reveal additional relevant information supporting the claims made in this Complaint.

340. The Enactment of Criminal Conduct by Dallas County Sheriff's Office Personnel

Plaintiff further alleges that the Defendants in the Dallas County Sheriff's Office, including but not limited to Defendant Deputy Wyatt Westberg, Defendant Deputy Jalen Townsell, Defendant Detective Adam Jacobs, and Defendant Sergeant Neil Vanderlust, engaged in conduct that constitutes serious criminal offenses under both Iowa and federal law. This conduct, Detailed in the factual allegations above, was deliberately undertaken under color of state law and demonstrates a profound disregard for constitutional rights and the rule of law. The systematic failure of the Dallas County Sheriff's Office to investigate, prosecute, or discipline its personnel for these criminal acts, while simultaneously aggressively pursuing fabricated charges against Plaintiff, reflects a systemic policy, custom, or practice of deliberate indifference and selective enforcement, directly violating the Equal Protection and Due Process Clauses of the Fourteenth Amendment. Plaintiff cites these criminal statutes not to assert independent causes of action under state or federal criminal law, but rather to demonstrate: (1) that the conduct alleged violated clearly established law, defeating any qualified immunity defense; (2) the malicious and intentional nature of Defendants' actions; and (3) the existence of a systematic policy of selective enforcement constituting the 'official policy' required for municipal liability under Monell v. Department of Social Services, 436 U.S. 658 (1978)

Specifically, the following criminal conduct is alleged:

    a. Defendant Deputy Wyatt Westberg's Fabrication of Probable Cause and False Reports: Defendant Deputy Wyatt Westberg, in his January 5, 2025 report and subsequent application for an arrest warrant, knowingly and intentionally:

        i. Made false statements and material omissions to secure Plaintiff's arrest, including fabricating attempts to contact Plaintiff and misrepresenting the nature of the underlying civil no-contact order. This conduct constitutes:

• Iowa Code § 718.6 (False Reports to Public Safety Entities)
• Iowa Code § 720.5 (Perjury)
• 18 U.S.C. § 1001 (False Statements)

        ii. Relied upon demonstrably false and technically impossible claims, such as "iCloud tampering" by Plaintiff, demonstrating a willful and reckless disregard for the truth in manufacturing probable cause.

    b. Defendant Deputy Jalen Townsell's Deliberate Indifference, Obstruction, and Discriminatory Conduct: Defendant Deputy Jalen Townsell, acting during and after Plaintiff's January 17, 2025 arrest and interrogation, knowingly and intentionally:

i. Deliberately ignored and actively misrepresented Plaintiff's credible report of an attempted murder plot, including suppressing Detailed exculpatory evidence and Plaintiff's offer of audio recordings. This conduct constitutes:

• Iowa Code § 719.1 (Obstruction of Justice)
• Iowa Code § 721.2 (Official Misconduct)
• 18 U.S.C. § 1512 (Tampering with a Witness, Victim, or an Informant)

ii. Exhibited discriminatory animus against Plaintiff based on race and gender, influencing his official duties and leading to biased enforcement. This conduct constitutes:

• 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law)

iii. Executed Plaintiff's arrest in an unnecessarily public and profoundly traumatic manner in the presence of his four-year-old child, R.C., constituting child endangerment. This conduct constitutes:

• Iowa Code § 726.6 (Child Endangerment)

iv. Deliberately failed to investigate serious threats of harm against Defendant Keith Bittner and explicit concerns from a social worker regarding Defendant Keith Bittner's mental health, despite directly implicating the safety and welfare of minor children in his care. This constitutes:

• Iowa Code § 232.69 (Mandatory Reporting of Child Abuse) violation of a mandatory duty
• Iowa Code § 726.6 (Child Endangerment)

c. Defendant Detective Adam Jacobs' and Defendant Sergeant Neil Vanderlust's Unlawful Device Access and Obstruction of Justice:

Defendants Detective Adam Jacobs and Sergeant Neil Vanderlust, acting during the January 17-18, 2025 interrogations, knowingly and intentionally:

i. Engaged in a deliberate, premeditated scheme to steal Plaintiff's passcodes by physically coercing Plaintiff to input them in their unobstructed view, including hitting Plaintiff's hand away when he attempted to obscure his input. This conduct constitutes:

• Iowa Code § 716A.14 (Unauthorized Access to Computer Data)
• 18 U.S.C. § 1030 (Fraud and Related Activity in Connection with Computers - specifically unauthorized access)
• 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law)

ii. Unlawfully accessed Plaintiff's cellular phones without a valid search warrant, probable cause, or consent, in direct violation of the Fourth Amendment. This conduct constitutes:

• Iowa Code § 716A.14 (Unauthorized Access to Computer Data)
• 18 U.S.C. § 1030 (Fraud and Related Activity in Connection with Computers - specifically unauthorized access)
• 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law)

iii. Deliberately prevented Plaintiff from presenting critical exculpatory evidence by falsely claiming attorney-client privilege. This conduct constitutes:

• Iowa Code § 719.1 (Obstruction of Justice)
• 18 U.S.C. § 1512 (Tampering with a Witness, Victim, or an Informant - specifically corruptly influencing testimony/evidence)

iv. Knowingly refused to identify any crimes committed by Defendants Kara and Keith Bittner, despite Plaintiff's Detailed hypothetical scenario describing their criminal conduct, demonstrating a deliberate intent to protect co-conspirators and obstruct justice. This conduct constitutes:

• Iowa Code § 719.1 (Obstruction of Justice)
• Iowa Code § 721.2 (Official Misconduct)
• 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law)

d. Defendant DCSO's Unlawful Search of Plaintiff's Vehicle:
Defendants Sgt. Neil Vanderlust and Det. ADAM Jacobs, personally or through other DCSO personnel acting at their direction, unlawfully removed Plaintiff's car key from his secured possessions and used it to access, enter, and search Plaintiff's vehicle without a search warrant, probable cause, or consent. This conduct constitutes:

• Iowa Code § 716A.14 (Unauthorized Access to Computer Data - if vehicle contained digital devices requiring access)
• Iowa Code § 714.2 (Theft - specifically unauthorized control over property)
• 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law)

e. Defendant DCSO's Deliberate Obstruction of Public Records and Concealment of Misconduct:
Defendant Rebecca Moser, in her official capacity as Records Custodian for DCSO, and other unnamed DCSO personnel, engaged in a systematic and deliberate pattern of obstructing Plaintiff's lawful access to public records, including investigatory reports and personnel files, to conceal the extensive pattern of constitutional violations. This conduct constitutes:

• Iowa Code Chapter 22 (Violation of Open Records Law)
• Iowa Code § 719.1 (Obstruction of Justice)
• Iowa Code § 721.2 (Official Misconduct)
• 18 U.S.C. § 1519 (Destruction, Alteration, or Falsification of Records in Federal Investigations and Bankruptcy) applicable if records withheld were relevant to federal investigation.

f. Defendant DCSO's Conspiracy to Deprive Rights:
SO Defendants, through their collective and individual actions and omissions as Detailed herein, engaged in a conspiracy to deprive Plaintiff of his civil rights under color of state law. This conduct constitutes:

• 18 U.S.C. § 241 (Conspiracy Against Rights)
• 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law)

## V. CAUSES OF ACTION

Plaintiff Theodore Clark incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein for each and every cause of action stated below.

COUNT I: VIOLATION OF 42 U.S.C. § 1983 – FOURTH AMENDMENT FALSE ARREST AND UNLAWFUL SEIZURE OF PERSON

341. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

342. At all times relevant hereto, Defendants Dallas County Sheriff's Office, Dallas County, Iowa, Sheriff Adam Infante, Chief Deputy Bret Maxwell, Sgt. Nick Pearson, Sgt. Neil Vanderlust, Det. Adam Jacobs, Deputy Wyatt Westberg, Deputy Jalen Townsell, Deputy Deavon Richards, and Unnamed Sgt. Badge #6 in 2025 (collectively "Law Enforcement Defendants") were acting under color of state law within the meaning of 42 U.S.C. § 1983.

343. The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, protects individuals against unreasonable seizures of their person, which includes arrests made without probable cause.

344. On January 6, 2025, Defendant Deputy Wyatt Westberg, acting with deliberate indifference to the truth or with reckless disregard for whether his statements were true, fabricated material facts in a police report and affidavit submitted to obtain an arrest warrant for Plaintiff. (Paras. 100-108)

345. Specifically, Defendant Westberg knowingly made or recklessly disregarded the following false statements and material omissions:
   a. False Statement of Contact Attempts: Defendant Westberg falsely stated "I attempted to contact Theodore multiple times and he did not answer the phone" when Plaintiff's phone records for January 5, 2025 show zero incoming calls from Westberg or DCSO. (Para. 102)
   b. False Technical Claim: Defendant Westberg falsely claimed the spoofed number (515-567-6635) stated "the line is out of service" when such numbers typically generate a "busy" message, demonstrating either fabrication or reckless disregard for accuracy. (Para. 104)
   c. Reliance on Demonstrably False "Exclusive Knowledge" Theory: Defendant Westberg relied on Defendant Kara Bittner's patently false claim that "only her, Theodore and another family member know that 1/6/2025 is the custody exchange day" when in fact Defendant Keith Bittner (living with Kara Bittner for nearly six months), both extended families, court personnel, and anyone with access to court schedules possessed this information. (Para. 105)
   d. Reliance on Technically Impossible "iCloud Tampering" Allegation: Defendant Westberg's report relied heavily on Defendant Kara Bittner's claim of "iCloud tampering" by Plaintiff despite the fact that Plaintiff has never owned an Apple product, rendering such tampering technically impossible—a fact DCSO would have discovered through their own surveillance of Plaintiff's phone numbers conducted between January 6-16, 2025. (Para. 106a)
   e. Deliberate Failure to Investigate Reported Child Abuse: Defendant Westberg's report explicitly documented Defendant Kara Bittner's statement that she would not pick up the children on January 6, 2025 "due to an alleged child abuse issue," constituting a mandatory report of child abuse under Iowa Code § 232.69. Despite this explicit

allegation, Defendant Westberg deliberately failed to conduct any investigation, failed to contact the alleged child victim (R.C.), and failed to investigate the readily discoverable truth that R.C.'s injury resulted from a bathtub accident, not a "belt" as falsely alleged in the fabricated text messages. (Para. 106b-c)

f. Deliberate Misrepresentation of Order Type: Defendant Westberg deliberately misrepresented the nature of the underlying order, presenting a consented civil no-contact order from family court proceedings as if it were a criminal protective order, thereby misleading the magistrate about the severity of any alleged violation and manufacturing apparent probable cause where none existed. (Paras. 107-108)

g. Conflict of Interest Concealment: Defendant Westberg failed to disclose his pre-existing personal relationship with Defendant Kara Bittner as high school acquaintances, demonstrating a clear conflict of interest and bias. (Para. 109)

346. Based solely on this fabricated and materially false report, a warrant was issued for Plaintiff's arrest on January 6, 2025 at 10:34 AM. (Para. 110)

347. Despite the warrant being issued on January 6, 2025, Law Enforcement Defendants deliberately delayed execution of the warrant for eleven (11) days until January 17, 2025, during which time they conducted targeted surveillance of Plaintiff to obtain non-public information, including a secondary phone number not publicly available and not known to Plaintiff himself. (Paras. 111-112)

348. Law Enforcement Defendants possessed, or deliberately avoided obtaining, exculpatory evidence that would have immediately negated probable cause, including:

a. DCSO's Own Prior Conclusion of "Nothing Founded": On January 9, 2025—eight days before Plaintiff's arrest—DCSO contacted Shane Dewees and explicitly informed him that they had investigated allegations of cyberstalking against both Plaintiff and Shane Dewees and that "nothing was founded" against either individual. Despite this official conclusion, DCSO proceeded to arrest Plaintiff on January 17, 2025 for charges directly related to these previously unfounded allegations. (Para. 115)

b. Exculpatory Information from Shane Dewees: On January 9, 2025, Shane Dewees explicitly informed DCSO that he had never spoken to Plaintiff until recently, did not know Valerie Bittner, and that the allegations of coordinated cyberstalking were implausible given that no such evidence emerged during the many months Shane and Defendant Kara Bittner were together. (Para. 114)

c. Attorney's Attempt to Manufacture Evidence: Prior to Plaintiff's arrest and prior to January 9, 2025, Defendant Kara Bittner's attorney, Jaclyn Zimmerman, contacted Shane Dewees explicitly seeking "proof of text messages" between Shane and Plaintiff to manufacture a narrative of a hacking conspiracy. Shane Dewees refused and immediately reported this attempt to fabricate evidence to DCSO. Therefore, prior to Plaintiff's arrest, DCSO possessed explicit notice of Defendant Kara Bittner and her attorney's deliberate efforts to fabricate evidence against Plaintiff. (Para. 113)

d. Defendant Keith Bittner's Documented Pattern: DCSO possessed actual knowledge from its own September 16, 2024 investigation (Case 2024-00014193) that Defendant

Keith Bittner was suspected of child sexual abuse, police impersonation (a felony), and engaging in a pattern of spoofed communications, yet deliberately failed to investigate Keith Bittner as the obvious source of the January 4, 2025 spoofed messages. (Paras. 85-89)

e. Available Phone Records: If DCSO obtained Plaintiff's phone records through legal process during the January 6-16, 2025 surveillance period, those records would have provided unequivocal exculpatory evidence proving:

      i. Westberg's January 5th claim of "multiple contact attempts" was fabricated;

      ii. Plaintiff did not send the January 4th messages;

      iii. Plaintiff did not engage in any cyberstalking activity. (Para. 116)

349. On January 17, 2025, when Plaintiff arrived at DCSO headquarters to report the January 12, 2025 murder trap and plot against his life (as advised by his attorney), he was ambushed and arrested by Defendant Deputy Jalen Townsell using the stale January 6th warrant as pretext, while the true motivation was the fabricated January 16th "AllTracker" allegations manufactured by Defendant Keith Bittner. (Paras. 129-130)

350. The arrest was executed in Plaintiff's vehicle while his four-year-old son R.C. was present, causing R.C. to cry, attempt to break the police car window, attempt to open the door, and attempt to break Plaintiff's handcuffs—severe emotional trauma that was a direct and foreseeable consequence of the unlawful arrest. (Paras. 131-134)

351. No reasonable officer in Defendant Westberg's position could have believed that probable cause existed to arrest Plaintiff, given:

    a. The demonstrably false statements in the affidavit;

    b. The reliance on technically impossible allegations (iCloud tampering);

    c. The failure to conduct even minimal investigation into readily discoverable facts (bathtub accident vs. belt);

    d. The deliberate misrepresentation of the order type;

    e. DCSO's own prior conclusion that "nothing was founded" against Plaintiff;

    f. The explicit warning from Shane Dewees about the attorney's attempt to manufacture evidence;

    g. The obvious alternative suspect (Keith Bittner) with documented history of the exact conduct alleged.

352. The arrest violated clearly established Fourth Amendment law that an arrest without probable cause constitutes an unreasonable seizure of the person.

353. Defendant Sheriff Adam Infante and Defendant Chief Deputy Bret Maxwell, as final policymakers for DCSO, are liable under § 1983 for:

    a. Failure to Train: Failing to train deputies on constitutional requirements for probable cause, mandatory child abuse reporting, conflict of interest protocols, and the duty to investigate exculpatory evidence;

b. Failure to Supervise: Failing to supervise Westberg, Townsell, and other deputies despite knowledge of constitutional violations;

c. Deliberate Indifference: Exhibiting deliberate indifference to a pattern of constitutional violations by DCSO personnel, including Deputy Townsell's documented history of excessive force (Michael Nelson case, December 2022) and discriminatory conduct;

d. Ratification: Reviewing and ratifying the unlawful arrest through their supervisory review of reports and failure to intervene despite obvious constitutional violations.

354. Defendant Dallas County and Defendant DCSO are liable under § 1983 pursuant to Monell v. Department of Social Services, 436 U.S. 658 (1978), for maintaining policies, customs, and practices that caused the constitutional violations, including:

a. A custom of accepting facially inadequate probable cause affidavits without meaningful review;

b. A policy of deliberate indifference to exculpatory evidence when pursuing charges;

c. A practice of protecting favored individuals (the Bittners) while targeting disfavored individuals (Plaintiff);

d. A custom of discriminatory enforcement based on gender;

e. A practice of failing to discipline officers who violate constitutional rights;

f. A pattern of false arrests and malicious prosecution, leading to significant settlements, including a $600,000 settlement in the case of Justin Wynn and Demercurio Settlement for false arrest where charges were later dismissed, demonstrating a systemic failure to ensure probable cause and respect for due process;

g. A recurring pattern of obtaining and executing broad "boilerplate phone warrants" to access all digital data, even when only specific information is sought, and denying individuals access to counsel during such demands, as evidenced by incidents including Plaintiff's coerced passcode disclosure in January 2025 and a similar incident reported in October 2025 where DCSO allegedly refused an individual access to an attorney while obtaining such a warrant.

355. As a direct and proximate result of the false arrest and unlawful seizure, Plaintiff suffered:

a. Loss of liberty and unlawful Detention from January 17-18, 2025;

b. Severe emotional distress and humiliation;

c. Damage to reputation in the community;

d. Trauma to his minor child R.C. who witnessed the arrest;

e. Substantial attorney's fees and costs defending against fabricated charges;

f. Loss of parenting time with his children;

g. Ongoing emotional and psychological harm.

356. The actions of the Law Enforcement Defendants were willful, wanton, malicious, and demonstrated reckless indifference to Plaintiff's constitutional rights, warranting punitive damages against the individual defendants in their individual capacities.

COUNT II: VIOLATION OF 42 U.S.C. § 1983 – FOURTH AMENDMENT UNLAWFUL SEARCHES AND SEIZURES OF PROPERTY

357. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

358. At all times relevant hereto, Defendants Dallas County Sheriff's Office, Dallas County, Iowa, Sheriff Adam Infante, Chief Deputy Bret Maxwell, Sgt. Nick Pearson, Sgt. Neil Vanderlust, Det. Adam Jacobs, Deputy Wyatt Westberg, Deputy Jalen Townsell, and Deputy Deavon Richards were acting under color of state law within the meaning of 42 U.S.C. § 1983.

359. The Fourth Amendment protects against unreasonable searches and seizures of property, including the contents of cellular phones, which the United States Supreme Court has held contain "the privacies of life" and warrant heightened constitutional protection. Riley v. California, 573 U.S. 373, 403 (2014).

360. Unlawful Seizure and Search of Cellular Phones Through Coerced Passcode Disclosure: In the early morning hours of January 18, 2025, after deliberately depriving Plaintiff of sleep by waking him immediately after he fell asleep in his jail cell, Defendants Sgt. Neil Vanderlust and Det. Adam Jacobs engaged in a coordinated scheme to unlawfully access Plaintiff's cellular phones without a valid warrant and without voluntary consent. (Paras. 150-151)

361. Fabrication of Legal Authority – The Fraudulent "Warrant" Signature Demand: Defendants Vanderlust and Jacobs removed Plaintiff from his cell and presented him with a document purporting to be a "warrant" to access his cellular phones, explicitly and falsely demanding that Plaintiff "sign it" before he would be permitted to show them exculpatory evidence regarding the January 12, 2025 murder plot. (Para. 152)

362. This demand was a deliberate fabrication of legal authority because:
    a. Search warrants, once validly issued by a neutral magistrate, require no signature from the subject of the search for execution or validity;
    b. The demand for Plaintiff's signature was designed to manufacture retroactive "consent" for an otherwise unlawful search;
    c. The conditioning of access to present exculpatory evidence upon signing the purported "warrant" constituted coercion that vitiated any semblance of voluntary consent;
    d. Plaintiff was in a profoundly exhausted and disoriented state after deliberate sleep deprivation, rendering any purported "consent" involuntary under established Fourth Amendment standards. (Paras. 152-153)

363. Deliberate Passcode Theft Through Coordinated Deception: During subsequent interrogation while Plaintiff remained severely exhausted and disoriented, Defendants Vanderlust and Jacobs executed a premeditated scheme to steal Plaintiff's phone passcodes:
    a. Defendant Vanderlust physically seized Plaintiff's secondary phone from his hands (erroneously believing it to be his primary device);

b. Vanderlust opened the camera application and repeatedly swiped the screen to prevent automatic locking;

c. Defendants repeatedly compelled Plaintiff to input his numeric passcode dozens of times in their direct and unobstructed view;

d. Defendants explicitly demanded Plaintiff hold the device in a position preventing him from concealing passcode input;

e. Defendants deliberately prevented Plaintiff from using biometric authentication (fingerprint) that would have shielded the passcode from view;

f. This coordinated conduct was designed to memorize and steal Plaintiff's passcodes, thereby circumventing the Fourth Amendment's warrant requirement. (Paras. 154-155)

364. Unlawful Access and False Denial: DCSO, through Defendants Sgt. Pearson, Sgt. Vanderlust, Det. Jacobs, and other unnamed officers, illegally accessed Plaintiff's cellular phones using the stolen passcode, tested the passcode outside the interrogation room to confirm accuracy, and then deliberately and falsely represented to Plaintiff that they were "not getting past password" and could not access the devices—a demonstrable lie designed to conceal their unlawful access and justify further coercive demands. (Para. 157)

365. Absence of Valid Warrant or Exigent Circumstances: At no time did Defendants articulate, establish, or demonstrate the existence of any exigent circumstances justifying warrantless search of Plaintiff's phones. Plaintiff was in unlawful custody, his phones were secured, and no emergency existed preventing Defendants from obtaining a proper warrant through constitutional means. The underlying arrest itself was illegal, rendering any search conducted during the unlawful Detention inherently tainted. (Para. 156)

366. Unlawful Search of Plaintiff's Vehicle: On or about the night of January 17, 2025 or early morning of January 18, 2025, Law Enforcement Defendants, personally or through agents acting at their direction, unlawfully searched Plaintiff's vehicle:

a. Upon Plaintiff's arrival at Dallas County Jail, his car key was confiscated with other personal possessions;

b. After midnight on January 18, 2025, jail workers entered Plaintiff's cell and demanded he sign a document acknowledging the key's presence and return;

c. The only reasonable inference from Defendants' prior possession of the secured key and the suspicious middle-of-the-night return with signature demand is that Defendants unlawfully removed the key and used it to access and search Plaintiff's vehicle without warrant, probable cause, exigent circumstances, or consent;

d. No search warrant for Plaintiff's vehicle was ever presented to Plaintiff, and upon information and belief, no such warrant existed or was sought. (Para. 158)

367. These warrantless searches violated clearly established Fourth Amendment law:

a. Riley v. California, 573 U.S. 373 (2014) unequivocally holds that warrantless searches of cell phone contents are per se unconstitutional, even incident to lawful arrest;

b. Bumper v. North Carolina, 391 U.S. 543 (1968) establishes that consent obtained through deception, coercion, or misrepresentation of legal authority is constitutionally invalid;

c. The coerced extraction of passcodes through deliberate sleep deprivation and false claims of legal authority rendered any purported "consent" involuntary as a matter of law.

368. No reasonable officer could have believed that:

a. Demanding a suspect sign a "warrant" was lawful procedure;

b. Deliberately engineering circumstances to observe and steal passcodes constituted lawful consent;

c. Conditioning access to present exculpatory evidence upon surrender of phone access was constitutional;

d. Searching phones and vehicles without warrants, probable cause, or voluntary consent was permissible.

369. Defendant Sheriff Adam Infante and Defendant Chief Deputy Bret Maxwell are liable for failure to train, failure to supervise, deliberate indifference, and ratification as Detailed in Count I, Paragraphs 353-354.

370. Defendant Dallas County and Defendant DCSO are liable under Monell v. Department of Social Services, 436 U.S. 658 (1978) for the policies, customs, and practices Detailed in Count I, Paragraph 354, including a demonstrable pattern of obtaining broad "boilerplate phone warrants" to circumvent the Fourth Amendment's particularity requirement and denying individuals access to counsel during such demands.

371. As a direct and proximate result of these unlawful searches and seizures, Plaintiff suffered:

a. Violation of his most private and personal information contained in his phones;

b. Severe emotional distress from the invasion of privacy;

c. Ongoing concern about what private information was accessed and how it may be misused;

d. Loss of property (phones) for extended period;

e. Substantial costs to secure and protect his digital information;

f. Damage to reputation from potential disclosure of private information.

372. The actions of the Law Enforcement Defendants were willful, wanton, malicious, and demonstrated reckless indifference to Plaintiff's constitutional rights, warranting punitive damages against individual defendants in their individual capacities.

COUNT III: VIOLATION OF 42 U.S.C. § 1983 – FIFTH AND FOURTEENTH AMENDMENT COERCED STATEMENTS AND DENIAL OF DUE PROCESS

373. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

374. At all times relevant hereto, Defendants Dallas County Sheriff's Office, Dallas County, Iowa, Sheriff Adam Infante, Chief Deputy Bret Maxwell, Sgt. Neil Vanderlust, Det. Adam Jacobs, and Deputy Jalen Townsell were acting under color of state law within the meaning of 42 U.S.C. § 1983.

375. The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, protects individuals against compulsory self-incrimination and guarantees that no person shall be deprived of liberty without due process of law.

376. Deliberate Sleep Deprivation as Coercive Tactic: Following Plaintiff's initial interrogation on January 17, 2025, Defendants deliberately employed sleep deprivation as a coercive interrogation tactic:
   a. Plaintiff was placed in a holding cell despite his exhaustion from the day's traumatic events;
   b. Defendants, through jail staff acting at their direction and/or interrogating officers Vanderlust and Jacobs, deliberately waited until immediately after Plaintiff fell asleep to wake him for further interrogation;
   c. This is a well-documented coercive tactic specifically designed to induce disorientation, impair cognitive function, reduce resistance to questioning, and elicit involuntary statements or false confessions;
   d. The timing of presenting the fraudulent "warrant" and subsequent interrogations was deliberately designed to exploit Plaintiff's severe exhaustion and disoriented state. (Paras. 150-151)

377. Exploitation of Impaired Mental State: Defendants' interrogation tactics were specifically designed to exploit Plaintiff's profoundly impaired physical and mental state:
   a. Plaintiff was subjected to multiple interrogations during non-standard hours (late night/early morning);
   b. Plaintiff's severe exhaustion was deliberately exacerbated to render him vulnerable and susceptible to coercive pressure;
   c. Defendants prevented Plaintiff from effectively asserting his constitutional rights;
   d. The coercive conditions were designed to obtain involuntary consent, statements, and facilitate unlawful searches. (Para. 151)

378. Obstruction of Exculpatory Evidence Presentation: During prolonged interrogations on January 17-18, 2025, Defendants Vanderlust and Jacobs engaged in systematic obstruction designed to prevent Plaintiff from presenting exculpatory evidence:
   a. Deliberate Focus on Fabricated Charges: Defendants relentlessly focused questioning on fabricated hacking allegations and phone configurations while simultaneously ignoring, dismissing, and refusing to investigate Plaintiff's repeated, Detailed attempts to present compelling evidence of the January 12, 2025 murder trap orchestrated by Defendants KARA and Keith Bittner. (Para. 159)
   b. False Invocation of Attorney-Client Privilege: When Plaintiff attempted to present critical exculpatory evidence—specifically his recorded conversation with his family law

attorney regarding the murder plot—Defendant Det. Jacobs explicitly stopped Plaintiff, falsely claiming he was "not allowed to look at communication with my lawyer and that is privileged." This was a knowing, deliberate falsehood because: (i) the communication was with Plaintiff's family law attorney, not criminal defense counsel; (ii) Plaintiff was voluntarily waiving any privilege; (iii) the privilege belongs to the client, not law enforcement; (iv) the evidence was directly exculpatory. This deliberate refusal constituted obstruction of justice and violation of due process. (Paras. 160-161)
c. Refusal to Provide Interrogation Videos: Defendants' subsequent and ongoing refusal to provide Plaintiff with interrogation videos, despite multiple formal requests, constitutes spoliation, obstruction of justice, and continuing violation of due process, as these videos would irrefutably document the coercive tactics, misrepresentations of legal authority, and Plaintiff's impaired state. (Para. 162)

379. Demonstration of Conspiracy Through Refusal to Identify Obvious Crimes: During interrogation, Plaintiff directly asked Defendant Det. Jacobs what crimes Defendants KARA and Keith Bittner would be charged with for fabricating evidence that led to Plaintiff's false arrest. After accepting the premise of a hypothetical involving fabricated evidence leading to false arrest, Jacobs responded on video that he "couldn't think of anything they would be charged with." (Paras. 163-164)

380. For an experienced Detective to claim inability to identify even one applicable criminal statute (false reports, perjury, fraud, conspiracy against rights, deprivation of rights under color of law) demonstrates:
a. Defendant Jacobs already knew the arrest was based on fabricated evidence;
b. Jacobs had no intention of investigating or charging the Bittners regardless of the evidence of their criminal conduct;
c. Jacobs was actively protecting the Bittners as part of the conspiracy;
d. The entire arrest and interrogation was pretextual and designed to target Plaintiff while shielding the actual criminals. (Para. 164)

381. The conditions and conduct of Defendants Vanderlust, Jacobs, and Townsell, including deliberate sleep deprivation, exploitation of Plaintiff's impaired state, and systematic obstruction of exculpatory evidence, were so coercive and outrageous as to render any statements made by Plaintiff involuntary and to deprive him of his liberty without due process of law.

382. Defendant Sheriff Adam Infante and Defendant Chief Deputy Bret Maxwell are liable under Section 1983 for failure to train, failure to supervise, deliberate indifference, and ratification as Detailed in Count I, Paragraphs 353-354.

383. Defendant Dallas County and Defendant DCSO are liable under Monell v. Department of Social Services, 436 U.S. 658 (1978) for the policies, customs, and practices Detailed in Count I, Paragraph 354.

384. As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiff suffered:

    a. Severe emotional distress, psychological harm, and mental anguish;
    b. Compulsion to endure interrogations under unconstitutional conditions;
    c. Denial of the opportunity to present exculpatory evidence;
    d. Violation of his fundamental right against self-incrimination and to due process.

385. The actions of the Law Enforcement Defendants were willful, wanton, malicious, and demonstrated reckless indifference to Plaintiff's constitutional rights, warranting punitive damages against the individual defendants in their individual capacities.

COUNT IV: VIOLATION OF 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT MALICIOUS PROSECUTION AND ABUSE OF PROCESS

386. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

387. At all times relevant hereto, Defendants Dallas County Sheriff's Office, Dallas County, Iowa, Sheriff Adam Infante, Chief Deputy Bret Maxwell, Sgt. Nick Pearson, Sgt. Neil Vanderlust, Det. Adam Jacobs, Deputy Wyatt Westberg, Deputy Jalen Townsell, Deputy Deavon Richards, Unnamed Sgt. Badge #6 in 2025, Iowa Division of Criminal Investigation ("DCI"), Agent Matthew Papin, Kara Bittner, Keith Bittner, and Jaclyn Zimmerman, were acting under color of state law or in concert with state actors, within the meaning of 42 U.S.C. § 1983.

388. The Fourteenth Amendment to the United States Constitution guarantees the right to due process of law, which includes the right to be free from malicious prosecution initiated or continued without probable cause and with malice, and the right to be free from abuse of legal process.

389. Initiation or Continuation of Proceedings: Defendants initiated or continued criminal proceedings against Plaintiff by:
    a. Defendant Kara Bittner and Keith Bittner fabricating the "phantom texts" on January 4, 2025 and the "hacking" narrative. (Paras. 97-99, 100-101)
    b. Defendant Deputy Wyatt Westberg fabricating a police report and obtaining an arrest warrant based on knowingly false information and material omissions. (Paras. 100-110)
    c. DCSO Defendants deliberately delayed Plaintiff's arrest to conduct unlawful surveillance and acquire non-public information, then executing a pretextual arrest. (Paras. 111-112, 129-130)
    d. DCSO Defendants and DCI Defendant Agent Matthew Papin actively suppressing exculpatory evidence and failing to investigate the true source of the spoofed messages despite actionable intelligence. (Paras. 113-116, 136-142, 218-238)
    e. Defendant Kara Bittner filing fraudulent Ex Parte Protection Orders in 2021 and 2024. (Paras. 38-43, 57-65, 192)
    f. Defendant Jaclyn Zimmerman filing knowingly false pleadings and attempting to suborn perjury from Shane Dewees. (Paras. 90-93, 113, 191)

g. Defendant Agent Matthew Papin's deliberate misapplication of the crime-fraud exception and self-contradictory statements regarding phone extractions to protect Defendant Keith Bittner and obstruct justice. (Paras. 231, 234, 237)

h. DCSO Defendants continuing to ignore Plaintiff's reports of the January 12, 2025 murder trap. (Paras. 135-142)

i. Engaging in a pattern of obtaining broad "boilerplate phone warrants" to access all digital data, even for specific alleged offenses, and denying individuals access to counsel during such demands, as evidenced by Plaintiff's coerced passcode disclosure in January 2025 and a similar incident reported in October 2025. (Para. 354g)

390. Absence of Probable Cause: Defendants acted without probable cause, as they knew or should have known that:

a. The allegations against Plaintiff were fabricated and lacked any factual basis. (Paras. 97-99, 113-116, 136-142)

b. Exculpatory evidence, including DCSO's own conclusion that "nothing was founded" against Plaintiff for cyberstalking, existed prior to his arrest. (Para. 115)

c. Defendant Keith Bittner had a documented history and modus operandi of digital manipulation and false accusations, making him the obvious true perpetrator. (Paras. 73-84)

d. The "AllTracker" claims were fabricated and technically impossible to attribute to Plaintiff. (Paras. 125-126, 106a)

391. Malice: Defendants acted with malice, as evidenced by their:

a. Deliberate fabrication of evidence;

b. Knowing reliance on false statements and material omissions;

c. Active suppression of exculpatory information;

d. Retaliatory motive stemming from Plaintiff's success in custody proceedings and his attempts to expose Defendants' misconduct;

e. Intent to harass, intimidate, and deprive Plaintiff of his constitutional rights and his children. (Paras. 34-36, 47, 51, 66, 88, 109, 117, 120, 134, 146-147, 164, 194-195, 220-221, 278)

392. Favorable Termination: The criminal proceedings against Plaintiff were terminated in his favor, as evidenced by the dismissal of criminal charges related to the January 17, 2025 arrest, and the ultimate award of custody to Plaintiff in the underlying family law proceedings. (Paras. 204, 269)

393. Abuse of Process: Defendants intentionally misused legal process (including arrest warrants, criminal complaints, and protective orders) for an ulterior purpose, namely to harass, intimidate, silence, and unlawfully punish Plaintiff, and to gain an unfair advantage in custody proceedings, rather than for the legitimate purpose for which the process was designed. (Paras. 34, 38, 51, 57, 69, 71, 91, 110, 130, 165, 192-193, 278)

394. Defendant Sheriff Adam Infante and Defendant Chief Deputy Bret Maxwell are liable under Section 1983 for failure to train, failure to supervise, deliberate indifference, and ratification as Detailed in Count I, Paragraphs 353-354.

395. Defendant Dallas County and Defendant DCSO are liable under Monell v. Department of Social Services, 436 U.S. 658 (1978) for the policies, customs, and practices Detailed in Count I, Paragraph 354.

396. As a direct and proximate result of Defendants' malicious prosecution and abuse of process, Plaintiff suffered:
   a. Severe emotional distress, psychological harm, and mental anguish;
   b. Loss of liberty and unlawful Detention;

   c. Damage to his reputation, personal and professional;
   d. Substantial legal fees and costs defending against fabricated charges;
   e. Interference with his fundamental parental rights;
   f. Loss of consortium and companionship with his children.

397. The actions of the Law Enforcement Defendants, Kara Bittner, Keith Bittner, and Jaclyn Zimmerman were willful, wanton, malicious, and demonstrated reckless indifference to Plaintiff's constitutional rights, warranting punitive damages against the individual defendants in their individual capacities.

COUNT V: VIOLATION OF 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT EQUAL PROTECTION (CLASS-BASED DISCRIMINATION)

398. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

399. At all times relevant hereto, Defendants Dallas County Sheriff's Office, Dallas County, Iowa, Sheriff Adam Infante, Chief Deputy Bret Maxwell, Sgt. Nick Pearson, Sgt. Neil Vanderlust, Det. Adam Jacobs, Deputy Wyatt Westberg, Deputy Jalen Townsell, Deputy Deavon Richards, Unnamed Sgt. Badge #6 in 2025, Iowa Division of Criminal Investigation, and Agent Matthew Papin, were acting under color of state law within the meaning of 42 U.S.C. § 1983.

400. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits state actors from intentionally discriminating against individuals based on their membership in a protected class. Plaintiff is a white male.

401. Defendants acted with invidious discriminatory animus against Plaintiff based on his status as a white male, as evidenced by:
   a. Explicit Racial and Gender Animus: Defendant Deputy Jalen Townsell, after exiting the interrogation room and deliberately moving beyond the view of the recording camera, confronted Plaintiff and stated, "as a half black man, you are a racist." This statement,

made outside the official record, unequivocally revealed Townsell's personal animus and a retaliatory, biased predisposition against Plaintiff based on Plaintiff's race and gender. (Para. 146)

b. Differential Treatment of Similarly Situated Individuals: DCSO Defendants engaged in a pattern and practice of discriminatory enforcement, providing preferential treatment to female individuals (e.g., the DUI arrestee's girlfriend, Defendant Kara Bittner) while applying more stringent and punitive enforcement against Plaintiff (a male) and other male individuals similarly situated. (Paras. 169-175)

c. Preferential Treatment of Female DUI Suspect: On the early morning of January 18, 2025, while Plaintiff was Detained, a female individual who arrived at the jail visibly intoxicated and having driven in that condition (an act constituting DUI and potential endangerment), was not arrested. Instead, DCSO deputies actively facilitated her departure by instructing her to take an Uber home and return later to bail out her boyfriend, starkly contrasting with the immediate arrest and Detention of a male DUI suspect. (Paras. 171-172)

d. Systemic Bias Against Male Accused: Plaintiff observed and was informed by another male inmate that false accusations by ex-partners were routinely accepted without evidence against men, and that "No One Believes him" despite evidence of innocence. (Para. 174)

e. Deliberate Failure to Investigate Against Female Accusers: DCSO Defendants and DCI Defendant Agent Matthew Papin deliberately failed to investigate serious criminal allegations against Defendant Kara Bittner and Defendant Keith Bittner (who was acting in concert with Kara Bittner), despite overwhelming evidence of their crimes, including:

    i. Child endangerment; (Paras. 68-69, 271-319)

    ii. Fabrication of evidence; (Paras. 40, 59, 97-99, 196-197)

    iii. Malicious prosecution; (Paras. 40, 59, 192-193)

    iv. Police impersonation; (Para. 75d)

    v. Perjury; (Para. 40d, 271c)

    vi. The January 12, 2025 murder trap. (Paras. 118-124)

f. Unwarranted Intervention in Civil Matters on Behalf of Female Party: DCSO Defendants actively intervened in Plaintiff's civil custody matters on behalf of Defendant Kara Bittner, including delivering an unwarranted "warning" to Kara Bittner about Plaintiff's potential move, despite having no legitimate law enforcement purpose or jurisdiction in a purely civil dispute. (Paras. 226-229, 320-323)

g. Increased Vigor in Pursuing Male Plaintiff: DCSO Defendants pursued Plaintiff with increased vigor based on fabricated allegations, while simultaneously ignoring and protecting female perpetrators. (Paras. 118, 147)

402. This discriminatory enforcement was intentional and caused Plaintiff to be treated differently from similarly situated individuals based on his race and gender.

403. Defendant Sheriff Adam Infante and Defendant Chief Deputy Bret Maxwell are liable under Section 1983 for failure to train, failure to supervise, deliberate indifference, and ratification as Detailed in Count I, Paragraphs 353-354.

404. Defendant Dallas County and Defendant DCSO are liable under Monell v. Department of Social Services, 436 U.S. 658 (1978), for the policies, customs, and practices Detailed in Count I, Paragraph 354.

405. As a direct and proximate result of Defendants' discriminatory actions, Plaintiff suffered:
   a. Severe emotional distress, psychological harm, and mental anguish;
   b. Loss of liberty and unlawful Detention;
   c. Damage to his reputation;
   d. Substantial legal fees and costs;
   e. Interference with his fundamental parental rights.

406. The actions of the Law Enforcement Defendants were willful, wanton, malicious, and demonstrated reckless indifference to Plaintiff's constitutional rights, warranting punitive damages against the individual defendants in their individual capacities.

COUNT VI: VIOLATION OF 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT DUE PROCESS (INTERFERENCE WITH PARENTAL RIGHTS / ACCESS TO COURTS)

407. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

408. At all times relevant hereto, Defendants Dallas County Sheriff's Office, Dallas County, Iowa, Sheriff Adam Infante, Chief Deputy Bret Maxwell, Sgt. Nick Pearson, Sgt. Neil Vanderlust, Det. Adam Jacobs, Deputy Wyatt Westberg, Deputy Jalen Townsell, Deputy Deavon Richards, Unnamed Sgt. Badge #6 in 2025, Iowa Division of Criminal Investigation, Agent Matthew Papin, Rebecca Moser, Kara Bittner, Keith Bittner, Erin Helleso, Candor Recovery & Counseling, Inc, and Jaclyn Zimmerman, were acting under color of state law or in concert with state actors, within the meaning of 42 U.S.C. § 1983.

409. The Fourteenth Amendment to the United States Constitution protects a parent's fundamental liberty interest in the care, custody, and control of their children, as well as the fundamental right of access to the courts to seek redress for grievances.

410. Interference with Parental Rights: Defendants' actions, individually and in concert, were designed to and did interfere with Plaintiff's established legal custody and his fundamental parental relationship with his children, C.C. and R.C., in violation of his due process rights. Such actions include, but are not limited to:
   a. Fabrication of Evidence and False Allegations: Defendants Kara Bittner, Keith Bittner, and Jaclyn Zimmerman fabricated evidence and made false allegations against Plaintiff (e.g., "phantom texts," "hacking," child abuse, domestic violence) to undermine his parental fitness and gain tactical advantage in custody proceedings. (Paras. 40, 59, 97-99, 106, 192-193)

b. Malicious Prosecution and False Arrest: The false arrest and malicious prosecution of Plaintiff, based on fabricated evidence, directly undermined his parental role and caused profound instability and emotional distress to both Plaintiff and his children. (Paras. 129-134, 269)

c. Custodial Interference: Defendant Kara Bittner, often with the complicity of Keith Bittner, engaged in repeated acts of custodial interference, including withholding children from court-ordered custody, reckless endangerment during exchanges, and school-based interference. (Paras. 279-281, 282-284, 285-286, 292-293, 297-298, 300, 307-310)

d. Parental Alienation and Emotional Abuse: Defendants Kara Bittner and Keith Bittner engaged in systematic parental alienation tactics and emotional abuse, including surveillance of children, remote punishment, excessive physical punishment, humiliating punishment, and psychological manipulation to alienate children from Plaintiff. (Paras. 277, 281a, 288-291, 294-297, 302, 304, 308-311)

e. Biased Custody Evaluation: Defendant Erin Helleso and Candor Recovery & Counseling, Inc conducted a biased, unprofessional, and unauthorized custody evaluation designed to discredit Plaintiff and undermine his parental fitness, contributing to interference with his parental rights. (Paras. 242-269)

f. Unwarranted State Intervention: DCSO Defendants, including Deputy Westberg, Deputy Townsell, and Chief Deputy Maxwell, engaged in unwarranted interventions in Plaintiff's civil custody matters, acting on behalf of Defendant Kara Bittner and Keith Bittner to intimidate Plaintiff and interfere with his parental rights. (Paras. 226-229, 320-323)

411. Denial of Access to Courts: Defendants, individually and in concert, deliberately obstructed Plaintiff's fundamental right of access to the courts to seek redress for grievances, in violation of his due process rights. Such actions include, but are not limited to:

a. Obstruction of Public Records: Defendant Rebecca Moser and DCSO systematically obstructed Plaintiff's lawful access to public records essential for challenging his arrest, exposing the conspiracy, and preparing his litigation, by falsely claiming "ongoing investigations" or simply ignoring requests. (Paras. 329-335)

b. Active Suppression of Exculpatory Evidence: DCSO Defendants and DCI Defendant Agent Matthew Papin deliberately suppressed exculpatory evidence and refused to investigate credible allegations of multi-jurisdictional criminal activity and corrupt law enforcement, despite statutory mandates, thereby denying Plaintiff an effective avenue for state-level investigation and access to justice. (Paras. 113-116, 135-142, 178-189, 218-238)

c. Deliberate Obstruction of Reporting: DCSO Defendants, including Detective Jacobs and others, deliberately terminated calls, denied access to supervisors, and otherwise obstructed Plaintiff's attempts to report crimes committed against him by the Bittners, effectively preventing him from initiating legal proceedings. (Paras. 197-198)

d. Manufacturing Legal Pretexts: Defendants Kara Bittner, Keith Bittner, and Jaclyn Zimmerman manufactured legal pretexts (e.g., fraudulent EPOs, false motions) to initiate

and perpetuate litigation designed to harass Plaintiff and deplete his resources, thereby hindering his access to courts. (Paras. 40, 59, 72, 74, 91, 192-193, 206-207, 280, 294)

412. Defendant Sheriff Adam Infante and Defendant Chief Deputy Bret Maxwell are liable under Section 1983 for failure to train, failure to supervise, deliberate indifference, and ratification as Detailed in Count I, Paragraphs 353-354.

413. Defendant Dallas County and Defendant DCSO are liable under Monell v. Department of Social Services, 436 U.S. 658 (1978), for the policies, customs, and practices Detailed in Count I, Paragraph 354.

414. As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiff suffered:
    a. Severe emotional distress, psychological harm, and mental anguish;
    b. Disruption and damage to his fundamental parental relationship with his children;
    c. Substantial legal fees and costs;
    d. Denial of his right to seek justice and redress through the courts.

415. The actions of the Defendants were willful, wanton, malicious, and demonstrated reckless indifference to Plaintiff's constitutional rights, warranting punitive damages against the individual defendants in their individual capacities.

COUNT VII: VIOLATION OF 42 U.S.C. § 1985(3) – CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS

416. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

417. Defendants Dallas County Sheriff's Office, Dallas County, Iowa, Sheriff Adam Infante, Chief Deputy Bret Maxwell, Sgt. Nick Pearson, Sgt. Neil Vanderlust, Det. Adam Jacobs, Deputy Wyatt Westberg, Deputy Jalen Townsell, Deputy Deavon Richards, Unnamed Sgt. Badge #6 in 2025, Rebecca Moser, Iowa Division of Criminal Investigation, Agent Matthew Papin, Kara Bittner, Keith Bittner, Erin Helleso, Candor Recovery & Counseling, Inc, Jaclyn Zimmerman, George Millard, Beverly Derry, Deborah Vodenik, Randy Vodenik, Shelby Caruso, and Penny Scott, combined and conspired with each other and with others unknown to Plaintiff, for the purpose of directly or indirectly depriving Plaintiff of the equal protection of the laws and of equal privileges and immunities under the laws.

418. The conspiracy was motivated by class-based and invidiously discriminatory animus against Plaintiff due to his status as a white male, as evidenced by:
    a. Defendant Deputy Jalen Townsell's explicit racial and gender animus. (Para. 146)
    b. The pattern of discriminatory enforcement and preferential treatment towards female individuals described in Count V, Paragraph 401.
    c. Defendant Erin Helleso's public display of anti-white male sentiment and biased evaluation against Plaintiff. (Para. 248)

d. The systemic bias within the Sheriff's Department in accepting unverified claims against men while protecting female perpetrators. (Paras. 173-174)

419. In furtherance of this conspiracy, Defendants committed numerous overt acts, including but not limited to:

a. Fabricating evidence and false allegations against Plaintiff, including the "phantom texts" and "hacking" narrative. (Paras. 97-99, 100-101, 192-193, 196-197)

b. Maliciously prosecuting Plaintiff and abusing legal process, including obtaining a fraudulent arrest warrant and filing false protective orders. (Paras. 40, 59, 100-110, 192)

c. Conducting unlawful arrests, searches, and seizures of Plaintiff's person, phones, and vehicle. (Paras. 129-134, 150-158)

d. Suppressing exculpatory evidence and obstructing justice, including refusing to investigate the true source of spoofed messages, ignoring the murder trap, and withholding public records. (Paras. 113-116, 135-142, 178-189, 218-238, 329-335)

e. Interfering with Plaintiff's fundamental parental rights through false allegations, custodial interference, and biased evaluations. (Paras. 242-269, 277-319)

f. Deliberately failing to investigate credible criminal allegations against Defendants Kara Bittner and Keith Bittner despite overwhelming evidence. (Paras. 85-89, 194-195, 218-238)

g. Orchestrating the attempted "murder trap" on January 12, 2025, involving Defendants Kara Bittner, Keith Bittner, and Randy Vodenik. (Paras. 118-124)

h. Defendant Jaclyn Zimmerman attempting to suborn perjury from Shane Dewees. (Paras. 113, 191)

i. Defendant Kara Bittner stealing $2500 from Defendant George Millard and bragging about it to Shane Dewees. (Para. 271a)

j. Defendant Randy Vodenik committed perjury by denying knowledge of the "brown boy incident" in court. (Para. 271c)

k. Defendant Erin Helleso making biased and unauthorized diagnoses against Plaintiff. (Paras. 253-254)

l. Financial support provided by Defendants George Millard, Beverly Derry, Deborah Vodenik, Randy Vodenik, Shelby Caruso, and Penny Scott, knowing it enabled the ongoing abuse and malicious prosecution. (Paras. 271, 275)

420. As a direct and proximate result of this conspiracy, Plaintiff suffered:

a. Severe emotional distress, psychological harm, and mental anguish;

b. Loss of liberty and unlawful Detention;

c. Damage to his reputation, personal and professional;

d. Interference with his fundamental parental rights;

e. Substantial legal fees and costs.

421. The actions of the Defendants were willful, wanton, malicious, and demonstrated reckless indifference to Plaintiff's constitutional rights, warranting punitive damages against the individual defendants in their individual capacities.

COUNT VIII: STATE LAW CLAIM – MALICIOUS PROSECUTION (IOWA)

422. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

423. Defendants Kara Bittner, Keith Bittner, Jaclyn Zimmerman, Dallas County Sheriff's Office, Dallas County, Iowa, Sheriff Adam Infante, Chief Deputy Bret Maxwell, Sgt. Nick Pearson, Sgt. Neil Vanderlust, Det. Adam Jacobs, Deputy Wyatt Westberg, Deputy Jalen Townsell, Deputy Deavon Richards, Unnamed Sgt. Badge #6 in 2025, Iowa Division of Criminal Investigation, and Agent Matthew Papin, maliciously initiated or continued criminal or quasi-criminal proceedings against Plaintiff.

424. Specifically, Defendants initiated or continued proceedings including, but not limited to, obtaining the January 6, 2025 arrest warrant, pursuing criminal charges against Plaintiff, and filing fraudulent Ex Parte Protection Orders. (Paras. 40, 59, 100-110, 192)

425. Defendants acted without probable cause, as they knew or should have known that the allegations were fabricated, based on knowingly false statements, and that substantial exculpatory evidence existed. (Paras. 97-99, 113-116, 136-142)

426. Defendants acted with malice, as evidenced by their deliberate fabrication of evidence, suppression of exculpatory information, retaliatory motives, and intent to harass Plaintiff. (Paras. 34-36, 47, 51, 66, 88, 109, 117, 120, 134, 146-147, 164, 194-195, 220-221, 278)

427. The criminal proceedings were terminated in Plaintiff's favor, as evidenced by the dismissal of criminal charges related to the January 17, 2025 arrest, and the ultimate award of custody to Plaintiff. (Paras. 204, 269)

428. As a direct and proximate result of Defendants' malicious prosecution, Plaintiff suffered:
    a. Severe emotional distress, psychological harm, and mental anguish;
    b. Loss of liberty and unlawful Detention;
    c. Damage to his reputation, personal and professional;
    d. Substantial legal fees and costs defending against fabricated charges.

429. The actions of the Defendants were willful, wanton, malicious, and demonstrated reckless disregard for Plaintiff's rights, warranting punitive damages.

COUNT IX: STATE LAW CLAIM – ABUSE OF PROCESS (IOWA)

430. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

431. Defendants Kara Bittner, Keith Bittner, Jaclyn Zimmerman, Dallas County Sheriff's Office, Dallas County, Iowa, Sheriff Adam Infante, Chief Deputy Bret Maxwell, Sgt. Nick Pearson, Sgt.

Neil Vanderlust, Det. Adam Jacobs, Deputy Wyatt Westberg, Deputy Jalen Townsell, Deputy Deavon Richards, Unnamed Sgt. Badge #6 in 2025, Iowa Division of Criminal Investigation, and Agent Matthew Papin, used legal process (including but not limited to arrest warrants, subpoenas, protective orders, and court filings) in an improper manner.

432. Defendants acted with an ulterior motive, specifically to harass, intimidate, punish, and deprive Plaintiff of his constitutional rights, his liberty, and his children, rather than for the legitimate purpose for which the process was designed. (Paras. 34, 38, 51, 57, 69, 71, 91, 110, 130, 165, 192-193, 278)

433. The improper uses of process include, but are not limited to:
    a. Obtaining a fraudulent arrest warrant based on fabricated evidence. (Paras. 100-110)
    b. Filing multiple fraudulent Ex Parte Protection Orders. (Paras. 40, 59, 192)
    c. Filing false motions and pleadings in court. (Paras. 91-93, 193-194, 206, 280, 294)
    d. Attempting to suborn perjury from Shane Dewees. (Paras. 113, 191)
    e. Using the arrest warrant as a pretext for an unlawful fishing expedition for information. (Paras. 111-112, 130)
    f. Deliberately withholding or obstructing access to public records to impede litigation. (Paras. 329-335)

434. As a direct and proximate result of Defendants' abuse of process, Plaintiff suffered:
    a. Severe emotional distress, psychological harm, and mental anguish;
    b. Loss of liberty and unlawful Detention;
    c. Damage to his reputation, personal and professional;
    d. Substantial legal fees and costs.

435. The actions of the Defendants were willful, wanton, malicious, and demonstrated reckless disregard for Plaintiff's rights, warranting punitive damages.

COUNT X: STATE LAW CLAIM – CIVIL CONSPIRACY (IOWA)

436. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

437. Defendants Kara Bittner, Keith Bittner, Erin Helleso, Candor Recovery & Counseling, Inc, Jaclyn Zimmerman, George Millard, Beverly Derry, Deborah Vodenik, Randy Vodenik, Shelby Caruso, Penny Scott, Dallas County Sheriff's Office, Dallas County, Iowa, Sheriff Adam Infante, Chief Deputy Bret Maxwell, Sgt. Nick Pearson, Sgt. Neil Vanderlust, Det. Adam Jacobs, Deputy Wyatt Westberg, Deputy Jalen Townsell, Deputy Deavon Richards, Unnamed Sgt. Badge #6 in 2025, Iowa Division of Criminal Investigation, Agent Matthew Papin, and Rebecca Moser, engaged in a combination or agreement to accomplish an unlawful end or to accomplish a lawful end by unlawful means.

438. The unlawful objective of this conspiracy was to deprive Plaintiff of his constitutional rights, his liberty, and his children, through a campaign of fabricated evidence, false arrests, malicious prosecution, deliberate suppression of exculpatory information, and credible threats against Plaintiff's life.

439. Defendants committed numerous overt acts in furtherance of this conspiracy, as Detailed throughout this Complaint, including but not limited to:

a. Fabricating evidence and false allegations against Plaintiff. (Paras. 40, 59, 97-99, 100-101, 192-193, 196-197)

b. Maliciously prosecuting Plaintiff and abusing legal process. (Paras. 40, 59, 100-110, 192)

c. Conducting unlawful arrests, searches, and seizures of Plaintiff's person, phones, and vehicle. (Paras. 129-134, 150-158)

d. Suppressing exculpatory evidence and obstructing justice. (Paras. 113-116, 135-142, 178-189, 218-238, 329-335)

e. Interfering with Plaintiff's fundamental parental rights. (Paras. 242-269, 277-319)

f. Deliberately failing to investigate credible criminal allegations against Defendants Kara Bittner and Keith Bittner. (Paras. 85-89, 194-195, 218-238)

g. Orchestrating the attempted "murder trap" on January 12, 2025. (Paras. 118-124)

h. Defendant Jaclyn Zimmerman attempting to suborn perjury. (Paras. 113, 191)

i. Defendant Kara Bittner stealing $2500 from Defendant George Millard. (Para. 271a)

j. Defendant Randy Vodenik committing perjury. (Para. 271c)

k. Defendant Erin Helleso making biased and unauthorized diagnoses against Plaintiff. (Paras. 253-254)

l. Financial and logistical support provided by Defendants George Millard, Beverly Derry, Deborah Vodenik, Randy Vodenik, Shelby Caruso, and Penny Scott, knowing it enabled the ongoing abuse and malicious prosecution. (Paras. 271, 275)

m. DCSO's unwarranted interventions in Plaintiff's civil custody matters. (Paras. 226-229, 320-323)

n. DCI's refusal to investigate criminal activity and corrupt law enforcement. (Paras. 218-238)

o. Defendant Rebecca Moser's obstruction of public records. (Paras. 329-335)

440. As a direct and proximate result of this civil conspiracy, Plaintiff suffered:

a. Severe emotional distress, psychological harm, and mental anguish;

b. Loss of liberty and unlawful Detention;

c. Damage to his reputation, personal and professional;

d. Interference with his fundamental parental rights;

e. Substantial legal fees and costs.

441. The actions of the Defendants were willful, wanton, malicious, and demonstrated reckless disregard for Plaintiff's rights, warranting punitive damages.

COUNT XI: STATE LAW CLAIM – DEFAMATION (IOWA)

442. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

443. Defendants Kara Bittner, Keith Bittner, Erin Helleso, Candor Recovery & Counseling, Inc, and Jaclyn Zimmerman, published false and defamatory statements of fact concerning Plaintiff to third parties.

444. These statements included, but were not limited to:
a. False accusations of hacking and cyberstalking. (Paras. 90-93, 114, 125-126, 192-193, 196-197, 288)
b. False accusations of domestic violence and child abuse. (Paras. 40, 59, 106b-c)
c. False accusations of mental instability and personality disorders. (Paras. 253-254, 255)
d. Defamatory statements in court filings and official reports. (Paras. 90-93, 193-194, 206, 288)
e. False claims that Plaintiff was the "worst romantic partner" Defendant Kara Bittner had ever had. (Para. 268)

445. Defendants published these statements to various third parties, including law enforcement, court officials, family members, and the public via social media. (Paras. 90-93, 114, 125-126, 192-193, 196-197, 288)

446. These statements were false, and Defendants knew they were false, or acted with reckless disregard for their truth or falsity.

447. As a direct and proximate result of Defendants' defamatory statements, Plaintiff suffered:
a. Severe emotional distress, psychological harm, and mental anguish;
b. Damage to his reputation, personal and professional;
c. Interference with his family relationships and parental rights;
d. Financial harm, including legal fees and lost opportunities.

448. The actions of the Defendants were willful, wanton, malicious, and demonstrated reckless disregard for Plaintiff's rights, warranting punitive damages.

COUNT XII: STATE LAW CLAIM – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IOWA)

449. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

450. Defendants Kara Bittner, Keith Bittner, Erin Helleso, Candor Recovery & Counseling, Inc, Jaclyn Zimmerman, George Millard, Beverly Derry, Deborah Vodenik, Randy Vodenik, Shelby Caruso, Penny Scott, Dallas County Sheriff's Office, Dallas County, Iowa, Sheriff Adam Infante,

Chief Deputy Bret Maxwell, Sgt. Nick Pearson, Sgt. Neil Vanderlust, Det. Adam Jacobs, Deputy Wyatt Westberg, Deputy Jalen Townsell, Deputy Deavon Richards, Unnamed Sgt. Badge #6 in 2025, Iowa Division of Criminal Investigation, Agent Matthew Papin, and Rebecca Moser, by their conduct as described herein, intentionally or recklessly engaged in extreme and outrageous conduct towards Plaintiff.

451. This conduct included, but was not limited to:
　　a. Orchestrating false arrests and malicious prosecutions. (Paras. 129-134, 389-393)
　　b. Fabricating evidence and making knowingly false allegations. (Paras. 97-99, 100-101, 192-193, 196-197)
　　c. Orchestrating an attempted "murder trap" against Plaintiff. (Paras. 118-124)
　　d. Interfering with Plaintiff's fundamental parental rights and causing profound trauma to his children. (Paras. 277-319)
　　e. Subjecting Plaintiff to unconstitutional interrogations, including deliberate sleep deprivation and coerced passcode disclosure. (Paras. 150-157)
　　f. Deliberately suppressing exculpatory evidence and obstructing justice. (Paras. 113-116, 135-142)
　　g. Engaging in biased custody evaluations and making unauthorized, defamatory diagnoses. (Paras. 242-269)
　　h. Providing financial and logistical support to enable the ongoing abuse and malicious prosecution. (Paras. 271, 275)
　　i. Deliberately obstructing Plaintiff's access to public records and legal redress. (Paras. 329-335)

452. Defendants' conduct was so extreme in degree as to go beyond all possible bounds of decency and was utterly intolerable in a civilized community.

453. Defendants knew or should have known that their actions would cause Plaintiff severe emotional distress.

454. As a direct and proximate result of Defendants' extreme and outrageous conduct, Plaintiff suffered severe emotional distress, including profound anguish, anxiety, depression, and psychological harm.

455. The actions of the Defendants were willful, wanton, malicious, and demonstrated reckless disregard for Plaintiff's rights, warranting punitive damages.

COUNT XIII: STATE LAW CLAIM – INVASION OF PRIVACY (IOWA)

456. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

457. Defendants Kara Bittner, Keith Bittner, Dallas County Sheriff's Office, Dallas County, Iowa, Sgt. Neil Vanderlust, Det. Adam Jacobs, Deputy Wyatt Westberg, Deputy Jalen Townsell, and

Deputy Deavon Richards, by their actions as described herein, intentionally intruded upon the solitude or seclusion of Plaintiff, or his private affairs or concerns, or publicly disclosed private facts about Plaintiff, or placed Plaintiff in a false light before the public.

458. This conduct included, but was not limited to:
    a. Intrusion Upon Seclusion:
        i. Defendant Keith Bittner's extensive, documented history of using "AllTracker" and other spyware to covertly monitor and record his partners' phones and cameras, and his pattern of digital surveillance and intrusion. (Paras. 74-75)

        ii. DCSO Defendants' unlawful surveillance of Plaintiff between January 6-16, 2025, and acquisition of his non-public secondary phone number through unauthorized means. (Paras. 112, 320)
        iii. DCSO Defendants' unlawful search and seizure of Plaintiff's mobile phones and vehicle without a warrant, including the coerced passcode disclosure and physical seizure of devices. (Paras. 150-158)
        iv. Defendant Keith Bittner's use of covert cameras in the children's playroom to remotely monitor and punish R.C. (Para. 296a)
    b. Public Disclosure of Private Facts / False Light:
        i. Public dissemination of false and private information about Plaintiff (e.g., through social media posts accusing him of hacking, cyberstalking, domestic violence, mental instability). (Paras. 288, 248)
        ii. Defendant Erin Helleso's unauthorized and defamatory diagnoses of Plaintiff's mental health in a public report. (Paras. 253-254)

459. The intrusion or disclosure would be highly offensive to a reasonable person.

460. As a direct and proximate result of Defendants' invasion of privacy, Plaintiff suffered:
    a. Severe emotional distress, psychological harm, and mental anguish;
    b. Damage to his reputation, personal and professional;
    c. Loss of control over his private information;
    d. Interference with his family relationships and parental rights.

461. The actions of the Defendants were willful, wanton, malicious, and demonstrated reckless disregard for Plaintiff's rights, warranting punitive damages.

COUNT XIV: STATE LAW CLAIM – CHILD ENDANGERMENT (IOWA CODE § 726.6)

462. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

463. Defendants Kara Bittner, Keith Bittner, Shelby Caruso, Penny Scott, Randy Vodenik, and Deborah Vodenik, by their conduct as described herein, knowingly or recklessly committed acts that constitute child endangerment, in violation of Iowa Code Section 726.6.

464. This conduct included, but was not limited to:

a. Emotional Harm and Psychological Abuse:

i. Fabricating evidence and orchestrating false arrests that caused severe emotional harm to C.C. and R.C. (Paras. 131-134, 278)

ii. Parental alienation tactics, including undermining Plaintiff's parental role, consistently refusing to release children until the exact scheduled minute, and manipulating children's perceptions. (Paras. 62-66, 296b, 298-299, 308, 311)

iii. Humiliating punishment, excessive physical punishment, and psychological coercion. (Paras. 304-305, 309-311, 316, 318)

iv. Exposing children to surveillance (playroom camera) and remote punishment. (Para. 296a)

v. Neglecting emotional needs, such as refusing to explain Plaintiff's absence to R.C. (Para. 64)

b. Physical Endangerment and Neglect:

i. Exposing children to individuals with documented criminal histories, illicit activities (drug use), and unstable living environments. (Paras. 39-40, 44-46, 58, 271e)

ii. Exposing children to second-hand marijuana smoke ("hotboxing") in enclosed spaces. (Paras. 72, 271e)

iii. Deliberately destroying forensic evidence (hair and fingernails) to conceal drug exposure. (Para. 84)

iv. Reckless endangerment during custody exchanges, including forcing R.C. to walk unaccompanied across active gas pump lanes, vehicular assault, and physical assault in presence of child. (Paras. 280-281, 285, 286, 307, 314-315)

v. Unsafe vehicle restraints, including using a non-compliant booster seat and driving off before children are fully buckled. (Paras. 293, 306)

vi. Exposing children to domestic violence (Keith throwing cake pan at Kara) and animal abuse (Keith throwing dog). (Paras. 301-302)

vii. Confinement and restricted access to basic necessities (e.g., forbidding children from leaving bedroom/playroom). (Para. 300)

c. Educational Neglect: Deliberate school interference and failure to transport C.C. to school, creating false truancy allegations. (Paras. 292, 297, 299)

d. Knowing Failure to Intervene: Defendants Penny Scott, Randy Vodenik, and Deborah Vodenik, despite direct observation or notification of child endangerment (e.g., "hotboxing," Keith's child abuse history, Kara's drug use), continued to provide financial and emotional support, enabling the harmful environment. (Paras. 271, 272-275)

465. This conduct was committed with knowledge that it would cause injury, abuse, or endangerment to the children, or with reckless disregard for their well-being.

466. As a direct and proximate result of Defendants' child endangerment, C.C. and R.C. suffered severe emotional, psychological, and physical harm, and Plaintiff, as their parent, suffered severe emotional distress and financial harm in seeking to protect them.

467. The actions of the Defendants were willful, wanton, malicious, and demonstrated reckless disregard for the well-being of minor children, warranting punitive damages.

COUNT XV: STATE LAW CLAIM – VIOLATION OF IOWA OPEN RECORDS LAW (IOWA CODE § 22)

468. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

469. At all times relevant hereto, Defendant Dallas County Sheriff's Office and Defendant Rebecca Moser were acting in their official capacities as state actors.

470. Iowa Code Chapter 22 mandates that public records shall be made available for public examination and copying, subject to limited exceptions.

471. Defendant Rebecca Moser, acting in her official capacity as Administrative Clerk and Records Custodian for the DCSO, and other unnamed DCSO personnel, engaged in a systematic and deliberate pattern of obstructing Plaintiff's lawful access to public records, in direct violation of Iowa Code Chapter 22. (Paras. 329-335)

472. On or about November 30, 2025, Plaintiff submitted a comprehensive Open Records Request via certified mail to the DCSO, meticulously Detailing the records sought, including:
   a. All records related to Plaintiff's arrest on January 17, 2025 (interrogation videos, jail logs, phone seizure records).
   b. Complete personnel files for all involved officers.
   c. All incident and investigation records related to Defendant Keith Bittner and Defendant Kara Bittner from January 1, 2012, to present.
   d. All records related to specific investigations where Plaintiff was accused of harassment or hacking.
   e. All records related to Plaintiff's own complaints and evidence submissions. (Para. 330)

473. Despite this comprehensive and clearly articulated request, Defendant DCSO, through Defendant Rebecca Moser, deliberately obstructed access to these records by:
   a. Denying access to investigatory reports for five separate cases (2025-00000694, 2025-00000778, 2024-000014193, 2025-00000169, and Plaintiff's own reported incident on June 12, 2025), claiming false justifications like "ongoing investigations" (even for cases officially closed) or simply refusing access to a reporting party's own file. (Para. 331)
   b. Refusing to provide critical custodial records, disciplinary records for deputies, and video recordings of Plaintiff's interrogations. (Para. 332)
   c. Systematically ceasing communication with Plaintiff and refusing to answer questions regarding these denials, even after Plaintiff explicitly cited Iowa Code Chapter 22 violations. (Para. 333)

d. Ignoring multiple certified mail requests for records. (Paras. 239-240, 335)

474. This obstruction was undertaken with malicious intent to conceal misconduct, impede Plaintiff's civil rights claims, and hinder his access to justice, thereby violating Plaintiff's Fourteenth Amendment Right of Access to Courts and First Amendment Right to Petition for Redress of Grievances.

475. As a direct and proximate result of Defendants' violations of Iowa Code Chapter 22, Plaintiff suffered:
        a. Financial harm, including increased legal fees and costs of litigation;
        b. Deprivation of information essential to protect his rights and prepare his case;
        c. Interference with his ability to identify all responsible parties and seek legal redress.

COUNT XVI: STATE LAW CLAIM – PROFESSIONAL NEGLIGENCE / BREACH OF DUTY
(Erin Helleso & Candor Recovery & Counseling, Inc)

476. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

477. Defendant Erin Helleso was, at all times relevant hereto, a court-appointed custody evaluator and Licensed Independent Social Worker (LISW), acting within her professional capacity.

478. Defendant Candor Recovery & Counseling, Inc was, at all times relevant hereto, a business entity operating in Iowa providing counseling and evaluative services, and Defendant Erin Helleso was an employee, agent, or apparent agent thereof.

479. Defendant Erin Helleso owed Plaintiff a professional duty of care as a court-appointed custody evaluator, requiring impartiality, adherence to professional standards (including those for LISW licensure), and competency in conducting evaluations that directly impact fundamental parental rights.

480. Defendant Helleso breached this duty of care through her negligent and unprofessional conduct, including but not limited to:
        a. Exhibiting Clear Bias and Unprofessional Conduct:
                i. Openly displaying prejudiced views against "white males" on public social media, demonstrating a fundamental lack of impartiality. (Para. 248)
                ii. Refusing to return Plaintiff's phone calls or respond to email inquiries, creating deliberate communication barriers. (Para. 245)
                iii. Mischaracterizing Plaintiff's actions (e.g., office visit, accidental phone call) as harassment or boundary violations. (Paras. 246-247)
                iv. Demonstrating personal antagonism towards Plaintiff and his family, including disparaging Plaintiff's mother in her formal report. (Para. 260)

v. Refusing to recuse herself when confronted with extreme bias and threatening to call law enforcement on Plaintiff. (Para. 265)

b. Unauthorized Diagnostic Activity:

i. Exceeding the scope of her professional license as an LISW by making unauthorized diagnoses of complex psychological disorders (Autism Spectrum Disorder, Obsessive Compulsive Personality Disorder) for Plaintiff, his mother, and his children, without proper testing or qualification. (Paras. 253-254, 261)

ii. Weaponizing pseudoscientific diagnoses based on prejudicial stereotypes (e.g., pathologizing Plaintiff's sobriety as autism). (Para. 252)

c. Systematic Minimization of Defendant Kara Bittner's Issues:

i. Dismissing Defendant Kara Bittner's hedonistic past and documented issues (e.g., drug use, domestic violence, false allegations) as irrelevant or non-existent. (Paras. 244, 257)

ii. Making glaring omissions by stating "No observed concerns throughout this process on behalf of Kara are noted" despite overwhelming evidence to the contrary. (Para. 257)

d. Biased and Incomplete Investigation:

i. Failing to thoroughly investigate Defendant Keith Bittner, a key figure in the children's environment with a significant troubling history, despite Plaintiff's expressed concerns and Helleso's initial promise to run background checks. (Para. 259)

ii. Failing to thoroughly investigate Plaintiff's collateral contacts, dismissing positive input, and giving disproportionate weight to unsubstantiated anonymous allegations. (Paras. 258, 266)

e. Manipulation of Evidence and Testimony:

i. Using manipulative and leading questioning with minor children (e.g., R.C. in the shower incident) to manufacture false allegations against Plaintiff. (Para. 262)

ii. Mischaracterizing children's statements and drawings to fit a biased narrative against Plaintiff. (Paras. 263-264)

iii. Obstructing the legal process by submitting her report immediately prior to deadlines in an inaccessible format. (Para. 266)

iv. Making false testimony and unsubstantiated allegations based on anonymous sources at trial. (Paras. 266, 268)

481. Defendant Candor Recovery & Counseling, Inc is vicariously liable for the professional negligence of its agent/employee, Defendant Erin Helleso, under theories of respondeat superior, and is directly liable for inadequate supervision, training, and quality control of its employees, including Defendant Helleso, and for its role in the conspiracy to violate Plaintiff's civil rights.

482. As a direct and proximate result of Defendants' professional negligence and breach of duty, Plaintiff suffered:

a. Severe emotional distress, psychological harm, and mental anguish;

b. Increased legal fees and costs due to defending against a biased report;
c. Damage to his reputation and credibility in family court proceedings;
d. Interference with his fundamental parental rights.

483. The actions of Defendant Erin Helleso were willful, wanton, malicious, and demonstrated reckless disregard for Plaintiff's rights and professional standards, warranting punitive damages against her in her individual capacity.

COUNT XVII: STATE LAW CLAIM – PROFESSIONAL NEGLIGENCE / BREACH OF DUTY
(Erin Helleso & Candor Recovery & Counseling, Inc)

484. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

485. Defendant Erin Helleso was, at all times relevant hereto, a court-appointed custody evaluator and Licensed Independent Social Worker (LISW), acting within her professional capacity.

486. Defendant Candor Recovery & Counseling, Inc was, at all times relevant hereto, a business entity operating in Iowa providing counseling and evaluative services, and Defendant Erin Helleso was an employee, agent, or apparent agent thereof.

487. Defendant Erin Helleso owed Plaintiff a professional duty of care as a court-appointed custody evaluator, requiring impartiality, adherence to professional standards (including those for LISW licensure), and competency in conducting evaluations that directly impact fundamental parental rights.

488. Defendant Helleso breached this duty of care through her negligent and unprofessional conduct, including but not limited to:
a. Exhibiting Clear Bias and Unprofessional Conduct:
i. Openly displaying prejudiced views against "white males" on public social media, demonstrating a fundamental lack of impartiality. (Para. 248)
ii. Refusing to return Plaintiff's phone calls or respond to email inquiries, creating deliberate communication barriers. (Para. 245)
iii. Mischaracterizing Plaintiff's actions (e.g., office visit, accidental phone call) as harassment or boundary violations. (Paras. 246-247)
iv. Demonstrating personal antagonism towards Plaintiff and his family, including disparaging Plaintiff's mother in her formal report. (Para. 260)
v. Refusing to recuse herself when confronted with extreme bias and threatening to call law enforcement on Plaintiff. (Para. 265)
b. Unauthorized Diagnostic Activity:
i. Exceeding the scope of her professional license as an LISW by making unauthorized diagnoses of complex psychological disorders (Autism Spectrum

Disorder, Obsessive Compulsive Personality Disorder) for Plaintiff, his mother, and his children, without proper testing or qualification. (Paras. 253-254, 261)

ii. Weaponizing pseudoscientific diagnoses based on prejudicial stereotypes (e.g., pathologizing Plaintiff's sobriety as autism). (Para. 252)

c. Systematic Minimization of Defendant Kara Bittner's Issues:

i. Dismissing Defendant Kara Bittner's hedonistic past and documented issues (e.g., drug use, domestic violence, false allegations) as irrelevant or non-existent. (Paras. 244, 257)

ii. Making glaring omissions by stating "No observed concerns throughout this process on behalf of Kara are noted" despite overwhelming evidence to the contrary. (Para. 257)

d. Biased and Incomplete Investigation:

i. Failing to thoroughly investigate Defendant Keith Bittner, a key figure in the children's environment with a significant troubling history, despite Plaintiff's expressed concerns and Helleso's initial promise to run background checks. (Para. 259)

ii. Failing to thoroughly investigate Plaintiff's collateral contacts, dismissing positive input, and giving disproportionate weight to unsubstantiated anonymous allegations. (Paras. 258, 266)

e. Manipulation of Evidence and Testimony:

i. Using manipulative and leading questioning with minor children (e.g., R.C. in the shower incident) to manufacture false allegations against Plaintiff. (Para. 262)

ii. Mischaracterizing children's statements and drawings to fit a biased narrative against Plaintiff. (Paras. 263-264)

iii. Obstructing the legal process by submitting her report immediately prior to deadlines in an inaccessible format. (Para. 266)

iv. Making false testimony and unsubstantiated allegations based on anonymous sources at trial. (Paras. 266, 268)

489. Defendant Candor Recovery & Counseling, Inc is vicariously liable for the professional negligence of its agent/employee, Defendant Erin Helleso, under theories of respondeat superior, and is directly liable for inadequate supervision, training, and quality control of its employees, including Defendant Helleso, and for its role in the conspiracy to violate Plaintiff's civil rights.

490. As a direct and proximate result of Defendants' professional negligence and breach of duty, Plaintiff suffered:

a. Severe emotional distress, psychological harm, and mental anguish;

b. Increased legal fees and costs due to defending against a biased report;

c. Damage to his reputation and credibility in family court proceedings;

d. Interference with his fundamental parental rights.

491. The actions of Defendant Erin Helleso were willful, wanton, malicious, and demonstrated reckless disregard for Plaintiff's rights and professional standards, warranting punitive damages against her in her individual capacity.

COUNT XVIII: STATE LAW CLAIM – CHILD ENDANGERMENT (IOWA CODE § 726.6)

492. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

493. Defendants Kara Bittner, Keith Bittner, Shelby Caruso, Penny Scott, Randy Vodenik, and Deborah Vodenik, by their conduct as described herein, knowingly or recklessly committed acts that constitute child endangerment, in violation of Iowa Code Section 726.6.

494. This conduct included, but was not limited to:
    a. Emotional Harm and Psychological Abuse:
        i. Fabricating evidence and orchestrating false arrests that caused severe emotional harm to C.C. and R.C. (Paras. 131-134, 278)
        ii. Parental alienation tactics, including undermining Plaintiff's parental role, consistently refusing to release children until the exact scheduled minute, and manipulating children's perceptions. (Paras. 62-66, 296b, 298-299, 308, 311)
        iii. Humiliating punishment, excessive physical punishment, and psychological coercion. (Paras. 304-305, 309-311, 316, 318)
        iv. Exposing children to surveillance (playroom camera) and remote punishment. (Para. 296a)
        v. Neglecting emotional needs, such as refusing to explain Plaintiff's absence to R.C. (Para. 64)
    b. Physical Endangerment and Neglect:
        i. Exposing children to individuals with documented criminal histories, illicit activities (drug use), and unstable living environments. (Paras. 39-40, 44-46, 58, 271e)
        ii. Exposing children to second-hand marijuana smoke ("hotboxing") in enclosed spaces. (Paras. 72, 271e)
        iii. Deliberately destroying forensic evidence (hair and fingernails) to conceal drug exposure. (Para. 84)
        iv. Reckless endangerment during custody exchanges, including forcing R.C. to walk unaccompanied across active gas pump lanes, vehicular assault, and physical assault in presence of child. (Paras. 280-281, 285, 286, 307, 314-315)
        v. Unsafe vehicle restraints, including using a non-compliant booster seat and driving off before children are fully buckled. (Paras. 293, 306)
        vi. Exposing children to domestic violence (Keith throwing cake pan at Kara) and animal abuse (Keith throwing dog). (Paras. 301-302)
        vii. Confinement and restricted access to basic necessities (e.g., forbidding children from leaving bedroom/playroom). (Para. 300)

c. Educational Neglect: Deliberate school interference and failure to transport C.C. to school, creating false truancy allegations. (Paras. 292, 297, 299)

d. Knowing Failure to Intervene: Defendants Penny Scott, Randy Vodenik, and Deborah Vodenik, despite direct observation or notification of child endangerment (e.g., "hotboxing," Keith's child abuse history, Kara's drug use), continued to provide financial and emotional support, enabling the harmful environment. (Paras. 271, 272-275)

495. This conduct was committed with knowledge that it would cause injury, abuse, or endangerment to the children, or with reckless disregard for their well-being.

496. As a direct and proximate result of Defendants' child endangerment, C.C. and R.C. suffered severe emotional, psychological, and physical harm, and Plaintiff, as their parent, suffered severe emotional distress and financial harm in seeking to protect them.

497. The actions of the Defendants were willful, wanton, malicious, and demonstrated reckless disregard for the well-being of minor children, warranting punitive damages.

COUNT XIX: STATE LAW CLAIM – VIOLATION OF IOWA OPEN RECORDS LAW (IOWA CODE § 22)

498. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

499. At all times relevant hereto, Defendant Dallas County Sheriff's Office and Defendant Rebecca Moser were acting in their official capacities as state actors.

500. Iowa Code Chapter 22 mandates that public records shall be made available for public examination and copying, subject to limited exceptions.

501. Defendant Rebecca Moser, acting in her official capacity as Administrative Clerk and Records Custodian for the DCSO, and other unnamed DCSO personnel, engaged in a systematic and deliberate pattern of obstructing Plaintiff's lawful access to public records, in direct violation of Iowa Code Chapter 22. (Paras. 329-335)

502. On or about November 30, 2025, Plaintiff submitted a comprehensive Open Records Request via certified mail to the DCSO, meticulously Detailing the records sought, including:

a. All records related to Plaintiff's arrest on January 17, 2025 (interrogation videos, jail logs, phone seizure records).

b. Complete personnel files for all involved officers.

c. All incident and investigation records related to Defendant Keith Bittner and Defendant Kara Bittner from January 1, 2012, to present.

d. All records related to specific investigations where Plaintiff was accused of harassment or hacking.

e. All records related to Plaintiff's own complaints and evidence submissions. (Para. 330)

503. Despite this comprehensive and clearly articulated request, Defendant DCSO, through Defendant Rebecca Moser, deliberately obstructed access to these records by:

    a. Denying access to investigatory reports for five separate cases (2025-00000694, 2025-00000778, 2024-000014193, 2025-00000169, and Plaintiff's own reported incident on June 12, 2025), claiming false justifications like "ongoing investigations" (even for cases officially closed) or simply refusing access to a reporting party's own file. (Para. 331)

    b. Refusing to provide critical custodial records, disciplinary records for deputies, and video recordings of Plaintiff's interrogations. (Para. 332)

    c. Systematically ceasing communication with Plaintiff and refusing to answer questions regarding these denials, even after Plaintiff explicitly cited Iowa Code Chapter 22 violations. (Para. 333)

    d. Ignoring multiple certified mail requests for records. (Paras. 239-240, 335)

504. This obstruction was undertaken with malicious intent to conceal misconduct, impede Plaintiff's civil rights claims, and hinder his access to justice, thereby violating Plaintiff's Fourteenth Amendment Right of Access to Courts and First Amendment Right to Petition for Redress of Grievances.

505. As a direct and proximate result of Defendants' violations of Iowa Code Chapter 22, Plaintiff suffered:

    a. Financial harm, including increased legal fees and costs of litigation;

    b. Deprivation of information essential to protect his rights and prepare his case;

    c. Interference with his ability to identify all responsible parties and seek legal redress.

## COUNT XX: STATE LAW CLAIM – INTERFERENCE WITH CUSTODIAL RIGHTS (IOWA CODE § 710.12)

506. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

507. At all times relevant hereto, Plaintiff was the lawful custodian of C.C. and R.C., having sole legal custody and primary physical care, as affirmed on appeal.

508. Defendants Kara Bittner and Keith Bittner, individually and in concert, intentionally interfered with Plaintiff's lawful custody of C.C. and R.C. by:

    a. Withholding children from Plaintiff during his court-ordered custody time. (Para. 279)

    b. Deliberately concealing children's whereabouts and refusing to return them during scheduled exchanges. (Para. 279)

    c. Engaging in school-based interference, including instructing C.C. not to board the bus to Plaintiff's residence and creating false allegations of educational neglect. (Para. 282)

    d. Using fraudulent and manipulative tactics, such as unilaterally modifying a protection order provision, to create pretexts for custodial interference. (Para. 283)

e. Engaging in digital impersonation to circumvent court-ordered communication channels and interfere with Plaintiff's parenting app access. (Para. 284)
f. Physically obstructing custody exchanges and creating hazardous conditions to prevent Plaintiff from safely taking custody of the children. (Paras. 280-281, 307, 314)

509. These actions were taken without lawful authority and with the specific intent to deprive Plaintiff of his lawful custody rights.

510. As a direct and proximate result of Defendants' interference with custodial rights, Plaintiff suffered:
   a. Severe emotional distress, psychological harm, and mental anguish;
   b. Loss of parenting time and disruption to his fundamental parental relationship;
   c. Substantial legal fees and costs in seeking to enforce his custody rights;
   d. Damage to his reputation and credibility as a parent.

511. The actions of the Defendants were willful, wanton, malicious, and demonstrated reckless disregard for Plaintiff's rights and the well-being of the children, warranting punitive damages. These counts complete your state law claims section with comprehensive allegations properly cross-referenced to your earlier paragraphs. Each count establishes the legal elements, Details the defendants' conduct, and specifies the damages suffered.

## VI PRAYER FOR RELIEF AND JURY DEMAND

WHEREFORE, Plaintiff Theodore Clark respectfully prays for judgment against Defendants Dallas County Sheriff's Office, Dallas County, Iowa, Sheriff Adam Infante, Chief Deputy Bret Maxwell, Sgt. Nick Pearson, Sgt. Neil Vanderlust, Det. Adam Jacobs, Deputy Wyatt Westberg, Deputy Jalen Townsell, Deputy Deavon Richards, Unnamed Sgt. Badge #6 in 2025, Rebecca Moser, Iowa Division of Criminal Investigation, Agent Matthew Papin, Kara Bittner (f/k/a Kara Clark), Keith Bittner, Erin Helleso, Candor Recovery & Counseling, Inc, Jaclyn Zimmerman, George Millard, Beverly Derry, Deborah Vodenik, Randy Vodenik, Shelby Caruso, and Penny Scott, jointly and severally, as follows:

A. For a declaratory judgment that Defendants violated Plaintiff's rights under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, and applicable Iowa state laws.

B. For a permanent injunction prohibiting Defendants, and each of them, from continuing their unlawful conduct, including but not limited to harassing Plaintiff, his minor children C.C. and R.C., and his identified witnesses, interfering with Plaintiff's parental rights, interfering with the well-being of C.C. and R.C., and obstructing justice or any judicial proceeding.

C. For compensatory damages in an amount to be Determined at trial, including, but not limited to:

1. Economic Damages: Lost income and earning capacity, substantial legal fees and costs incurred in defending against fabricated criminal charges and in family law proceedings, costs associated with child protection and therapeutic services, and other verifiable financial losses directly resulting from Defendants' unlawful conduct.

2. Non-Economic Damages: Severe emotional distress, psychological harm, mental anguish, profound trauma, loss of liberty, damage to reputation, humiliation, and the disruption and interference with his fundamental parental relationship with his children, including lost family experiences and the inability to fully enjoy time with his children due to the injustices inflicted upon him.

D. For punitive damages in an amount to be Determined at trial, against the individual Defendants in their individual capacities and the Private Defendants, for their willful, wanton, malicious, and reckless disregard of Plaintiff's constitutional and statutory rights, including their fraudulent and coercive tactics.

E. For attorney's fees and costs of this action, pursuant to 42 U.S.C. Section 1988, Iowa Code Chapter 22.10, and other applicable law.

F. For an order imposing immediate and substantial sanctions, including but not limited to financial penalties and preclusion of arguments or evidence, against any Defendant who files frivolous, harassing, or time-wasting motions, or otherwise abuses the judicial process, particularly in light of Defendant Keith Bittner's documented history of such conduct, pursuant to Federal Rule of Civil Procedure 11 and the Court's inherent authority to manage its docket and prevent abuse of process.

G. For such other and further relief as this Court deems just and proper.

VII. DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.
Dated: February 1, 2026

Respectfully submitted,

Theodore Clark, Pro Se Plaintiff
1022 Adler CT
De Soto, IA 50069
515-414-6951
gt42rted@gmail.com

## DECLARATION OF CASEY GALLAGHER
## DIGITAL FORENSIC EXPERT

**Client:** Ted Clark
**Internal EDF Case Number:** 2026-1003-CFI
**Examiner:** Casey Gallagher
**Agency:** Elite Digital Forensics

### ABOUT THE EXAMINER

I am Casey Gallagher with Elite Digital Forensics. I am a former law enforcement digital forensic examiner with extensive experience investigating cyber-related matters. I have conducted forensic examinations on hundreds of computers and mobile devices and have provided expert testimony in legal proceedings. My experience includes computer forensics, mobile device forensics, server analysis, cloud account investigations, social media analysis, cyber investigations, spyware/malware investigations, Internet-of-Things device examinations, and the analysis of carrier call detail records and cellular tower data. I hold a master's-level certification in digital forensics, providing advanced training in both theoretical and practical forensic methodologies.

### EXECUTIVE SUMMARY

Elite Digital Forensics was retained to conduct a review of allegations made against Mr. Ted Clark involving claims of electronic surveillance, installation of monitoring software, and harassing communications. This report is based solely on materials provided by the client, technical research into mobile operating system security models, and official documentation published by the developer of the application referenced as AllTracker.

### SUMMARY OF ALLEGATIONS

The allegations assert that Mr. Ted Clark installed or utilized monitoring software identified as AllTracker on mobile devices belonging to Kara Clark and Keith Bittner. It is further alleged that this monitoring occurred from approximately August 2024 through January 2025. Additional allegations include claims of harassing or unwanted communications attributed to Mr. Clark.

### STATEMENTS REGARDING DEVICE ACCESS

Mr. Clark stated that he has not had physical access to Kara Clark's mobile device since approximately late 2021 and that he has never had physical access to Keith Bittner's mobile device. Mr. Clark further stated that he thinks both individuals used Android-based smartphones during the period of the alleged activity.

EXHIBIT A - Page 1 of 4

## REVIEW OF OFFICIAL ALLTRACKER DOCUMENTATION

As part of this forensic analysis, I reviewed official documentation published by the developer of the application commonly referred to as AllTracker. The developer's installation guides and product descriptions describe AllTracker as a monitoring or parental control application that must be installed directly on the device intended to be monitored.

According to the developer's documentation, installation requires downloading the application onto the target device and completing an initial setup process on that device. This setup process includes granting specific operating system permissions necessary for the application to function. These permissions include access to notifications, location data, accessibility services, and other device-level features. It does not allow it to be installed remotely on another individual's device without physical access or user interaction. All described installation methods require that the installer interact directly with the target device during setup. This is not possible based on Mr. Clark's statements that he has never had access to Keith Bittner's device and has not had access to Kara Clark's device since late 2021.

## ANDROID SECURITY AND PERMISSION MODEL

Modern Android devices operate under a permission-based security architecture. Applications are isolated within sandboxed environments and are prohibited from accessing sensitive system resources unless explicit permission is granted by the device user.

Since Android 6.0, permissions are granted at runtime. When an application requests access to sensitive data such as location, SMS messages, call logs, camera, microphone, or accessibility services, the operating system displays a visible on-screen prompt requiring the user to approve or deny the request. If permission is denied, the application cannot perform the requested function.

Android further provides persistent indicators and settings menus allowing users to review and revoke permissions. Monitoring or tracking applications relying on these permissions cannot operate covertly without triggering user-visible prompts or permission indicators.

## TECHNICAL IMPACT ON ALLEGED MONITORING ACTIVITY

Based on official AllTracker documentation and established Android operating system behavior, installation and use of monitoring software would require at least all of the following:

- Physical access to the target device during installation;
- Direct interaction with the device to accept installation prompts;
- Explicit approval of multiple permission dialogs displayed by the operating system.

The materials reviewed do not document that any such access or permission approvals occurred. No forensic artifacts from the alleged victim devices were provided demonstrating application installation, permission grants, usage logs, or system-level indicators consistent with monitoring software operation.

## COMMUNICATION-BASED ALLEGATIONS

Separate from spyware allegations, the materials include claims of harassing or unwanted communications attributed to Mr. Clark. These allegations are attribution-based and require technical validation through carrier call detail records, provider-certified SMS/MMS logs, or forensic examination of the devices involved.

No evidence was identified indicating that subpoenas were issued to cellular carriers to obtain authenticated call detail records or message routing logs. Without such records, authorship and message origination cannot be technically validated.

## FORENSIC CONCLUSIONS

Based solely on the materials reviewed, official application documentation, and established mobile security behavior:

- There is no documented evidence that Mr. Clark had physical access to the alleged victim devices during the alleged timeframe.
- Official AllTracker documentation requires local installation and permission granting on the target device.
- Android security architecture mandates visible user interaction and permission approval.
- No forensic evidence was provided demonstrating installation or operation of monitoring software.
- Communication attribution claims are unsupported by carrier or device-level forensic evidence.

Accordingly, the allegations reviewed are not supported by technical forensic evidence demonstrating device access, application installation, or validated message attribution.

- Based on the evidence reviewed, the allegations lack technical substantiation and forensic corroboration.
- No carrier subpoenas, platform records, or forensic extractions were produced to

validate the allegations.

• AllTracker's own documentation confirms installation requires direct device access and explicit user authorization.

• The alleged conduct is technically infeasible under standard Android security architecture without physical access and user-granted permissions.

• No evidence was provided showing Mr. Clark had physical access to any alleged victim device during the alleged surveillance timeframe.

• No forensic evidence was identified demonstrating that Mr. Clark installed or accessed surveillance software on any alleged victim device.

I, Casey Gallagher, declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief. This declaration is based upon my professional review, training, experience, and the evidence made available to me in connection with this matter.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this date.

Date: 01/30/2026

E-Signed: /s/ Casey Gallagher
Casey Gallagher
Elite Digital Forensics

EXHIBIT A- Page 4 of 4